HELLER, DRAPER, HAYDEN, PATRICK & HORN, LLC
Proposed Attorneys for the Debtors
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
(504) 299-3300

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Deborah W. Fallis, LA Bar No. 02177
dfallis@hellerdraper.com
Leslie A. Collins, LA Bar No. 14891
lcollins@hellerdraper.com
Kendra M. Goodman, LA Bar No. 32790
kgoodman@hellerdraper.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **CONGRESS SAND & GRAVEL, LLC** | § | Case No. 10-37522 |
| | § | |
| DEBTOR, | § | Chapter 11 |
| | § | |
| and | § | |
| | § | |
| **CONGRESS MATERIALS, LLC** | § | Case No. 10-37526 |
| | § | |
| DEBTOR. | § | Chapter 11 |
| | § | |

### EMERGENCY MOTION FOR JOINT ADMINISTRATION OF CASES

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Congress Sand & Gravel, LLC ("Congress Sand") and Congress Materials, LLC ("Congress Materials") (individually the "Debtor", together the "Debtors"), by and through their undersigned counsel, hereby move this Court (the "Motion") pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order, the

{00306463-6}

proposed form of which is attached hereto as **Exhibit "A,"** directing joint administration of the Debtors' respective estates. In support of this Motion, the Debtors respectfully submit as follows:

## JURISDICTION, VENUE AND PREDICATE FOR RELIEF REQUESTED

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion concerns the administration of the estates; and therefore, it is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The predicate for the relief requested herein is Rule 1015(b) of the Bankruptcy Rules.

## PROCEDURAL BACKGROUND

**A. Procedural History**

4. On the date of this Motion (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases (individually referred to as the "Case" and collectively referred to as the "Cases").

5. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

6. As of the date of this Motion, no official committee of unsecured creditors has been appointed.

7. Contemporaneously with filing this Motion, the Debtors filed their *Request for Emergency Consideration of Certain "First Day" Matters.*

**B. Company Background**

8. Congress Sand is a Texas limited liability company formed on June 5, 2009.

Chiron Equities, LLC is the sole member and manager of Congress Sand.

9. Congress Materials is a Delaware limited liability company that was formed on September 19, 2007. It is qualified to do business in Texas and Arizona. Congress Materials is a member managed limited liability company, with Chiron Equities, LLC being its sole member.

10. The majority of the assets of Congress Sand and Congress Materials are located in Navarro County and Garland and Arlington, Texas respectively. The daily books and records and operational management of the Debtors are housed in Bridgeport, Texas.

11. On August 17, 2010 Green Aggregates, Inc. ("Green Aggregates") merged into Congress Materials (the "Merger").

12. Green Aggregates was a Texas corporation that was formed on March 28, 2006. Green Aggregates, whose principal place of business was located at 1001 Fannin Street, Suite 4775, Houston, Texas, had filed an assumed name certificate with the Texas Secretary of State for the name "Congress Materials". In addition, Green Aggregates had also used the names "Cooke County Stone", "Garland GAI", and "Recycled Aggregates".

13. Green Aggregates had filed a petition for relief under the Bankruptcy Code on December 31, 2007. This case was assigned Case No. 07-53439-RBK ("2007 Case") in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division ("WD Court").

14. On September 29, 2008, Chiron Equities, LLC filed a Chapter 11 Plan of Reorganization ("Original Plan") in the 2007 Case, and on December 8, 2008, Chiron Equities, LLC filed a Modification to Proposed Plan of Reorganization ("Modified Plan", together with the Original Plan hereinafter collectively referred to as the "Plan"). The *Order Confirming Amended Plan of Reorganization for Green Aggregates, Inc. as Modified Under Chapter 11, Title 11, United States Code* ("Confirmation Order") was entered by the WD Court on December

31, 2008. The Plan as modified and confirmed by the Confirmation Order is hereinafter referred to herein as the "Confirmed Plan". The Confirmed Plan became effective on January 12, 2009 ("Effective Date"). Pursuant to the Confirmed Plan, all of the equity interest in Green Aggregates vested in Congress Materials on the Effective Date[1].

15. On July 8, 2010, Raymond W. Battaglia, the Chapter 11 Trustee ("Trustee") in the 2007 Case, and Oppenheimer, Blend, Harrison & Tate, Inc. ("OBHT"), the Trustee's counsel, filed their joint motion to enforce the WD Court's Orders allowing the final fee applications of the Trustee and OBHT, or alternatively to convert the 2007 Case to Chapter 7 ("Trustee/OBHT Motion").

16. On July 14, 2010, the United States of America, Internal Revenue Service ("IRS") filed in the 2007 Case its motion to enforce plan and/or confirmation order, or alternatively to convert the 2007 Case to Chapter 7 ("IRS Motion").

17. On July 23, 2010, Equity Bank, SSB ("Equity Bank") joined in the Trustee/OBHT Motion and the IRS Motion ("Equity Motion").

18. The Trustee/OBHT Motion, the IRS Motion, and the Equity Motion are currently set for hearing before the WD Court on November 10, 2010 at 2:00 P.M.

19. The Debtors have collectively been in business for over four (4) years. The Debtors are primarily engaged in the processing of construction aggregates used over a wide range of applications, including road construction, commercial construction, and ready mix concrete. The Debtors' principal customers are road paving companies, oil and gas companies (for drilling pad sites), utility contractors (for pipe bedding) and concrete product companies (for ready mix and other precast products). For the six months ending June 30, 2010 the

---

[1] The Confirmation Order modified Section 9.1 of the Plan to "… Clarify that the Reorganized debtor shall continue its corporate existence, with its stock wholly owned by Congress." See Page 5.

consolidated Debtors had revenue of just over $2.7 million.[2] The Debtors employ approximately forty-one (41) individuals, of which twenty-six (26) are employed by Congress Materials.

20. Congress Materials previously had a limestone quarry in Cooke County[3], Texas ("Quarry") where Congress Materials processed a blend of sandstone and limestone for road construction applications. The Quarry, taking into account debt service, was a negative cash flow operation. The problems at the Quarry can be attributed to several factors, including the poor resource quality and quantity at the Quarry, depressed market conditions, and an inferior location compared to local competitors. Because of the belief of Congress Materials that this operation was economically and financially unfeasible, Congress Materials discontinued operations at the Quarry in July of 2010.

21. The Debtors more profitable operations have been in the concrete recycling business[4] and the mining of sand and gravel[5].

22. Congress Materials purchases concrete rubble and discarded asphalt from demolition contractors at two of its locations, Mosier Valley (Arlington, TX) and Garland (Garland, TX). This rubbish material is subsequently re-processed into road base, utility stone, and foundation material. The asphalt waste is recycled and used by various road contractors and oil and gas companies for dust control. Margins are strong in this business and additional revenue is generated during the re-processing phase through the sale of steel re-bar that exists in the rubble. Steel re-bar is a commodity whose value has increased significantly over the past few months.

23. Jay Krasoff ("Krasoff") acts as the CEO of the Debtors on a daily basis.

---

[2] Of this amount, approximately $2.1 million is attributable to Green Aggregates and approximately $600,000 is attributable to Congress Sand.
[3] Prior to the Merger, Green Aggregates operated the Quarry.
[4] Congress Materials.
[5] Congress Sand.

## C. Events Leading to the Filing

24. Prior to the Effective Date:

    a. Congress Materials operated Green Aggregates in its Chapter 11 case under an agreement with the Chapter 11 Trustee, Raymond Battaglia; and

    b. Congress Materials made a DIP loan to Green Aggregates.

25. Congress Materials acquired all of the equity interest of Green Aggregates as part of the Confirmed Plan. Unfortunately for Congress Materials this acquisition was ill-timed and directly in the middle of a macroeconomic downturn, with the construction and building industry especially hard hit. While private sector work was materially affected by the downturn in the economic cycle, the Debtors grew sales to the public sector and had higher month over month sales from previous years. The Debtors secured sales from many local municipalities in the Dallas-Fort Worth market and also secured sales from two large, federally funded tollway projects in the Dallas area.

26. The increased sales to the public sector were offset by increased debt. Following the Effective Date, Congress Materials has incurred new debt in an amount in excess of $5 million. The primary reason for this new debt was the fact that the equipment, which comprised the vast majority of Green Aggregate's core equipment, was not reliable or efficient. After spending close to $1 million on repairs and deferred maintenance on this equipment, it was determined that this old equipment was not sustainable and that Green Aggregates could not be profitable operating in that fashion. Key components for success in the sort of businesses carried on by the Debtors are efficiency of operations and the ability to keep costs low. The use of the old equipment inherited from Green Aggregates prevented this from happening. Continuing to use that equipment would have been a futile exercise as repair bills were never ending, down time was very high, and efficiencies were very low. As a result

Green Aggregates was not very dependable to its customers. All of these things prevented the growth of Green Aggregates' business, impeding Green Aggregates' ability (a) to develop a reputation in the marketplace of being reliable, (b) to have finished inventory that would be conducive to sales, and (c) to lower its costs so that it would not price itself out of the market.

27. As noted above, the period following the Effective Date of the Confirmed Plan in the 2007 Case was additionally marked by continued failures in Green Aggregates equipment that had been utilized by Green Aggregates prior to the Effective Date. Congress Materials assumed that major equipment repairs would be completed prior to the Effective Date, however this was not the case and Congress Materials was instead immediately confronted with issues concerning inefficient and continually underperforming equipment at all of the prior Green Aggregates locations.

28. After the Effective date, Congress Materials and Equity Bank pursuant to the Confirmed Plan of Green Aggregates executed:

    a. The Assumption and Modification of Promissory Note (SBA) ("Assumption 1");

    b. The Assumption and Modification of Promissory Note (USDA) ("Assumption 2", together with Assumption 1 hereinafter collectively referred to herein as the "Assumptions").

Under the Assumptions, Congress Materials assumed all of the obligations of Green Aggregates to Equity Bank, and the terms of the two (2) notes held by Equity Bank were modified. These notes in a total amount of approximately $4.5 million are secured by a deed of trust filed on the leasehold that is the Quarry, and security interests in numerous pieces of older equipment that have very little market value.

29. In March of 2009, Congress Materials spent approximately $1.65 million to purchase four (4) new John Deere loaders to load customer trucks and "feed" the processing

plants. These pieces of equipment were all financed by John Deere Credit and personally guaranteed by Kyle Tauch ("Tauch").

30. Also in March of 2009, there were other failures in equipment secured by the Equity Bank notes. The crushing spread[6] at the Garland plant was constantly broken down, and the crusher and several conveyors needed to be replaced. At the Quarry, Green Aggregates and Congress Materials were also confronted with failures in the dump trucks that hauled material from the blast pits to the processing plant, and new haul trucks needed to be purchased, as well as properly performing conveyors. All of this failing equipment was the collateral for Equity Bank's notes. Bank of the Ozarks and Continental Bank made additional loans to Congress Materials to allow the purchase of these necessary pieces of equipment. The Bank of the Ozark's notes evidencing these loans were personally guaranteed by Tauch. The Continental Bank's notes evidencing these loans were personally guaranteed by Tauch and Krasoff.

31. In September 2009, again out of necessity, Congress Materials purchased another John Deere loader for approximately $425,000.00. This loader was financed by GE Capital Solutions and personally guaranteed by Tauch.

32. Congress Materials continued to sell the old and incapable equipment that were subject to Equity Bank's security interests, which sales were made in accordance with the terms of the Plan. Sections 5.4 and 5.5 of the Plan allowed Congress Materials to liquidate items of Equity's collateral, and use the funds to purchase equipment, repair/upgrade existing equipment, or purchase real property. However, Congress Materials was only able to sell such equipment at severely deflated prices, yielding less than 10% of its stated value as scheduled in the 2007 Case. For example, Congress Materials sold five (5) old loaders on March 3, 2009 at

---

[6] The crushing spread takes big rocks and makes them into small rocks. This is the crux of the operations at Garland.

a Richie Brothers auction. These loaders, which were carried on the books after the Effective Date for approximately $750,000.00, were sold by Richie Brothers for only $91,000. This was an orderly sale of equipment through a reputable equipment dealer. It was clear at this point that the value of collateral underpinning the $4.5 million Equity Bank notes were significantly overstated, and Congress Materials was deriving very little benefit from all of this debt. In July 2010, a large number of other equipment that was the subject of security interests in favor of Equity Bank was sent to a Richie Brothers auction. This equipment which had been on a collateral list for a total value of approximately $1,000,000.00 was sold for a net price of less than $60,000.00.

33. Congress Materials will not continue its lease of the Quarry in Cooke County due to the fact that it is substantially depleted within the existing lease parameters. Congress Materials did not have access to qualified studies when it originally made its investment in Green Aggregates, and has subsequently realized that the original resource studies were flawed. In the spring of 2010, Congress Materials hired independent engineers to drill core samples and produce geological studies and maps of remaining resources. These studies showed a significant variation from the original studies, and indicated an economically unfeasible operation. Over approximately the last twelve (12) months, Congress Materials operated the Quarry as a blending operation. Limestone was the target resource for the finished product being sold to the customers, however, the limestone at the Quarry is substantially depleted, and Congress Materials met customer needs by blending sandstone and limestone. The increased cost of having to blend the material exceeded the sales price, and exacerbated the cash flow issues at the Quarry.

34. Equity Bank claimed a $2.5 million valuation for the Quarry in the 2007 Case. The equipment located at the Quarry was claimed by Equity Bank to be valued at $2.0 million [totaling $4.5 million in debt assumed by Congress Materials]. While Equity Bank has raised

numerous flags as being the largest secured creditor of Congress Materials, they are the largest unsecured creditor of Congress Materials, as its unsecured debt totals approximately $4,000,000.00. The value of the remaining equipment subject to their security interest, if auctioned, would most likely not exceed $300,000.00 to $400,000.00. In the opinion of Congress Materials there is no value to the Cooke County Quarry lease.

35. In the early spring of 2010, there were severe breakdowns in the processing plant at the Mosier Valley location of Congress Materials, and a new crusher and conveyor belts had to be purchased for this plant. These items are currently in the process of being installed. These new pieces of machinery were purchased by Congress Recycled Aggregates LLC ("Congress Recycled"). Congress Recycled is an affiliate of Congress Materials as the sole member of each is Chiron Equities, LLC. Congress Recycled will lease this necessary equipment to Congress Materials at a below market rate. The rental payments will be the same payments that Congress Recycled is obligated to pay its lender who financed this purchase. These purchases were made by Congress Recycled because the credit necessary for these purchases could not be obtained by Congress Materials. However, this transaction was absolutely necessary because the Mosier Valley plant has an excellent order backlog, but due to the equipment failure was unable to deliver material timely and just as importantly, produce it at an economically feasible cost.

36. Congress Materials also operates a recycling facility in Garland, Texas. Garland is conveniently located as it is but twenty (20) miles northeast of the Dallas Central Business District. The operations in Garland include crushing and screening of demolished concrete and asphalt. This facility is leased from the City of Garland. The lease extends through 2017. The Garland facility is the preferred material supplier for the turnpike extension. The turnpike extension:

    a.    Is less than two (2) miles from the Garland facility;

  b.  Is a 9.9 mile extension;

  c.  Has a projected cost of $1 billion; and

  d.  Has a completion date of late 2011 and all phases are currently under construction.

The closest competitor to the Garland facility is fifteen (15) miles away, giving Congress a clear transportation advantage to the turnpike extension project. Historically, the operations at Garland have supplied a substantial amount of material for public utility work to the surrounding area. Strong relationships have been formed with local municipalities, which provide a stable baseline of sales despite the current macro-economic conditions.

  37.  Congress Sand's operations are in Keren, Texas, which is approximately sixty (60) miles southeast of Dallas. These operations primarily include the mining and processing of sand and gravel deposits. This facility, which is on 500 acres of land, is leased from the VCH Ranch. The lease expires on August 1, 2011. There is one (1) five (5) year renewal option. It is estimated that there are 7 million tons of economically feasible reserves, and based on current production with an estimated useful remaining life of fifteen (15) years. Congress Sand has leveraged strong customer relationships with major ready-mix companies to sell the majority of its materials into the South Dallas area. Congress Sand also focuses on supplying concrete sand to areas southwest of Dallas such as Midlothian and Waxahachie and east of Dallas to Tyler and Longview.

  38.  Congress Materials has been paying approximately $30,000.00 per month on account of the Equity Bank debt that is, as noted above, substantially unsecured. The $4.5 million Equity Bank debt had also caused total debt to EBIDTA ratios for Congress Materials to be in a range that any banking institution would consider to be overleveraged. This has been a negative factor for additional investment, whether the monies were coming from legacy investors, new investors, or debt lending institutions. The Debtors have been in discussions

with some of its other major lenders including Presidential Financial Corporation, Bank of the Ozarks, and Continental Bank regarding the treatment of the Debtors' secured debts, and believe an equitable solution can and will be worked out with these parties.

### D. Existing Capital Structure

39. The existing capital structure includes the working capital lender, Presidential Financial Corporation ("Presidential"), with approximately $1.6 million loaned in the form of a revolving asset-based accounts receivable and inventory line of credit. Chiron Equities, LLC and JK Air Investment Group ("JK Air"), both affiliates of the Debtors, have approximately $300,000 invested as a last-out-participation in the Presidential loan. Presidential has agreed to be the debtor-in-possession lender to the Debtors.

40. The remainder of the secured capital structure is comprised of eleven term lenders secured by various equipment and four equipment leasing contracts. Bank of the Ozarks, Continental Bank, Equity Bank, and Patriot Bank are the commercial banks within the capital structure. Continental Bank and Bank of the Ozarks are substantially collateralized on their term debt. The assets of Congress Sand were purchased from Union Materials, LP and certain specific equipment notes were assumed from Patriot Bank.

41. Chiron Equities, LLC is the holder of certain secured equipment notes resulting from loans made to Green Aggregates in the 2007 Case, defined below. Chiron Equities, LLC holds approximately $400,000 of debt on two different pieces of equipment used at the recycling plants. Bank of the Ozarks has a security interest in the debt of these two pieces of equipment.

42. Vendor notes include: John Deere Credit, Ford Motor Credit, Chrysler Finance, and US Bank. John Deere Credit is a legacy debt of Green Aggregates relating to two pieces of equipment purchased in 2007 and is approximately $120,000. The Debtors believe the note is

secured. Ford Motor Credit, Chrysler Finance, and US Bank in the aggregate total less than $100,000 and are secured by small work trucks.

43. There are two seller financed notes, both of which have 5 to 7 year amortizations. The City of Garland financed an equipment crusher, and the owner of Union Materials seller financed the acquisition of Union Materials. These notes are approximately $600,000 in total.

44. The Debtors have capitalized leases under lease finance arrangements with GE Capital Solutions, John Deere Credit, and Congress Recycled Aggregates, LLC. Congress Recycled is related to the Debtors and has purchased certain crushing equipment, loading equipment, conveyors, and motor graders for the Debtors within the last six months. The capitalized value of this equipment is approximately $500,000. These pieces of equipment are relatively new and are used in both the sand and gravel operation and the recycling operations of the Debtors. Congress Recycled has leased this equipment at below market to the Debtors. GE Capital Solutions has one bucket-loader leased to Congress Materials with a value and capitalized liability of approximately $400,000, and John Deere Credit has four loaders leased to Congress Materials with a value and remaining capitalized liability of approximately $1.3 million. The John Deere Credit and GE Capital financed equipment were purchased new in 2009.

45. The capital structure also includes approximately $800,000 in debt most of which was assumption from the legacy purchase of Green Aggregates; however, there are also newly accrued liabilities as a result of operations in 2009 and 2010.

46. The total capital structure includes approximately $2.5 million in original equity investment plus another $550,000 in loans and inter-company loans to the Debtors.

47. The entities debts and some of its lender are cross-collateralized and cross defaulted. In addition, the Debtors

  a. jointly bill;

  b. have some common employees;

  c. function as a single business enterprise.

## RELIEF REQUESTED

48. Pursuant to Bankruptcy Rule 1015(b), the Debtors request that this Court enter an order directing joint administration of the Cases for the following procedural purposes:

  a. One docket shall be maintained for the Debtors' Cases, under the case number assigned to Congress Sand & Gravel, LLC

  b. All pleadings, orders, and other papers filed shall be captioned *In re Congress Sand & Gravel, LLC, et al.,* Case No. 10-37522 (Jointly Administered).

  c. The Office of the U.S. Trustee (the "Trustee") should conduct joint informal meetings with the Debtors, as required, and a joint first meeting of creditors, if required.

  d. One plan and disclosure statement may be filed for all Cases by any plan proponent; however, substantive consolidation is not being requested at this time.

  e. Unless otherwise ordered by the Court, each Debtor will file separate Schedules of Assets and Liabilities and Statements of Financial Affairs, and as applicable, Lists of Equity Security Holders.

  f. Proofs of claim filed by creditors of any Debtor shall reflect the caption and case number of the Debtor to which the claim relates and in whose case such claim is to be filed.

  g. A separate claims register shall be maintained for each Debtor.

## BASIS FOR RELIEF REQUESTED

49. Bankruptcy Rule 1015(b) provides, in relevant part, that: "[i]f . . . two or more petitions are pending in the same court by or against . . . a debtor and an affiliate, the court may order a joint administration of the estates of such debtor and its affiliates. Fed. R. Bank. P. 1015(b).

50. Congress Materials is an affiliate of Congress Sand. Since Congress Sand has

the lowest-numbered case, the Debtors request joint administration under that case number. *See* N.D. Tex. L.B.R. 1015-1.

51. The Debtors are "affiliates," under Bankruptcy Code § 101(2). See 11 U.S.C. § 101(2). Therefore, joint administration of the Debtors' Cases is appropriate under Bankruptcy Rule 1015(b). Further, joint administration of the Debtors' estates will be less costly and burdensome than the separate administration of the estates. For example, joint administration will permit the use of a single, general docket for the Debtors' Cases and combined notices to creditors and other parties in interest of the Debtors' respective estates. The Debtors believe it is likely that numerous filings and additional matters, including notices, applications, motions, orders, hearings and other proceedings will be made, issued or convened in these Cases. Many of these will affect both of the Debtors. Joint administration will protect parties in interest by ensuring that parties affected by each of the Debtors' respective Cases will be apprised of the various matters before the Court in those Cases.

52. Joint administration of the Debtors' estates will also avoid repetitive, duplicative, and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be filed and served in the Debtors' Cases, and (b) file documents in only one of the Debtors' Cases rather than in two Cases.

53. Moreover, joint supervision of the administrative aspects of the Cases by the Office of the United States Trustee and the Court will be simplified. As such, joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their respective creditors, the Office of the United States Trustee, and the Court.

54. The rights of the respective creditors of each of the estates will not be prejudiced by the joint administration of the Cases because the relief sought is purely procedural and is not intended to affect substantive rights. Each creditor will be entitled to file a proof of claim against the particular estate in which it allegedly has a claim or right and will retain whatever claims or rights it has against that particular estate. Further, all schedules of assets and liabilities and statements of financial affairs will be captioned and filed separately in each of the Cases, as appropriate.

55. The Debtors propose that the Court establish the following official caption to be used by all parties in all pleadings in the Debtors' jointly administered Cases, except as otherwise specifically provided herein:

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § § § | |
| **CONGRESS SAND & GRAVEL, LLC,** *et al*[7]. | § § | Case No. 10-37522 |
| **DEBTORS.** | § § | Chapter 11 (Joint Administration Requested) |

56. The Debtors submit that all parties' use of the simplified caption designated above will eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification.

57. The Debtors also seek this Court's direction that a notation substantially similar to the following be entered on the docket of each of the Debtors' Cases to reflect the joint administration of these Cases:

> An Order has been entered in this case consolidating this case with the case of Congress Sand & Gravel, LLC, *et al.,* Case No. 10-37522 for procedural purposes only and providing for its joint administration in accordance with the terms of such Order. The

---

[7] The Debtors include Congress Sand & Gravel, LLC and Congress Materials, LLC (Case No. 10-37526).

{00306463-6}   16

docket in Case No. 10-_____ should be consulted for all matters affecting this case.

58.  No administrative or scheduling orders previously entered in the Cases will require modification if this Motion is granted. Mailing lists in each of the Cases will be consolidated for future noticing requirements.

59.  No prior motion for the relief requested herein has been made to this or any other Court.

## NOTICE

60.  Notice of this pleading has been provided by e-mail, facsimile, or overnight delivery to: (a) the Debtors; (b) counsel for the Debtors; (c) any official committees appointed in the case and their respective counsel; (d) the Office of United States Trustee; (e) any secured creditors and their respective counsel; (f) the top 20 largest unsecured creditors of each of the Debtors until any official committee for unsecured creditors is formed; (g) the Internal Revenue Service; (h) Texas Workforce Commission; (i) United States Attorney; (j) Attorney General of the United States; (k) Texas Attorney General's Office; (l) Dallas County Tax Assessor-Collector; (m) State Comptroller of Public Accounts; and (n) all parties who request notices pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## PRAYER

The Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto as **Exhibit "A",** granting the relief requested herein. The Debtors also request such other and further relief to which they may be justly entitled.

Dated:  October 28, 2010                              Respectfully submitted,


                                                                      */s/ Douglas. S. Draper*_____
                                                                      Douglas S. Draper, La. Bar No. 5073

Deborah W. Fallis, La. Bar No. 02177
Leslie A. Collins, La. Bar No. 14891
Kendra M. Goodman, La. Bar No. 32790
Heller, Draper, Hayden, Patrick & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103
Telephone: 504.299.3300/Fax: 504.299.3399
ddraper@hellerdraper.com
dfallis@hellerdraper.com
lcollins@hellerdraper.com
kgoodman@hellerdraper.com

and

James C. Gordon, Texas Bar No. 08200300
Gordon, Sykes & Cheatham, LLP
1320 S. University Dr., Ste. 806
Fort Worth, Texas 76107
Telephone: 817.338.0724/Fax:817.338.0769
jgordon@gordonsykes.com

Proposed Counsel for
Congress Sand & Gravel, LLC and
Congress Materials, LLC

## **NOTICE ANNEX**

Pursuant to 11 U.S.C. § 342, the following sets forth the name, addresses and last four digits of the tax identification number for each of the referenced Debtors:

| DEBTORS AND ADDRESSES | CASE NO. | TAX I.D. NO. |
|---|---|---|
| Congress Sand & Gravel, LLC<br>14099 Ne Country Road 3180<br>Kerens, TX 75144 | 10-37522 | xx-xxx2409 |
| Congress Materials, LLC<br>1401 Cates Street<br>Suite 201<br>Bridgeport, TX 76426 | 10-37526 | xx-xxx5603 |

**CERTIFICATE OF CONFERENCE**

I, the undersigned counsel for Congress Sand & Gravel, LLC and Congress Materials, LLC, do hereby certify that counsel for Presidential Financial Corporation has consented to the relief requested in the Motion attached hereto. Because of the expedited filing of this Motion, it was impracticable for the Debtors to attempt to obtain consent from any other party which may have an interest in the relief requested herein.

                                                       */s/ Douglas S. Draper*
                                                      Douglas S. Draper, Esq.