HELLER, DRAPER, HAYDEN, PATRICK & HORN, LLC
Proposed Attorneys for the Debtors
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
(504) 299-3300

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Deborah W. Fallis, LA Bar No. 02177
dfallis@hellerdraper.com
Leslie A. Collins, LA Bar No. 14891
lcollins@hellerdraper.com
Kendra M. Goodman, LA Bar No. 32790
kgoodman@hellerdraper.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **CONGRESS SAND & GRAVEL, LLC,** *et al*[1]. | § | **Case No. 10-37522** |
| | § | |
| **DEBTORS.** | § | **Chapter 11** |
| | § | **(Joint Administration Requested)** |

**EMERGENCY MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363,**
**364(c)(1), (2) & (3), 364(d)(1) AND 364(e), FED. R. BANKR. P. 2002, 4001, AND**
**9014, AND THE COURT'S GENERAL ORDERS ON COMPLEX CHAPTER 11**
**CASES: (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION**
**FINANCING ON SUPERPRIORITY AND SECURED BASIS, (II) AUTHORIZING**
**THE USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION,**
**(IV) MODIFYING THE AUTOMATIC STAY, (V) GRANTING INTERIM RELIEF,**
**AND (VI) APPROVING THE FORM AND MATTER OF NOTICE AND**
**SCHEDULING A FINAL HEARING UNDER FED. R. BANKR. P. 4001(c)**

Congress Sand & Gravel, LLC ("Congress Sand") and Congress Materials, LLC

("Congress Materials") as debtors and debtors-in-possession (individually the "Debtor", together

the "Debtors"), by and through their undersigned attorneys, hereby request the entry of an

emergency interim order (the "Interim Order"), substantially similar to the order attached hereto

as Exhibit "A", and a final order (the "Final Order"; together with the Interim Order, the

---

[1] The Debtors include Congress Sand & Gravel, LLC and Congress Materials, LLC (Case No. 10-37526).

"Orders") pursuant to §§105(a), 363 and 364 of the Bankruptcy Code and Fed. R. Bank. P. 2002, 4001(c) and 9014 authorizing the Debtors to use cash collateral, as that term is defined in 11 U.S.C. § 363 (the "Cash Collateral") and incur post-petition financing as set forth herein (the "Financing Motion" or the "Motion"). In support of the Motion, the Debtors respectfully represent as follows:

### CONCISE STATEMENT OF RELIEF REQUESTED PURSUANT TO RULE 4001(c)

1. Debtors seek authority to enter into debtor-in-possession financing (the "DIP Facility" or "DIP Financing")[2] and use of cash collateral with Presidential Financial Corporation ('Presidential" or "DIP Lender") as described below.

2. The DIP Lender is willing to advance funds to the Debtors on the terms and conditions set forth in the proposed order in order to provide funds to the Debtors to assist in their restructuring efforts. Debtors are unable to obtain funds that are more favorable to the proposed DIP Facility.

3. The DIP Facility is an important part of the Debtors' restructuring, and will give the Debtors the funding needed to restructure their operations and save jobs for their employees.

4. The terms of the DIP Facility are straightforward, and are summarized as follows:[3]

 a) Borrowers: Congress Sand & Gravel, LLC and Congress Materials, LLC, as debtors in possession;

 b) DIP Lender: Presidential Financial Corporation;

---

[2] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Debtor in Possession Loan Agreement (the "DIP Loan Agreement"), attached hereto as Exhibit "B"

[3] The following description of the terms of the DIP Financing is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof. For a complete description of the terms and conditions of the DIP Financing, reference should be made to the proposed Interim Order and the DIP Loan Agreement attached hereto as Exhibits "A and B" and the Attorney Checklist. This summary is qualified in its entirety by reference to such documents. In the event of any conflict or inconsistency between the provisions of this Motion and the DIP Documents (defined in paragraph 20 below), the DIP Documents shall control in all respects.

c) The DIP Facility / Availability: The outstanding balance on all monetary Obligations will not exceed the Maximum Loan Amount of $1,750,000.00 (however the Debtors and Presidential have contemplated raising the Maximum Loan Amount to $1,900,000.00 by agreement, but in Presidential's sole discretion) including the funded Last-Out Participation by Chiron Equities, LLC, an insider of the Debtor ("Chiron") and including the funded Additional Participation. Availability means, on any date, an amount equal to:

   i. the Eligible Accounts on such date multiplied by the Accounts Advance Rate (85%);

**plus**

   ii. the Eligible Inventory on such date multiplied by the Inventory Advance Rate, provided, however, the portion of Availability with respect to Eligible Inventory shall be limited to the lesser of (a) the Maximum Inventory Loan or (b) the outstanding Advances against Eligible Accounts;

**plus**

   iii. the amount of the funded Last-Out Participation;

**plus**

   iv. the amount of the funded Additional Participation (if any);

**minus**

   v. all Reserves which Lender has established pursuant to Section 1.2 of the DIP Loan Agreement (including any to be established in connection with the requested Advance);

**minus**

   vi. the outstanding balance of all monetary Post-Petition Obligations on such date;

**minus**

   vii. The outstanding balance of the Pre-Petition Debt.

(DIP Loan Agreement Section 1.1);

d) Purpose: Principally short-term working capital and generally assist in restructuring efforts;

e) Financial Terms: Principal and interest shall be paid in accordance with the promissory note executed contemporaneously with the DIP Loan Agreement (DIP Loan Agreement Section 3.1);

f) Fees:  A list of fees is attached as Schedule B to the DIP Loan Agreement (DIP Loan Agreement Section 3.2 and Schedule B). Presidential is receiving a $25,000.00 DIP facility fee;

g) Maturity/Term: The DIP Loan Agreement is effective when executed by the Debtors and accepted by Presidential in the state of Georgia and approved by the Interim DIP order (the "Effective Date'), and continues until (i) the earliest of (aa) the twelve (12) month anniversary of the Effective Date, (bb) 30 days after the commencement of the Chapter 11 Case, if at such time there is no Final Order, (cc) the confirmation and substantial consummation of a plan of reorganization that is confirmed by an order of the Court (or any other court that may have jurisdiction in the Chapter 11 Case) as to which no stay has been entered and no appeal has been timely filed, and which has not been vacated, modified or reversed, or (ii) (aa) Debtors may terminate the DIP Loan Agreement at any time prior to the Termination Date by giving Presidential at least thirty (30) days notice in writing; or (bb) Presidential may terminate by giving the Debtors forty-five (45) days written notice or may terminate immediately without prior notice to the Debtors at any time an Event of Default exists.(DIP Loan Agreement Section 10.1-10.2).

h) Documentation: Documentation consisting of the proposed Interim Order and the DIP Loan Agreement are attached hereto as Exhibits "A and B";

i) Carve-Out: Proceeds of the Collateral and the DIP Loans used to pay (a) accrued and unpaid fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), (b) fees payable to the Clerk of the Bankruptcy Court, or any agent thereof, (c) $50,000 for the benefit of Debtors' counsel, and (d) $50,000 for the benefit of Debtors' counsel after payment in full of Obligations owing to Presidential as a lender under the DIP Loan Agreement but before payment of any of the Chiron Participation;

j) Collateral: All assets and interests of the Debtors, whether tangible or intangible, now owned or in existence or hereafter acquired or arising, and wherever located, including but not limited to the property listed in DIP Loan Agreement Section 4.1 (DIP Loan Agreement Section 4.1). Collateral means all property and interests in property in or upon which a Lien is granted pursuant to the DIP Loan Agreement or the other Loan Documents. The Collateral does not include Proceeds of avoidance actions created under Chapter 5 of the Bankruptcy Code (DIP Loan Agreement Schedule A);

k) Priority and Liens: The liens and security interests granted pursuant to the terms of the DIP Loan Agreement and the other DIP Loan Documents, and the

liens and security interests conferred upon Lender pursuant of the DIP Orders, shall constitute:

i.  pursuant to Section 364(c)(1) of the Bankruptcy Code, a "super-priority" administrative expense claim except to the extent of, and up to, the Carve-Out,

ii.  pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority lien upon or security interest in all of the Collateral that is not otherwise encumbered by a validly perfected security interest or lien in existence on the Petition Date that has not been primed;

iii.  pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming lien on all pre-petition and post-petition accounts, inventory, and all proceeds thereof; and

iv.  pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior priority lien upon or security interest in all of the Collateral that is subject to a validly perfected and unavoidable Permitted Encumbrance in existence at the time of the commencement of the Chapter 11 Cases or in existence at the time of such commencement that is perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, in each case, only to the extent the Permitted Encumbrance is not otherwise primed as set forth in clause (v) below; and

v.  pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming lien on all of the property of the Debtors, subject only to valid and unavoidable Permitted Encumbrances that are is existence on the Petition Date and that under applicable law are senior to and have not been subordinated to the liens and security interests of Presidential in connection with the Pre-Petition Loan Agreement.. Except as expressly provided in the DIP Orders, no expenses, costs or charges in connection with the Chapter 11 Case shall be charged against the Collateral or Lender under Section 506(c) of the Bankruptcy Code, and the Borrowers hereby waive any rights they have to seek such charges under Section 506(c) of the Bankruptcy Code. (DIP Loan Agreement Section 4.2(b))

l)  Perfection:  The liens and security interests and priority granted to the liens and security interests in favor of Presidential pursuant to the Interim Order and under the DIP Loan Agreement are perfected by operation of law upon execution of the Interim Order by the Court, without the need to file any UCC-1, financing statement, mortgage, or any other document, or take any other action (DIP Loan Agreement Section 4.2(a));

m) Covenants: Affirmative and Negative Covenants are described in Section 7 of the DIP Loan Agreement;

n) Funding Conditions: Satisfaction of or waiver in writing by Presidential of the following conditions precedent, as more fully described in Section 2 of the DIP Loan Agreement: (i) Resolutions, including those of the board of directors or managers of each Debtor authorizing the execution, delivery, and performance of the DIP Loan Documents to be executed by each Debtor, certified by the Secretary or Assistant Secretary (or other authorized officer or agent) of each Debtor, together with a certificate of such Secretary or Assistant Secretary (or other authorized officer or agent) as to the incumbency and signature of the officer(s) (or other authorized agent) executing the DIP Loan Documents; (ii) Officer's Certificate; (iii) Disbursement Authorizations (d) the absence of certain Legal Restraints/Litigation which could have a Material Adverse Effect; (iv) DIP Loan Documents executed and delivered; (v) Payment of Fees by Debtors or provision for such payment made; (vi) (aa) Presidential shall have received such information (financial or otherwise) as requested from the Debtors, (bb) discussed the Budget with officers and representatives of the Debtors, and (cc) given its written approval of the Budget, attached to the DIP Loan Agreement; (vii) Guarantees executed; (viii) the Interim Order shall have been entered by the Court, be in full force and effect, and not have been vacated, reversed, modified (other than with the written consent of Lender), appealed or stayed in any respect; (ix) all of the "first day orders" entered by the Court at the time of the Chapter 11 Case shall be in form and substance satisfactory to Presidential; (x) the Court shall issue a written approval of the DIP Loan Agreement; (xi) all requisite corporate and legal action shall have been taken in connection with the DIP Loan Agreement and DIP Loan Documents; (xii) all other documents and legal matters contemplated by the DIP Loan Agreement have been delivered, executed, or recorded (DIP Loan Agreement Section 2.1).

In addition, the following conditions subsequent must be performed, time being of the essence: (i) JK Air Investment Group, LLC ("JK Air") and Chiron, both affiliates of the Debtors, shall fund the Last-Out Participation (ii) the Debtors will deliver to Presidential within fifteen (15) days of the Closing Date, consents from the lessors and fully executed leasehold mortgages granting Lender a first priority lien against Borrowers' leasehold interest in (aa) that certain Commercial Lease Agreement (as amended from time to time, the "Garland Lease"), effective as of September 18, 2007, by and between the City of Garland, Texas, a Texas municipal corporation, as lessor, and Garland GAI, Inc., a Texas corporation, as lessee; and (bb) that certain Lease Agreement (as amended from time to time, the "Recycled Lease"), effective September 1, 2001, by and between J & W Sand & Gravel, Inc., a Texas corporation, as lessor, and Recycled Aggregates, Inc., a Texas corporation, as lessee, in form and substance satisfactory to Lender in its sole discretion; and (iii) all reports and certificates provided by Debtors related to the DIP Loan Agreement shall be certified by Jay Krasoff or other authorized

signer or officer approved by Presidential after the date of the DIP Loan Agreement;

(o) Events of Default: Include: (i) failure to comply with the Conditions Subsequent described paragraph 4(n) above; (ii) failure to pay any of the Obligations on the date due thereof; (iii) any representation, warranty, or other statement made to Lender by or on behalf of Borrowers which is false or misleading in any material respect; (iv) Failure or neglect to perform, keep or observe any covenant in the DIP Loan Agreement or other DIP Loan Documents; (v) any Material Adverse Change; (vi) any Obligor revokes or attempts to revoke or terminate, or fail to confirm Obligor's liability under, any guaranty to which any Obligor is a party; (vii) the transfer by the present shareholders or members of any Borrower to any other person or entity of any or all of the common stock or other ownership interests of such Borrower outstanding or in treasury as of the date of the DIP Loan Agreement without prior written consent of Lender, or that in the event of any transfer by operation of law, such Borrower fails to immediately notify Lender; (viii) any merger and/or acquisition by any Borrower without prior approval of Lender, which shall not be unreasonably withheld; (ix) any instruction or agreement regarding the Remittance Address and procedures related thereto is amended or terminated without written consent of Lender, or if a Borrower fails, within two (2) Business Days of receipt, to forward Collections it receives with respect to any Accounts to the Remittance Address; (x) any default under any other agreement or arrangement between Borrower and Lender; (xi) any guarantor of any of the Collateral shall revoke or attempt to revoke, or shall dispute, such guaranty of any of the Obligations; (xii) any failure of any Obligor to furnish current financial information to Lender upon written request; (xiii) any failure of any Obligor or any pledgor of any security interest in the Collateral to observe or perform any agreement, covenant, or promise contained in any agreement, instrument, or certificate executed in connection with the granting of the security interest in any Collateral to secure the Obligations; (xiv) any loss, theft, substantial damage, destruction, sale foreclosure of or encumbrance to any Collateral, or the making of any levy, seizure, or attachment thereof or thereon or the rendering of any judgment or lien or garnishment or attachment against any Obligor or its property, whether actual or threatened; (xv) the death, dissolution, termination of existence, appointment of receiver of any part of the property of, assignment for the benefit of creditors by Borrower or any Obligor; (xvi) any discontinuance or termination of any guaranty of any of the Obligations by a guarantor; (xvii) any amendment or termination of a financing statement naming any Borrower as debtor and the Lender as secured party, or any corrective statement with respect thereto, is filed without prior written consent of the Lender; (xviii) if the Collateral declines in value or becomes insufficient in Lender's sole and exclusive judgment to secure the repayment of the Obligations, and Borrowers, after demand, fail or refuse to substitute and/or make additions to the Collateral, or pay down the Obligations satisfactory to the Lender; (xix) Lender deems itself insecure as to the ability of Borrowers to repay the

Obligations, or as to the sufficiency of the Collateral; (xx) the bringing of a motion by any Borrower in the Chapter 11 Case to obtain additional financing from a party other than Lender under Section 364(d) of the Bankruptcy Code, unless the proceeds from such financing are used to immediately repay in cash all Obligations under the DIP Loan Agreement, or to use cash collateral of Lender under 363(c) of the Bankruptcy Code without the express consent of Lender; (xxi) a trustee or a responsible officer or examiner with expanded powers is appointed in the Chapter 11 Case (beyond the powers set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; the Borrowers file a motion which would alter, amend, vacate, supplement, modify, or reconsider, in any respect, any DIP Order or, without Lender's prior written consent, the Court shall enter an order terminating Borrowers' right to use cash collateral under Section 363 of the Bankruptcy Code; the Court grants a super-priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code to a person or entity other than the Lender; or Borrowers challenge the validity, extent, priority, or enforceability of any of the Pre-Petition Loan Documents or the Pre-Petition Debt; (xxii) dismissal of the Chapter 11 Case or conversion to a case under Chapter 7 of the Bankruptcy Code; (xxiii) the entry of an Order by the Court granting relief from or modifying the Automatic Stay (aa) to allow a creditor other then Lender to execute upon or enforce a lien or security interest in any Collateral, or (bb) with respect to any lien or security interest of or to permit the granting of a lien or security interest on any Collateral to any state, local, environmental or regulatory agency or authority; (xxiv) commencement of a suit or action against Lender that asserts, by or at the direction of Borrowers, any claim or legal or equitable remedy that seeks avoidance or subordination of the Post-Petition claim or Post-Petition lien or security interest of Lender; (xxv) any modification of the Court's DIP Order authorizing Borrowers to execute the DIP Loan Agreement or other DIP Loan Documents without consent of Lender; (xxvi) a Borrower or any other party proposing any sale of Collateral (pursuant to 11 U.S.C. § 363, a plan of reorganization, or otherwise) that seeks to limit or prohibit the Lender from credit bidding the Obligations or the Pre-Petition Debt; (xxvii) a Borrower shall make any payment of account of indebtedness, or on account of any interest, principal, premium or otherwise, or the Borrower shall make any other disbursement, except (aa) as expressly permitted by the DIP Loan Agreement or the DIP Orders, or (bb) as set forth in the Budget (subject to such variances as may be permitted under the DIP Orders); or (xxviii) any covenant, agreement or obligation of Borrowers contained in or evidenced by any of the DIP Loan Documents or Pre-Petition Loan Documents shall cease to be enforceable or shall be determined by a court of competent jurisdiction to be unenforceable in accordance with its terms or any Borrower shall file a pleading with the Court asserting same; Borrowers shall deny or disaffirm their obligations under any of the DIP Loan Documents or liens granted in connection therewith or ratified or reaffirmed thereby; or any liens in any of the Collateral granted under or ratified or reaffirmed by the DIP Loan Documents shall be

determined by a court of competent jurisdiction to be voidable, invalid, unperfected, subordinated, or not given the priority contemplated by the DIP Loan Agreement. (DIP Loan Agreement Section 8.1).

p) Use of Proceeds: In accordance with the DIP Orders, the proceeds of the Advances shall be used solely for one or more of the following purposes and then only in accordance with the Budget: (i) to pay the fees and transaction expenses associated with the closing of the transactions described herein, including payment of professionals' fees and expenses incurred by Borrowers in the Chapter 11 Case, allowable interest with respect to Pre-Petition Debt and other Pre-Petition Liabilities to the extent, if any, authorized by the DIP Orders; (ii) to pay any of the Obligations; and (iii) to make expenditures for other lawful corporate purposes of Borrowers to the extent such expenditures are not prohibited by this Agreement or Applicable Law. In no event may any Loan proceeds of an Advance, any Collateral proceeds or any amounts paid from the Carve-Out Reserve be used by any Borrower to purchase or to carry, or to reduce, retire or refinance any indebtedness incurred to purchase or carry, any margin stock or for any related purpose or be used to pay any fees and expenses incurred in (i) seeking to avoid, invalidate, subordinate, or otherwise impair any Pre-Petition or Post-Petition claims of Lender, (ii) seeking to recover on any claims against or transfers made to Lender, or (iii) seeking to prevent, hinder or delay Lender from enforcing or realizing upon any of the Collateral.

q) Other Provisions: The Interim Order and the attached DIP Credit Agreement provide for such other terms as are customary for transactions of this kind, all as more fully set forth therein.

r) Adequate Protection: The liens and security interests described above in paragraph 4(k) shall serve as adequate protection to Presidential.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of Debtors' chapter 11 cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is Bankruptcy Code §§ 105, 361, 362, 363(c), 364(c)(1)-(3), 364(d), and 364(e), in addition to Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND[4]

6.      On October 28, 2010 (the "Petition Date"), the Debtors each filed for relief under chapter 11 of the Bankruptcy Code.  The Debtors intend to continue to operate their businesses and manage their properties as debtors in possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code. As of the date of this Motion, no request has been made for the appointment of a trustee or examiner, and no official committee of unsecured creditors has been appointed

7.      On the Petition Date, the Debtors requested that the Court enter an order directing the Debtors' chapter 11 cases be jointly administered and consolidated for procedural purposes only.

8.      This Court is referred to the Debtors' *Emergency Motion for Joint Administration of Cases* ("Joint Administration Motion") for a detailed discussion of the factual background and circumstances surrounding the Debtors' commencement of these chapter 11 cases.

9.      On or about April 27, 2009, Green Aggregates, Inc. d/b/a/ Cooke County Stone; d/b/a Recycled Aggregates entered into a loan and security agreement (the "Original Agreement") with Presidential Financial Corporation. In connection with the Original Agreement, Green Aggregates, Inc. executed a promissory note, Congress Materials LLC executed a limited liability company guaranty agreement, and Chiron Equities, LLC similarly executed a limited liability company guaranty. A guaranty by Jay Krassoff was additionally executed in connection with this transaction. (The Original Agreement and related promissory note and guarantees are hereinafter collectively referred to as the "Original Obligations").

10.      The Original Agreement provided for a maximum loan amount of $1.3 million. To secure the full and timely payment and performance of all of the Obligations, Presidential

---

[4]      Due to the exigencies of the circumstances, the Debtors have not had time to fully investigate the obligations owed to and security positions of their existing lenders and creditors; accordingly, none of the Debtors' statements as to their beliefs in the Motion regarding creditors are binding on the Debtors and are all subject to further explanation and investigation at the appropriate times.

was grated a continuing security interest in and lien upon the following property and interests in property of Borrower, whether tangible or intangible, now owned or in existence or hereafter acquired or arising, and wherever located: all Accounts, Accounts and Securities, Chattel Paper, Furniture, Fixtures and Equipment, Instruments, Investment Property, General Intangibles, Deposit Accounts, Supporting Obligations, Inventory, Other Property, all Proceeds and products of the foregoing (including proceeds of any insurance policies and claims against third parties for loss or destruction of an of the foregoing), and all books and records relating to the foregoing. [5]

11.     On or about August 24, 2010, Congress Materials LLC as successor by merger to Green Aggregates, Inc. and Congress Sand & Gravel, LLC, entered into an Amended and Restated Loan and Security Agreement with Presidential (the "Pre-Petition Loan Agreement"). Under the Pre-Petition Loan Agreement, Congress Materials LLC was included as a Borrower, and Congress Sand & Gravel, LLC was added as a co-borrower. Certain provisions of the credit facility were also amended. As security for full and timely payment and performance of the obligations under the Pre-Petition Loan Agreement, Congress Materials and Congress Sand granted Presidential a continuing security interest in and lien upon all assets hereafter acquired or arising, and wherever located, (including any claims or counterclaims in XTO Energy v. Green Aggregates, Inc. and Congress Materials LLC, Cause No. 348 235990 09 in the 348th District Court, District Court of Tarrant County, Texas), all proceeds and products of these assets, and all books and records related thereto.

12.     Under the Pre-Petition Loan Agreement, the outstanding balance of monetary obligations could not exceed the Maximum Loan Amount of $1.6 million plus the funded Last-Out Participation and plus the funded Additional Participation as those terms are defined in the Pre-Petition Loan Agreement. The Debtors acknowledge that, as of the Petition Date, the

---

[5] All capitalized terms in this paragraph are given the meaning ascribed to in the Original Loan Agreement.

Debtors are indebted to Presidential in the approximate amount of $1,552,630.58 (together with all interest, attorneys' fees, and other expenses heretofore or hereafter accruing or chargeable to the Debtors and all other obligations of the Debtors under the Pre-Petition Loan Agreement, or other loan documents, is referred to herein as the "Pre-Petition Debt"). The Pre-Petition Debt is evidenced by, among other things, (i) a Loan and Security Agreement dated August 24, 2010 (as amended or modified, the "Pre-Petition Loan Agreement") between the Debtors and Presidential, pursuant to which Presidential agreed to make revolving loans available to the Debtors (as amended or modified, the "Pre-Petition Revolving Loan"), and (ii) a Demand Secured Promissory Note (as amended or modified, the "Pre-Petition Note") dated August 24, 2010 between the Debtors and Presidential. The Pre-Petition Loan Agreement, together with all other documents related to or evidencing the Pre-Petition Debt shall be collectively referred to herein as the "Pre-Petition Loan Documents."

13.     In addition, the IRS has asserted a levy against the Debtors. The IRS asserts some interests in personal property of Congress Materials, LLC. Those interests are inferior to the Presidential interests.

14.     Chiron an insider of the Debtors has a Last-Out Participation in the Presidential loan.

## THE PROPOSED DIP FINANCING AND
## USE OF CASH COLLATERAL

15.     Following extensive negotiations, the DIP Lender has agreed to the terms of a facility for the Debtors to obtain post-petition financing up to an aggregate principal amount not to exceed $1,750,000.00 (however the Debtors and Presidential have contemplated raising the

Maximum Loan Amount to $1,900,000.00 by agreement, but in Presidential's sole discretion) with Presidential Financial Corporation.

16.     The Debtors have an immediate and indisputable need for the DIP Financing to operate their businesses in chapter 11. Because the Debtors' existing cash on hand and projected operating revenues will not be sufficient to fund payment of their operating expenses and administrative expenses pending the completion of the restructuring process, and will not be sufficient to provide for necessary utility deposits and critical vendor payments, it is imperative that the Debtors obtain post-petition financing at the outset of these cases.   Otherwise, the Debtors will be forced to terminate their business operations and liquidate, to the substantial detriment of the estates and all stakeholders.

17.     The Debtors have an immediate need to obtain the DIP Financing and use cash which constitutes Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, maintain business relationships and customers, to fund utility deposits, to make payment to suppliers which may include payments critical vendors or be pursuant to the Debtors' performance under executory contracts, to make payroll and satisfy other working capital and operational needs. The access to sufficient working capital and liquidity through the use of Cash Collateral and the incurrence of new indebtedness for borrowed money is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization or sale of Debtors' assets.

18.     The Debtors are unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under §§ 364(a) and (b) of the Bankruptcy Code, or credit secured by

liens on the Debtors' assets junior to the liens of Presidential, as contemplated by § 364(c) of the Bankruptcy Code.

19.     The Debtors therefore determined, in the exercise of their sound business judgment, that the proposal for the DIP Financing provided by the DIP Lenders is the most favorable under the circumstances and addresses the Debtors' working capital needs. The Debtors do not believe they could obtain proposals for post-petition financing on terms and conditions more favorable to the Debtors' estates than those offered by the DIP Lenders pursuant to the DIP Documents (as defined below).

20.     Before determining to enter into the DIP Financing upon the terms of the DIP Loan Documents, the Debtors and the Presidential conducted lengthy, arm's-length, and good faith negotiations.

21.     Presidential is willing to make the DIP Financing available to the Debtors upon the terms and conditions set forth in the DIP Loan Agreement, the Interim Order, and the Final Order (collectively, the DIP Documents").

22.     Documentation of the interim portion of the DIP Facility consists of the proposed order to be entered by the Court, attached hereto as Exhibit "A".  By this Motion, Debtors request entry of an order granting the relief as set forth in the proposed Interim Order.

<u>**SIGNIFICANT PROVISIONS**</u>

23.     Pursuant to this Motion, the Debtors are requesting that the Court approve the following "significant provisions" with respect to the DIP Facility and use of Cash Collateral:

    a) The granting of  a "super-priority" administrative expense claim except to the extent of, and up to, the Carve-Out,
    b) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority lien upon or security interest in all of the Collateral that is not otherwise encumbered by a validly perfected security interest or lien in existence on the Petition Date that has not been primed;

c) pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority, senior priming lien upon or security interest in all of the Collateral, subject only to valid and unavoidable Permitted Encumbrances that are in existence on the Petition Date and that, under applicable law, are senior to and have not been subordinated to the liens and security interests of Lender in connection with the Pre-Petition Loan Agreement; and

d) pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior priority lien upon or security interest in all of the Collateral that is subject to a validly perfected and unavoidable Permitted Encumbrance in existence at the time of the commencement of the Chapter 11 Case or in existence at the time of such commencement that is perfected subsequent to such commencement as permitted by Section 546(c) of the Bankruptcy Code, in each case, only to the extent the Permitted Encumbrance has not been subordinated to the liens and security interest of Lender in connection with the Pre-Petition Loan Agreement. (DIP Loan Agreement Section 4.2(b))

e) The DIP Loan is a roll up of the Pre-Petition Debt of the Debtors into post petition liabilities. The roll up is in place due to the fact that the pre-petition loan and DIP Loan were revolving loans.

24. The Debtors are seeking to grant the DIP Lenders a super-priority administrative expense claim. Granting of super-priority administrative expense claims is typical in these types of transactions, and the effect of the super-priority status is mitigated by the Carve-Out.[6] Further, without this contingency, the DIP Lenders will not fund the DIP Facility.

## BASIS FOR RELIEF

### A. Approval of Financing

25. As described above, it is essential to the continued operation of the Debtors' businesses and the success of Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient post-petition financing. The preservation of estate assets, the Debtors' continuing viability and their ability to reorganize or sell their assets for the highest and best price depend heavily upon the expeditious approval of the DIP Financing and the related actions requested herein.

---

[6] The Uniform Procedures for Complex Chapter 11 Cases under the heading "Comments to Cash Collateral and DIP Financing Checklist" at Section 5(b) provides, "…persons who are advancing new money to the debtor post-petition may include in financing orders provisions that the post-petition loans have a §364(c)(1) super-super priority."

26.     If a debtor is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize a debtor to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

27.     In the event a debtor is unable to obtain credit under the provisions of §364(c) of the Bankruptcy Code, a debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien." 11 U.S.C. § 364(d). Such relief may be granted so long as there is adequate protection of the interests of the holder of the lien on the property on which the senior lien is proposed to be granted.

28.     The Debtors have pursued various potential avenues of post-petition financing, but have been unable to procure the required funds in the form of unsecured credit or unsecured debt with an administrative priority. In addition, the Debtors have been unable to procure the required funds solely under § 364(c) of the Bankruptcy Code. The Debtors negotiated the DIP Financing at arm's length and pursuant to the Debtors' business judgment. The terms and provisions of the DIP Financing are fair and reasonable under the circumstances and reflect the most favorable terms upon which the Debtors could obtain post-petition financing.

29.     The terms and conditions of the DIP Loan Agreement are fair and reasonable and were negotiated by the parties in good faith and at an arm's length. Accordingly, the DIP Lenders should be accorded the benefits of § 364(e) of the Bankruptcy Code in respect of the

DIP Financing.

30.     The DIP Financing will enable the Debtors to, among other things, (a) maintain the continuity of their operations, (b) maximize the value of their businesses and properties for the benefit of the Debtors' estates and creditors, and (c) give the Debtors' customers the necessary confidence to continue ongoing relationships with the Debtors.

**B.      Use of Cash Collateral**

31.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor "may not use, sell, or lease cash collateral…unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c). Section 363(e) of the Bankruptcy Code provides that upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e).

32.     A debtor has the burden to establish that the holder of a lien to be subordinated, or whose cash collateral will be used, has adequate protection. 11 U.S.C. § 363(p)(1). Adequate protection must be determined on a case-by-case basis, permitting a debtor maximum flexibility in structuring its adequate protection proposal. *See Id.*; *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re George Ruggerie Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984). Nonetheless, "[a] debtor, attempting to reorganize a business under chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild." *George Ruggerie*, 727 F.2d at 1019.

33.     The Debtors require access to their cash and any proceeds of existing inventory to operate their businesses and preserve their value as a going concern. Those essential items constitute part of the pre-petition collateral.

34.     The proposed Interim Order, if approved, will provide the Debtors with the ability to use cash which consists of Cash Collateral while providing Presidential with adequate protection, as contemplated by §§363(c)(2)(A) and 363(e) of the Bankruptcy Code.

35.     Under section 361 of the Bankruptcy Code, adequate protection may be provided by granting a lienholder an additional or replacement lien to the extent that the usage of the cash collateral results in a decrease in the value of such entity's interest in such property. As discussed above, the proposed Interim Order provides for replacement liens to protect Presidential against any diminution in value of their interest in cash which may constitute Cash Collateral. The replacement liens shall be subject and subordinate only to the security interests and liens granted to the DIP Lenders and the Carve-Out.

## C.     Adequate Protection

36.     Adequate protection is established here because the proposed DIP Facility will preserve the Debtors' going concern value and benefit all of the Debtors' creditors, including the secured creditors, by making possible the Debtors' continued operations and enhancing the opportunity for their successful reorganization.

37.     The proposed DIP Facility will augment and preserve the value of Presidential's interest in the collateral. Absent continuing expenditures by the Debtors for necessary operations on an emergency basis, which may include payment of critical vendor claims and required utility deposits, the assets which comprise the pre-petition collateral would be essentially valueless. If the Debtors are unable to obtain debtor in possession financing, their operations will immediately fall apart. If the Debtors' operations are forced to cease, there will be no value to the enterprise and diminished value to the collateral of the secured creditors. However, if the expenditures are paid and the Debtors' operations continue without disruption, then the going concern value of the

Debtors will be preserved, which constitutes adequate protection of the secured creditors.

38.     It is well established that adequate protection exists by virtue of augmentation (or preservation) of the value of a secured creditor's collateral of the type proposed here. *See eg. In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 826 (Bankr. S.D.N.Y. 1982) (creditor was adequately protected where debtor used cash collateral to maintain and preserve the value of the collateral); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D.Ga. 1988) ("an increase in the value of the collateral generated by the improvements resulting from the superpriority financing could constitute adequate protection"); *In re Aqua Assocs.*, 123 B.R. 192, 198-99 (Bankr. E.D.Pa. 1991) (approving priming loan because loan proceeds would be used to enhance the value of the secured creditor's collateral); *In re Ralar Distributors, Inc.*, 166 B.R. 3, 6 (Bankr. D.Mass. 1994), disagreed with on other grounds, *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir. 1995) ("[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection"); *In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D.Mass. 1988) (finding adequate protection where proceeds of accounts receivables were being used to generate new inventory and accounts, thus resulting in stability in collateral value).

39.     For example, in *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D.Pa. 1982), the court allowed the debtor's use of cash collateral even though the pre-petition creditor was undersecured and had no equity cushion in place because it found that the debtor's use of the cash collateral was necessary to its continued operations and that "the [creditors's] secured position can only be enhanced by the continued operation of the [debtor's business]." *See also In re Ledgemere Land Corp.*, 125 B.R. 58, 62 (Bankr. D.Mass. 1991), *disagreed with on other grounds*, *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir. 1995) (cash collateral usage authorized where debtor's construction and marketing efforts adequately protected

creditor's interest in collateral through realization of fair market rather than liquidation value).

40.    Here, the DIP Facility will preserve and indeed augment the value of the Presidential's interest in their collateral, by both preserving the existing asset base and by allowing the Debtors to continue their operations, which will necessarily enhance the current value of the Debtors' business. The DIP Facility is not "value dilutive" at all, but rather will augment the present value of the pre-petition secured creditors' collateral and the estate.

41.    In contrast, the impact on Presidential's collateral if the DIP Facility is not approved will be devastating. If the DIP Facility is not approved, the Debtors would be forced to cease operations within days and would ultimately liquidate. Unquestionably, the value of the Presidential's collateral in this scenario would be less than the value of their collateral in a going concern scenario with the DIP Facility in place.

42.    Based upon the foregoing, the Debtors submit that Presidential is adequately protected by the DIP Facility itself and that they would suffer erosion in the value of their interests in collateral if the DIP Facility is not promptly approved.

**D.    Modification of the Automatic Stay**

43.    The Interim Order provides that the automatic stay provisions of Section 362 of the Bankruptcy Code be lifted and terminated as to Presidential, to the limited extent necessary to implement the provisions of this Interim Order and the DIP Loan Agreement, thereby permitting Presidential, among other things, to file or record any UCC-1 financing statements, mortgages and other instruments and documents evidencing the liens and security interests granted to Presidential in the Pre-Petition Collateral and Post-Petition Collateral, and to take all other actions authorized by the Court in this Interim Order.

44.     In addition, the Interim Order provides that upon or after the occurrence, and during the continuance, of a Default or an Event of Default under (and as defined in) the DIP Loan Agreement, then, and in any such event, Presidential shall be fully authorized, in its sole discretion, to cease making DIP Loans to the Debtors.  Upon the occurrence and during the continuance of an Event of Default, Presidential shall be fully authorized, in its sole discretion, to immediately terminate the DIP Loan Agreement and/or demand payment of the Post-Petition Debt then outstanding, and to immediately take any action necessary to preserve and protect the Collateral.  In addition, upon expiration of three (3) business days after notice to the Debtors and their counsel, the U.S. Trustee and counsel to the unsecured creditors' committee (if any), is provided by Presidential of the occurrence of the Event of Default, the automatic stay provided for by § 362 of the Bankruptcy Code shall automatically be lifted to allow Presidential to take any other action not already authorized by the immediately preceding sentence in order (i) to enforce its security interests and liens granted under the DIP Loan Agreement or provided for in this Interim Order with respect to the Collateral, (ii) to exercise all other remedies under the DIP Loan Agreement and applicable law which may be deemed necessary or appropriate by Presidential to collect any of the Post-Petition Debt and (iii) to proceed against or realize upon all or any portion of the Collateral as if these Cases or any superseding cases under Chapter 7 were not pending.

**E.     Interim Approval Should Be Granted**

45.     Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure provide that a final hearing (the "Final Hearing") on a motion to use cash collateral pursuant to § 363 and to obtain credit pursuant to § 364 may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the court may conduct a preliminary expedited

hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

46. Pursuant to Rule 4001(b) and 4001(c), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion (the "Interim Hearing") and grant the relief requested in the proposed Interim Order in order to (a) maintain the Debtors' ongoing operations and (b) avoid the immediate and irreparable harm and prejudice to Debtors' estates and all parties in interest that would otherwise ensue.

47. The Debtors have an urgent and immediate need for cash to continue to operate. The Debtors will be immediately and irreparably harmed absent authorization from the Court to use cash which constitutes Cash Collateral and obtain secured credit as requested on an interim basis pending a Final Hearing on the Motion. In the short-term, if the Debtors are unable to continue their business operations, any chance of reorganization or sale will evaporate and the going concern value of the Debtors will disappear, to the immediate detriment of the creditors, employees, and all stakeholders of the Debtors, and to the detriment of all parties in interest.

## REQUEST FOR FINAL HEARING

48. The Debtors also request that the Court schedule the final hearing on this Motion, with objections, if any, to the Final Order being due in writing on or before the date that is at least five (5) business days prior to the Final Hearing. The Debtors request that the Court set the Final Hearing no earlier than fourteen (14) days after service of this Motion.

## NOTICE

49. Notice of this pleading has been provided by e-mail, facsimile, or overnight delivery to: (a) the Debtors; (b) counsel for the Debtors; (c) any official committees appointed in the case and their respective counsel; (d) the Office of United States Trustee; (e) any secured creditors and their respective counsel; (f) the top 20 largest unsecured creditors of each of the

Debtors until any official committee for unsecured creditors is formed; (g) the Internal Revenue Service; (h) Texas Workforce Commission; (i) United States Attorney; (j) Attorney General of the United States; (k) Texas Attorney General's Office; (l) Dallas County Tax Assessor-Collector; (m) State Comptroller of Public Accounts; and (n) all parties who request notices pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order substantially similar to the order attached hereto as Exhibit "A" and grant such further relief as this Court may deem just and proper.

Dated:  October 28, 2010            Respectfully submitted,

*/s/Douglas S. Draper*
Douglas S. Draper, La. Bar No. 5073
Deborah W. Fallis, La. Bar No. 02177
Leslie A. Collins, La. Bar No. 14891
Kendra M. Goodman, La. Bar No. 32790
Heller, Draper, Hayden, Patrick & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130-6103
Telephone: 504.299.3300/Fax: 504.299.3399
ddraper@hellerdraper.com
dfallis@hellerdraper.com
lcollins@hellerdraper.com
kgoodman@hellerdraper.com

AND

James C. Gordon, Texas Bar No. 08200300
Gordon, Sykes & Cheatham, LLP
1320 S. University Dr., Ste. 806
Fort Worth, Texas 76107
Telephone: 817.338.0724/Fax:817.338.0769
jgordon@gordonsykes.com

Proposed Counsel for
Congress Sand & Gravel, LLC and

Congress Materials, LLC

**NOTICE ANNEX**

Pursuant to 11 U.S.C. § 342, the following sets forth the name, addresses and last four digits of the tax identification number for each of the referenced Debtors:

| DEBTORS AND ADDRESSES | CASE NO. | TAX I.D. NO. |
|---|---|---|
| Congress Sand & Gravel, LLC<br>14099 Ne Country Road 3180<br>Kerens, TX 75144 | 10-37522 | xx-xxx2409 |
| Congress Materials, LLC<br>1401 Cates Street<br>Suite 201<br>Bridgeport, TX 76426 | 10-37526 | xx-xxx5603 |