**DEBTOR-IN-POSSESSION**
**LOAN AND SECURITY AGREEMENT**

**BETWEEN**


**CONGRESS MATERIALS, LLC,**
**AS SUCCESSOR BY MERGER TO GREEN AGGREGATES, INC.**

**AND**

**CONGRESS SAND & GRAVEL, LLC,**

**AS BORROWERS**
**(and as Debtors and Debtors-in-Possession)**


**AND**


**PRESIDENTIAL FINANCIAL CORPORATION**

**AS LENDER**




**DATED AS OF**

**OCTOBER ___, 2010**

# TABLE OF CONTENTS

Page

SECTION 1.      LOANS AND CREDIT ACCOMMODATIONS. ..................................... 2
  1.1    **Amount** ................................................................................................ 2
  1.2    **Reserve.** ............................................................................................... 3
  1.3    **Use of Proceeds** ...............................................**Error! Bookmark not defined.**
  1.4    **Repayment** .......................................................................................... 3

SECTION 2.      CONDITIONS ................................................................................... 3
  2.1    **Conditions Precedent to Initial Funding** ......................................... 3
  2.2    **Conditions Subsequent** ...................................................................... 5

SECTION 3.      ADVANCES TO COVER INTEREST AND FEES; FEES AND EXPENSES.  6
  3.1    **Interest.** .............................................................................................. 6
  3.2    **Fees and Expenses.** ............................................................................ 6
  3.3    **Loan Account.** ................................................................................... 6
  3.4    **Expense Reimbursement.** ................................................................... 6

SECTION 4.      SECURITY INTEREST. ................................................................... 7
  4.1    **Grant.** ................................................................................................. 7
  4.2    **Further Assurances.** ........................................................................... 8

SECTION 5.      ADVANCES AND ADMINISTRATION. ......................................... 8
  5.1    **Advance Requests.** ............................................................................ 8
  5.2    **Remittance of Collections and Other Proceeds and Procedures.** ..................... 9
  5.3    **Application of Payments.** ................................................................ 10
  5.4    **Notification; Verification.** ............................................................... 10
  5.5    **Power of Attorney.** .......................................................................... 11
  5.6    **Books and Records.** ......................................................................... 11

SECTION 6.      REPRESENTATIONS AND WARRANTIES ................................. 11
  6.1    **General.** ............................................................................................ 11
  6.2    **Accounts.** ......................................................................................... 12
  6.3    **Borrower Reports.** ........................................................................... 13

SECTION 7.      COVENANTS. ................................................................................ 13
  7.1    **Affirmative Covenants** ..................................................................... 13
  7.2    **Negative Covenants** .......................................................................... 15
  7.3    **Financial and Other Covenants.** ....................................................... 16

SECTION 8.      EVENTS OF DEFAULT AND REMEDIES. ................................. 16
  8.1    **Events of Default** ............................................................................. 16
  8.2    **Remedies.** ........................................................................................ 19

026734.0101\576119.05

SECTION 9.        [RESERVED] .......................................................................................... 20

SECTION 10.        TERM ............................................................................................... 20
    10.1   **Effectiveness of Agreement.** ............................................................. 20
    10.2   **Termination.** ..................................................................................... 20
    10.3   **Early Termination Fee.** .................................................................... 20
    10.4   **Effect of Termination.** ..................................................................... 20

SECTION 11.        GENERAL PROVISIONS. ............................................................... 20
    11.1   **Miscellaneous.** ................................................................................. 20
    11.2   **Notices.** ............................................................................................ 21
    11.3   **Consent to Forum.** ........................................................................... 21
    11.4   **Waivers by Borrower.** ...................................................................... 22
    11.5   **Joint and Several Liability** ............................................................... 23
    11.6   **Release and Indemnity** ..................................................................... 25
    11.7   **Amendment and Restatement**...........................**Error! Bookmark not defined.**

026734.0101\576119.05

# DEBTOR-IN-POSSESSION
## LOAN AND SECURITY AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (as it may be amended, this **"Agreement"**) is entered into on October __, 2010 (**"Closing Date"**) by and among PRESIDENTIAL FINANCIAL CORPORATION (**"Lender"**), having an address at 3460 Preston Ridge Road, Suite 550, Alpharetta, GA 30005, and each of CONGRESS MATERIALS, LLC, AS SUCCESSOR BY MERGER TO GREEN AGGREGATES, INC. (**"Materials"**), having an address at 1001 Fannin Street, Suite 4775, Houston, TX 77002 and CONGRESS SAND & GRAVEL, LLC (**"S&G"**), having an address at 1001 Fannin Street, Suite 4775, Houston, TX 77002, (Materials and S&G, each being a Debtor and a Debtor-In-Possession, individually, a **"Borrower"** and collectively the **"Borrowers"**).  Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth on **Schedule A**.  All other terms contained in this Agreement, unless otherwise indicated, shall have the meaning provided in the UCC to the extent such terms are defined therein.  The schedules attached to this Agreement are an integral part of this Agreement and are incorporated herein by reference.

## RECITALS

WHEREAS, Borrowers and Lender are parties to a certain Amended and Restated Loan and Security Agreement, dated as of August 24, 2010, as amended from time to time (the **"Pre-Petition Loan Agreement"**), pursuant to which, among other things, Lender has made loans, advances and certain other financial accommodations to Borrowers (collectively, the "Pre-Petition Liabilities").  As security for the payment and performance of Borrowers' obligations under or in connection with the Pre-Petition Loan Agreement and the Pre-Petition Liabilities, Borrowers granted to Lender liens and security interests against certain of Borrowers' property; and

WHEREAS, on October 27, 2010 (the **"Petition Date"**), Borrowers commenced Chapter 11 cases (as jointly administered, collectively, the **"Chapter 11 Case"**) by filing voluntary petitions (collectively, the **"Petition"**) for relief under the Bankruptcy Code as hereinafter defined, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the **"Court"**); and

WHEREAS, Borrowers continue to operate as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, Borrowers have requested that Lender enter into certain financing arrangements with Borrowers pursuant to Sections 364(c)(1), (c)(2), (c)(3) and (d) of the Bankruptcy Code for such purposes as are hereinafter described in this Agreement; and

WHEREAS, Borrowers have been unable to obtain debtor-in-possession financing on an unsecured basis or on terms as favorable or more favorable than the terms provided herein, and an immediate need exists for each Borrower to obtain funds to continue in the operation of its business;

WHEREAS, to provide security for, and to assure the repayment of the Obligations, the Borrowers have agreed to provide to Lender, among other things, security interests in all of their

property and interests, whether real or personal, tangible or intangible, on the terms and conditions set forth herein and in accordance with Sections 364(c)(1), (c)(2), (c)(3) and (d) of the Bankruptcy Code;

WHEREAS, Lender is willing to make such loans and provide such financial accommodations to Borrowers, subject to the terms and conditions of this Agreement and subject to the terms and conditions set forth in the DIP Orders approving the proposed financing; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

# SECTION 1. LOANS AND CREDIT ACCOMMODATIONS.

### 1.1 **Amount**.

Subject to the terms and conditions in this Agreement, at Borrowers' request and provided that no Default or Event of Default exists, Lender may, in its sole discretion, make Advances to Borrowers during the Term, to the extent that there is sufficient Availability at the time of such request to cover, dollar for dollar, the requested Advance, and further provided that after giving effect to such Advances, the outstanding balance of all monetary Obligations will not exceed the Maximum Loan Amount plus the funded Last-Out Participation and plus the funded Additional Participation. For this purpose, "Availability" means, on any date, an amount equal to:

(i) the Eligible Accounts on such date multiplied by the Accounts Advance Rate;

**plus**

(ii) the Eligible Inventory on such date multiplied by the Inventory Advance Rate, provided, however, the portion of Availability with respect to Eligible Inventory shall be limited to the lesser of (a) the Maximum Inventory Loan or (b) the outstanding Advances against Eligible Accounts;

**plus**

(iii) the amount of the funded Last-Out Participation;

**plus**

(iv) the amount of the funded Additional Participation (if any);

*minus*

(v) all Reserves which Lender has established pursuant to Section 1.2 (including any to be established in connection with the requested Advance);

*minus*

(vi) the outstanding balance of all monetary Post-Petition Obligations on such date;

**minus**

**1.2**     **Reserve**.

Lender may from time to time in its sole discretion establish and revise such reserves as Lender deems appropriate ("**Reserves**") to reflect (i) the amount of accrued but unpaid interest with respect to the monetary Obligations on such date, (ii) events, conditions, contingencies or risks which affect or may affect (A) the Collateral or its value, or the Liens and other rights of Lender in the Collateral or (B) the assets, business or prospects of Borrowers or any Obligor, (iii) Lender's concern that any Collateral or financial information furnished by or on behalf of Borrowers to Lender is or may have been incomplete, inaccurate or misleading in any material respect, (iv) any fact or circumstance which Lender determines in its sole discretion constitutes, or could constitute, a Default or Event of Default, (v) the Carve-Out Reserve, or (vi) any other events or circumstances which Lender determines in its sole discretion make the establishment or revision of a Reserve prudent.  Lender may, in its sole discretion, establish and revise Reserves by deducting them in determining Availability or by reclassifying Eligible Accounts as ineligible.  In no event shall the establishment of a Reserve in respect of a particular actual or contingent liability obligate Lender to make Advances hereunder to pay such liability or otherwise obligate Lender with respect thereto.

1.3     **Repayment**.  Principal and interest shall be paid as stated in the Demand Secured Promissory Note (the "**Note**") executed by Borrowers in favor of Lender.  In addition, if at any time the amount of monetary Obligations exceeds Availability (any such excess, an "**Overadvance**"), or if at any time or for any reason the outstanding amount of Advances extended or issued pursuant hereto exceeds any of the dollar limitations ("**Overline**"), Borrowers will immediately pay to Lender the amount of such Overadvance or Overline. Notwithstanding the foregoing, Lender may, in its sole discretion, make or permit the Advances or any other monetary Obligations that give rise to or constitute an Overadvance or Overline, provided that Borrowers shall, upon Lender's written demand, pay to Lender such amounts as shall eliminate such Overadvance or Overline on or before two (2) business days after receipt of such written demand; provided, however, that Lender has no obligation to provide Advances during such period of time between receipt of written demand by Borrowers and the elimination of any Overadvance or Overline.  All unpaid monetary Obligations shall be due and payable in full upon termination of this Agreement on the Termination Date or, if earlier, pursuant to Section 10.2.  When the amount of aggregate Advances and Obligations exceed the Maximum Loan Amount, Borrowers shall execute a new Note at the request of Lender to evidence such increased amount.

## SECTION 2.  CONDITIONS

2.1     **Conditions Precedent to Initial Funding**.  The obligation of Lender to make the initial loans hereunder, immediately prior to or concurrently with the making of such loans, is subject to the satisfaction or waiver in writing by Lender of the following conditions precedent:

(a)     **Resolutions**.  Lender shall have received a copy of resolutions of the board of directors or managers, as the case may be, of each Borrower authorizing the execution, delivery and performance of the DIP Loan Documents to be executed by each Borrower,

certified by the Secretary or Assistant Secretary (or other authorized officer or agent) of each Borrower as of the date hereof, together with a certificate of such Secretary or Assistant Secretary (or other authorized officer or agent) as to the incumbency and signature of the officer(s) (or other authorized agent) executing the DIP Loan Documents on behalf of the each Borrower.

(b) **Officer's Certificate**. Lender shall have received an executed Officer's Certificate of each Borrower, signed by Jay Krasoff satisfactory in form and substance to Lender, certifying that as of the Closing Date (i) the representations and warranties contained herein are true and correct in all material respects, (ii) each Borrower is in compliance with all of the terms and provisions set forth herein and (iii) no Default or Event of Default has occurred.

(c) **Disbursement Authorizations**. The Borrowers shall have delivered to Lender all information necessary for Lender to issue wire transfers on behalf of each each Borrower for the initial and subsequent advances to be made under this Agreement, including disbursement authorizations in form acceptable to Lender, signed by either Jay Krasoff, or other authorized signer approved by Lender, in its sole discretion, after the date of this Agreement.

(d) **Legal Restraints/Litigation**. As of the Closing Date and other than the Chapter 11 Case, there shall be no (x) injunction, writ or restraining order restraining or prohibiting the consummation of the financing arrangements contemplated under this Agreement, or (y) suit, action, investigation or proceeding (judicial or administrative) pending against any Borrower, any Guarantor, any subsidiary of any Borrower or any of their assets, which, in the opinion of Lender, if adversely determined, could have a Material Adverse Effect and which is not subject to the Automatic Stay.

(e) **DIP Loan Documents**. The Borrowers and all other persons and entities party to the DIP Loan Documents (other than Lender) shall have executed and delivered to Lender this Agreement and the other DIP Loan Documents necessary to consummate the lending arrangement contemplated by this Agreement, including without limitation, the Procedures Letter.

(f) **Payment of Fees**. The Borrowers shall have paid, or made provision for the payment on the Closing Date of, all fees and expenses to be paid to Lender in connection with the DIP Loan Documents on the Closing Date.

(g) **Budget Discussion**. Lender shall have (i) received such information (financial or otherwise) as requested from the Borrowers, (ii) discussed the Budget with officers and representatives of the Borrowers, and (iii) given its written approval of the Budget, attached hereto as **Exhibit C**.

(h) **Guaranty**. Guarantors (including Chiron, Rock Bottom LLC and Jay Krasoff) shall each have executed full guaranties of all Obligations, in form and substance satisfactory to Lender, in its sole discretion.

(i) **Interim Order**. The Interim Order, in form and substance satisfactory to Lender, shall (i) have been entered by the Court, (ii) be in full force and effect, and (iii) not have

been vacated, reversed, modified (other than with the written consent of Lender), appealed or stayed in any respect.

(j) **First Day Orders**. All of the "first day orders" entered by the Court at the time of the Chapter 11 Case shall be in form and substance satisfactory to Lender.

(k) **Court Approval**. The Court shall issue a written approval of this Agreement in form and substance satisfactory to Lender, in its sole discretion.

(l) **Organizational Action**. All requisite corporate and legal action in connection with this Agreement and the other DIP Loan Documents shall have been taken in a manner satisfactory to Lender, in its reasonable discretion, including, but not limited to, the merger of Materials and Green.

(m) **Other Documents**. All other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed or recorded and shall be in form and substance reasonably satisfactory to Lender.

Upon the execution of this Agreement and the initial disbursement of the initial loans hereunder, all of the above conditions precedent shall have been deemed satisfied, except as the Borrowers and Lender shall otherwise agree in a separate writing.

2.2    **Conditions Subsequent**. Borrowers are obligated to perform (or others shall have performed as appropriate), according to the terms set forth herein, each of the following conditions subsequent, time being of the essence:

(a) **Last-Out Participation**. JK Air and Chiron shall fund the Last-Out Participation.

(b) **Leasehold Mortgage**. To the extent not previously provided, Borrowers shall use best efforts to deliver to Lender, within fifteen (15) days of the Closing Date, consents from the lessors and fully executed leasehold mortgages granting Lender a first priority lien against Borrowers' leasehold interest in (i) that certain Commercial Lease Agreement (as amended from time to time, the "**Garland Lease**"), effective as of September 18, 2007, by and between the City of Garland, Texas, a Texas municipal corporation, as lessor, and Garland GAI, Inc., a Texas corporation, as lessee; and (ii) that certain Lease Agreement (as amended from time to time, the "**Recycled Lease**"), effective September 1, 2001, by and between J & W Sand & Gravel, Inc., a Texas corporation, as lessor, and Recycled Aggregates, Inc., a Texas corporation, as lessee, in form and substance satisfactory to Lender in its sole discretion.

(c) **Reports and Certificates**. All reports and certificates provided by Borrowers related to this Agreement shall be certified by Jay Krasoff or other authorized signer or officer approved by Lender after the date of this Agreement.

Failure of Borrowers (or others) to comply with the Conditions Subsequent listed in this Section 2.2 shall constitute an Event of Default and avail Lender of all rights and remedies contained herein.

026734.0101\576119.05

# SECTION 3.  ADVANCES TO COVER INTEREST AND FEES; FEES AND EXPENSES.

### 3.1     Interest.

Principal and interest shall be paid as stated in the Note executed by Borrowers in favor of Lender contemporaneously herewith.  The parties agree that, and Borrowers instruct Lender that, immediately upon accrual of interest and other charges provided for herein and in the Note, such interest and other charges shall be paid by Advances and charged to Borrowers' Loan Account with Lender.  Such Advances shall thereafter bear interest and be subject to other charges upon the same terms as other Advances, and such Advances are agreed by the parties to be principal pursuant to O.C.G.A.  Section 7-4-2(A)(3).  Borrowers specifically agree, by execution of this Loan Agreement and Note, to this treatment of all accrued but unpaid interest and other charges hereunder and under the Note.

### 3.2     Fees and Expenses.

In addition to all interest and other sums payable by Borrowers to Lender under this Agreement, Borrowers shall pay Lender the fees and reimbursements listed on **Schedule B**, which are and shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.

### 3.3     Loan Account.

Lender shall maintain a loan account in the name of Borrowers, reflecting all Advances, charges, fees, expenses and payments made pursuant to this Agreement (the **"Loan Account"**). Lender shall provide Borrowers with commercially reasonable electronic access to information about Borrowers' Loan Account (the **"Online Statement"**); provided, however, that Lender shall not be liable to Borrowers for any damages suffered by Borrowers as a result of the temporary failure or unavailability of or the lack of updates to the Online Statement.  All information posted to the Online Statement shall be deemed to have been delivered to Borrowers and, unless Borrowers notify Lender in writing to the contrary (including a detailed description of the alleged error or omission) within 45 days after such information is made available to Borrowers, the Online Statement shall be deemed correct, accurate and conclusively binding on Borrowers as an account stated (except for reverses and reapplications of payments made and corrections of errors discovered by Lender).

### 3.4     Expense Reimbursement.

Borrowers shall reimburse Lender for (i) any Extraordinary Expenses incurred by Lender and (ii) all reasonable legal, accounting, appraisal, consulting and other fees and expenses suffered or incurred by Lender in connection with:  (a) the negotiation and preparation of any of the Loan Documents and any amendment or modification thereto; (b) the administration of the Loan Documents and the transactions contemplated thereby; (c) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral; (d) any inspection of or audits conducted by Lender with respect to Borrowers' books and records or any of the Collateral, which shall not be conducted more than four (4) times per twelve (12) month period if no Event of Default has occurred and is continuing; or (e) any effort

by Lender to verify or appraise any of the Collateral. Attorney's fees relating to collection for which Borrowers shall be responsible to reimburse Lender shall be equal to actual fees and expenses. All amounts chargeable to or reimbursable by Borrowers under this Section 3.4 shall constitute Obligations payable on demand to Lender. The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Loan Documents regarding the indemnification or reimbursement by Borrowers of claims suffered or incurred by Lender.

## SECTION 4. SECURITY INTEREST.

### 4.1 **Grant**.

To secure the full and timely payment and performance of all of the Obligations, each of the Borrowers hereby grants to Lender a continuing security interest in and Lien upon all assets and interests of Borrowers, whether tangible or intangible, now owned or in existence or hereafter acquired or arising, and wherever located, including but not limited to: (i) all Accounts, Accounts and Securities, Chattel Paper, Furniture, Fixtures and Equipment, Instruments, Investment Property, General Intangibles, Deposit Accounts, Supporting Obligations, Inventory, real estate (fee and leasehold), Other Property, and commercial tort claims (including without limitation any claims or counterclaims in *XTO Energy v. Green Aggregates, Inc. and Congress Materials LLC*, Cause No. 348 235990 09 in the 348th District Court, District Court of Tarrant County, Texas), (ii) all Proceeds and products of all of the foregoing (including proceeds of any insurance policies and claims against third parties for loss or any destruction of any of the foregoing), and (iii) all books and records relating to any of the foregoing.

### 4.2 **Lien Perfection**.

(a)    Lender's liens and security interests in and to the Collateral shall attach to all Collateral without further action on the part of Lender or the Borrowers (or any of them). The liens and security interests and priority granted to the liens and security interests in favor of Lender pursuant to the Interim Order and hereunder shall be perfected by operation of law upon execution of the Interim Order by the Court. Lender shall not be required to file any UCC-1 financing statements, mortgages or any other document, or take any other action (including possession of any of the Pre-Petition Collateral or Post-Petition Collateral) in order to validate or perfect the liens and security interests granted to Lender hereunder or under any of the other DIP Loan Documents, as all such liens and security interests shall be deemed automatically perfected as of the date of the Interim Order. If Lender shall, in its sole discretion, choose to file such UCC-1 financing statements (or amendments to or continuations of any existing financing statements), mortgages and otherwise confirm perfection of such liens and security interests, all such financing statements, mortgages or similar instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order. Lender may, in its sole discretion, file a certified copy of the Interim Order or the Final Order in any filing or recording office in any jurisdiction in which any Borrower has or maintains any Pre-Petition Collateral or Post-Petition Collateral or an office or is organized. The liens and security interests granted to Lender pursuant to the provisions of this Agreement and pursuant to any of the other DIP Loan Documents shall be in addition to all liens conferred upon Lender by the Court pursuant to the terms of the DIP Orders.

(b) The liens and security interests granted pursuant to the terms of this Agreement and the other DIP Loan Documents, and the liens and security interests conferred upon Lender pursuant of the DIP Orders, shall constitute (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, a "super-priority" administrative expense claim except to the extent of, and up to, the Carve-Out, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority lien upon or security interest in all of the Collateral that is not otherwise encumbered by a validly perfected security interest or lien in existence on the Petition Date that has not been primed; (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority, senior priming lien upon or security interest in all of the Collateral, subject only to valid and unavoidable Permitted Encumbrances that are in existence on the Petition Date and that, under applicable law, are senior to and have not been subordinated to the liens and security interests of Lender in connection with the Pre-Petition Loan Agreement; and (iv) pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior priority lien upon or security interest in all of the Collateral that is subject to a validly perfected and unavoidable Permitted Encumbrance in existence at the time of the commencement of the Chapter 11 Case or in existence at the time of such commencement that is perfected subsequent to such commencement as permitted by Section 546(c) of the Bankruptcy Code, in each case, only to the extent the Permitted Encumbrance has not been subordinated to the liens and security interest of Lender in connection with the Pre-Petition Loan Agreement. Except as expressly provided in the DIP Orders, no expenses, costs or charges in connection with the Chapter 11 Case shall be charged against the Collateral or Lender under Section 506(c) of the Bankruptcy Code, and the Borrowers hereby waive any rights they have to seek such charges under Section 506(c) of the Bankruptcy Code.

4.3 **Further Assurances**.

Borrowers agree to comply with all Applicable Laws to perfect Lender's Lien in the Collateral and to execute such documents as Lender may require to effectuate the foregoing and to implement this Agreement. Borrowers irrevocably authorize Lender to file financing statements, and all amendments and continuations with respect thereto, in order to create, perfect or maintain it's Lien in the Collateral as a duly perfected Lien, subject to no other Liens except Permitted Liens listed on **Schedule C**. Borrowers hereby ratify and confirm any and all financing statements, amendments and continuations with respect thereto heretofore and hereafter filed by Lender pursuant to the foregoing authorization.

## SECTION 5. ADVANCES AND ADMINISTRATION.

5.1 **Advance Requests**.

Whenever Borrowers desire to obtain an Advance, Borrowers shall give Lender notice of such borrowing request telephonically (and confirmed in writing if requested by Lender) or by facsimile or electronic mail transmission no later than 11:00 a.m. Eastern Standard Time ("**EST**"), or, if in effect, Daylight Savings Time ("**DST**") on the Business Day of the requested borrowing, and notices (in the form stipulated herein) received by Lender after 11:00 a.m. EST or DST, whichever is in effect, shall be deemed received on the next Business Day and notices received other than in the form stipulated herein shall be ineffective and deemed not received by Lender. Unless payment is otherwise timely made by Borrowers, the becoming due of any amount required to be paid with respect to any of the Obligations (including any interest thereon)

shall be deemed irrevocably to be a request (without any requirement for the submission of a notice of borrowing) for an Advance on the due date of and in an aggregate amount required to pay such Obligations and the proceeds of such Advance may be disbursed by way of direct payment of the relevant Obligations, provided that Lender shall have no obligation to honor any deemed request for an Advance on or after the date on which this Agreement is terminated pursuant to Section 10.2, or when an Overadvance exists or would result from such funding or when any applicable condition precedent is not satisfied, but Lender may do so in its sole discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default and regardless of whether such Advance is made after the date on which this Agreement is terminated due to the occurrence of the Termination Date or otherwise pursuant to Section 10.2. Subject to the approval in the Interim Order and/or Final Order, the outstanding principal amount of the Pre-Petition Debt shall, automatically and without any action on the part of any Person, under this Agreement constitute and be deemed to be an Advance made under, and in accordance with, this Agreement.

5.2 **Use of Proceeds**.

In accordance with the DIP Orders, the proceeds of the Advances shall be used by Borrowers solely for one or more of the following purposes and then only in accordance with the Budget: (i) to pay the fees and transaction expenses associated with the closing of the transactions described herein, including payment of professionals' fees and expenses incurred by Borrowers in the Chapter 11 Case, allowable interest with respect to Pre-Petition Debt and other Pre-Petition Liabilities to the extent, if any, authorized by the DIP Orders; (ii) to pay any of the Obligations; and (iii) to make expenditures for other lawful corporate purposes of Borrowers to the extent such expenditures are not prohibited by this Agreement or Applicable Law.  In no event may any Loan proceeds of an Advance, any Collateral proceeds or any amounts paid from the Carve-Out Reserve be used by any Borrower to purchase or to carry, or to reduce, retire or refinance any indebtedness incurred to purchase or carry, any margin stock or for any related purpose or be used to pay any fees and expenses incurred in (i) seeking to avoid, invalidate, subordinate, or otherwise impair any Pre-Petition or Post-Petition claims of Lender, (ii) seeking to recover on any claims against or transfers made to Lender, or (iii) seeking to prevent, hinder or delay Lender from enforcing or realizing upon any of the Collateral.

5.3 **Priority of All Advances**.

All Obligations of Borrower and Advances made hereunder by Lender to Borrowers shall constitute and be deemed a cost and expense of administration in the Chapter 11 Case and shall be entitled to priority under Section 364(c)(1) of the Bankruptcy Code ahead of all other costs and expenses of administration of the kind specified in Sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code, except as otherwise expressly provided in the DIP Orders and except to the extent of, and up to, the Carve-Out permitted under this Agreement.

5.4 **Remittance of Collections and Other Proceeds and Procedures**.

Borrowers shall notify all Account Obligors to direct all Collections to the remittance address provided by Lender in the Procedures Letter (the **"Remittance Address"**). Lender shall retain the sole discretion to require Borrowers to enter into a bank agreement or other agreement

governing the remittance of Collections, which agreement shall be in form and substance acceptable to Lender and only Lender shall have access to withdraw or otherwise direct the disposition of Collections. In the event that Borrowers receive any Collections or other proceeds of Collateral, Borrowers shall promptly upon receipt (and in all events within two (2) Business Days of receipt by Borrowers) remit in kind such Collections or other proceeds of Collateral directly to the Remittance Address and promptly notify Lender of such event. Until so forwarded, any such Collections or other proceeds of Collateral received by Borrowers shall not be commingled with Borrowers' other funds and shall be held by Borrowers, as trustee of an express trust, for Lender's benefit, subject to the terms and conditions hereof. In the event any Collections are received by Borrowers but not remitted to Lender in the time and manner specified herein, the Misdirected Payment Fee set forth on **Schedule B** shall be assessed and charged to the Borrowers' Loan Account. Borrowers shall specify the Remittance Address on all agreements and contracts, and take all necessary steps to ensure all Collections are directed to the Remittance Address. On all invoices Borrowers will place the Payment Notice that each invoice shall only be paid to the Remittance Address. All invoices shall be mailed or otherwise transmitted by Borrowers to Account Obligors within five business days of issuance. With each Advance request, Borrowers will provide Lender with copies of all invoices as set forth in the Procedures Letter along with any other information as Lender may reasonably request. Borrowers will provide Lender with proof of delivery on all invoices within two (2) business days of the Advance request.

5.5      **Application of Payments**.

Lender may, in its sole discretion, apply, reverse and re-apply all Collections and other proceeds of Collateral or other payments received with respect to the Obligations, in such order and manner as Lender shall determine, whether or not the Obligations are due, and whether before or after the occurrence of a Default or an Event of Default. Unless this Agreement expressly provides otherwise or the Pre-Petition Debt is deemed an advance under this Agreement pursuant to Section 5.1, Lender agrees to apply all proceeds of Collateral of a Borrower to pay the Pre-Petition Debt to the extent that Lender is not prohibited under any DIP Order from applying such proceeds to the Pre-Petition Debt, next, to the Loan Account and thereafter, to payment of any other Obligations then outstanding. For purposes of determining Availability, funds received at the Remittance Address will be credited to the Loan Account upon Lender's receipt of notice that such items have been credited to the Payment Account, subject to final payment and collection; provided, however, that for purposes of computing interest on the Obligations, such items shall be deemed applied by Lender two Business Days after Lender's receipt of advice of deposit in the Payment Account. If, as the result of Lender's application of Collections to the Obligations as authorized by this Section 5.5 a credit balance exists in favor of Borrowers (meaning that, on any date of determination, the collected balance of Collections after the applicable cutoff time on such date exceeds the outstanding principal balance of (and all interest, fees and other amounts payable with respect to) the Obligations after the applicable cutoff time on such date), such credit balance shall not accrue interest in favor of Borrowers, but shall be available to, and promptly paid by Lender to Borrowers upon Borrowers' request, at any time or times for so long as no Default or Event of Default exists and is continuing.

5.6      **Notification; Verification**.

Lender or its designee may, from time to time and to the extent permitted by Applicable Law, whether or not a Default or Event of Default has occurred: (i) verify directly with the Account Obligors the validity, amount and other matters relating to the Accounts, by means of mail, telephone or otherwise, either in the name of any Borrower or Lender or such other name as Lender may choose; (ii) notify Account Obligors that Lender has a Lien in the Accounts and that payment thereof is to be made directly to Lender; and (iii) demand, collect or enforce payment of any Accounts (but without any duty to do so).

5.7 **Power of Attorney**.

Borrowers hereby make, constitute and appoint each of Lender's officers or agents as Borrowers' attorney-in-fact with full power of substitution, in the name of Borrowers or in the name of Lender, but for Lender's use and benefit, to do or perform at any time, in Lender's discretion, any of the following: (i) at any time, irrespective of whether there exists an Event of Default, receive, open and dispose of all mail addressed to any Borrower and endorse Borrowers' names on any checks or other payment items with respect to any Collateral and to deposit same and apply them to such of the Obligations as Lender may elect; and (ii) at any time that an Event of Default exists, cause all mail to be diverted from any post office box in Borrowers' name to a post office box or other address designated by Lender; demand, sue for, collect and receive monies due or to become due on any Accounts and to settle, compound, compromise or extend the time of payment of any Account or other Collateral upon terms acceptable to Lender without releasing Borrowers from any liability to Lender, and do such other and further acts in Borrowers' name which Lender may deem necessary or desirable to enforce any of the terms of this Agreement or to collect any of the Obligations or realize upon any Collateral. This power, being coupled with an interest, is irrevocable.

5.8 **Books and Records**.

Borrowers irrevocably authorize all accountants and third parties to disclose and deliver to Lender, at Borrowers' expense, subject to attorney-client privilege, all financial information, books and records, work papers, management reports and other information in their possession regarding Borrowers. Borrowers will not enter into any agreement with any accounting firm, service bureau or third party to store Borrowers' books or records at any location other than at one or more of the business locations set forth in **Schedule F** hereto without first obtaining Lender's written consent (which consent may be conditioned upon such accounting firm, service bureau or other Person agreeing to give Lender the same rights with respect to access to books and records and related rights as Lender has under this Agreement).

**SECTION 6. REPRESENTATIONS AND WARRANTIES.**

6.1 **General**.

To induce Lender to enter into this Agreement and make Advances, Borrowers represent and warrant that:

(a) each Borrower's legal name is exactly as set forth on the signature page of this Agreement;

(b)     S&G is duly organized and validly existing under the laws of the state of organization and Materials is duly organized and validly existing under the laws of the state of Delaware and each Borrower is qualified to do business in each state where such qualification is required, all of which are listed on **Schedule F** attached hereto;

(c)     the Lien granted by Borrowers in the Collateral is and will at all times remain a duly perfected, first priority Lien in such Collateral;

(d)     the most recent financial statements provided to Lender accurately reflect Borrowers' financial condition as of that date and that there has been no material adverse change in Borrowers' financial condition since the date of those financial statements;

(e)     there are no actions, suits or other legal proceedings of any kind now pending or, to Borrowers' knowledge, threatened against Borrowers in excess of $5,000 except as set forth on **Schedule H** attached hereto;

(f)     no Borrower has ever carried on business under or used any name other than its legal name and the trade names or trade styles listed on **Schedule F** attached hereto, and each Borrower has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Units and all other Persons as is required or necessary to its assets and to carry on its business, and Borrowers have not been notified by any such Governmental Unit or other Person that such Governmental Unit or other Person has rescinded or not renewed, or intends to rescind or not renew, any such license, consent, accreditation, approval or authorization;

Each of the foregoing representations and warranties shall be deemed reaffirmed and remade as of the date of each Advance hereunder and shall not be affected by any knowledge of, or any investigation by, Lender.  The continuing accuracy of each of the foregoing representations and warranties shall be a condition precedent to each Advance.

6.2     **Accounts**.

Lender may rely, in determining which Accounts are Eligible Accounts, on all statements and representations made by Borrowers with respect to any Account. With respect to each Account, each Borrower warrants with respect to their applicable Account that (i) all information relating to such Account that has been delivered to Lender is true and correct in all material respects, such Account has been invoiced after the date the services or goods giving rise to such Account were rendered or provided in the ordinary course of business, as applicable, all information set forth in the invoice is true, complete and correct in all material respects, each Borrower has delivered to the applicable Account Obligor all requested supporting claim documents and each invoice contains the Payment Notice to remit payments as set forth in Section 5.2; (ii) the Account and any goods sold in respect of such Account are the applicable Borrower's exclusive property and are not and will not be, subject to any consignment, sale on approval, sale or return or "bill and hold" arrangement or any Lien other than in Lender's favor; (iii) any goods the sale or other disposition of which give rise to the Account or other right to payment are not (and will not at any time be) subject to any Lien other than in Lender's favor; (iv) all amounts payable in respect of the Account are payable in Dollars; (v) the Account

Obligor has accepted the goods or services relating to the Account; (vi) unless otherwise disclosed to Lender prior to Lender advancing any funds against an invoice, to the actual knowledge of the applicable Borrower, the Account Obligor owes and is obligated to pay the full amount stated in the invoice relating to the Account according its terms, without dispute, offset, deduction, defense or counterclaim; (vii) the Account does not arise from a sale to an Affiliate or a sale to a consumer of goods to be used for personal, family or household purposes; (viii) it has absolute ownership of and title to the Account; (ix) the Account is not evidenced by any instrument, negotiable document, warehouse receipt or chattel paper; (x) prior to the date on which the Account arose, it had not received notice of the insolvency of the Account Obligor in respect of such Account or the commencement of any Insolvency Proceedings by or against such Account Obligor.

6.3 **Borrower Reports**.

Each Borrower will provide Lender the reports listed below in a format and frequency acceptable to the Lender. All reports, which are to be submitted in Excel format and/or via direct data submission to an online computer system authorized and in form and substance acceptable to Lender, are due as follows: (i) Borrowing Base Certificate is due with each funding request and to be delivered no later than 10:00 a.m. EST or DST, whichever is in effect; (ii) a detailed invoice date aging of the Accounts is due weekly, or as requested by Lender; (iii) a complete customer list of all Accounts with contact information (name of primary contact, address and telephone number) is due at the beginning of each calendar quarter and (iv) a summary listing of Inventory stating approximate values and location is due no later than the fifth working day following each month end; (v) monthly bank statements for all bank accounts of each Borrower; (vi) monthly evidence of its tax payments; and (vii) together with each delivery of financial statements required above, the certificate of each Borrower substantially in the form of **Exhibit A** hereto signed on behalf of each Borrower by Jay Krasoff or such other authorized signer of such Borrower approved by Lender, in its reasonable discretion, after the date of this Agreement, stating, among other things, that no event has occurred which constitutes an Event of Default or would constitute an Event of Default but for the requirement that notice be given, or time elapse or both, under this Agreement (such certificate shall publish the accounting calculations used to determine compliance or noncompliance with each Borrower's financial obligations and financial covenants provided in this Agreement), or, if any such Event of Default or Defaults exists, specifying the nature thereof.

## SECTION 7. COVENANTS.

7.1 **Affirmative Covenants**. Borrowers:

(a) shall permit representatives of Lender from time to time, as often as may be reasonably requested, but only during normal business hours, to inspect and appraise the Collateral and to inspect, audit, and make extracts from each Borrower's books and records and to discuss Borrower's financial affairs with each Borrower's respective independent accountants;

(b) shall keep adequate records and books of account with respect to its business activities in accordance with prudent accounting practices;

(c)     shall cause to be prepared and furnished to Lender, in accordance with GAAP within thirty (30) days after the end of each month through and including July 2010, and thereafter twenty (20) days after the end of each month, an unaudited balance sheet of each Borrower and its subsidiaries and related unaudited statements of income and cash flow for such month and for the portion of Borrowers' fiscal year then elapsed, on a consolidated and consolidating basis and certified by an authorized officer of each Borrower;

(d)     shall cause to be prepared and furnished to Lender, in accordance with GAAP within 60 days after the end of each fiscal year of each Borrower, an in-house prepared financial statement of each Borrower and its subsidiaries as of the end of such fiscal year, on a consolidated and consolidating basis;

(e)     shall cause to be prepared and furnished to Lender, in accordance with GAAP within 120 days after the end of each fiscal year of each Borrower, a compiled financial statement prepared by a third party accountant for fiscal year ended 2010 of each Borrower and its subsidiaries as of the end of such fiscal year, on a consolidated and consolidating basis and thereafter an accountant prepared and reviewed (with notes) financial statement of each Borrower and its subsidiaries as of the end of such fiscal year, on a consolidated and consolidating basis;

(f)     shall pay and discharge all taxes prior to the date on which such taxes become delinquent or penalties attach thereto;

(g)     shall comply with all Applicable Laws;

(h)     shall carry property, liability and other insurance, with insurers acceptable to Lender, in such form and amounts, and with such deductibles and other provisions as Lender shall require, with each such insurance policy naming Lender as loss payee or additional insured pursuant to a form of endorsement acceptable to Lender;

(i)     shall promptly notify Lender of all disputes or claims in excess of $2,000 relating to Materials Accounts and claims in excess of $1,000 relating to S&G Accounts; and

(j)     shall cause each Obligor to deliver to Lender an updated financial statement as requested by Lender in writing, but in no event less frequently than annually

(k)     shall furnish to Lender, no later than the close of business each Tuesday of each week, a Budget, accompanied by copies of any authorities for expenditures reflected in such Budget, together with a comparison of the Borrowers' actual results to the cash flow forecasted by the Borrowers for such time, each Budget shall be for the immediately following thirteen-week period and subject to the approval of Lender in all respects (with the categories and amounts contained in each of the first twelve weeks of each such Budget to match the categories and amounts of the corresponding periods contained in the then most recent Budget delivered by the Borrowers unless otherwise consented to by Lender in writing);

(l)     shall make their financial advisor and restructuring consultant (or chief restructuring officer), if any, available to Lenders to discuss (i) the status of discussions and negotiations for any sale or other disposition of the business(es) or assets, as applicable and

14

(ii) the operations, financial performance and cash flow reports, as applicable, of the Borrowers and such other matters as Lenders may reasonably request;

(m)     shall promptly deliver to Lender all written proposals, term sheets, commitment letters, letters of intent, purchase agreements and related documents and materials as to any proposed sale of the assets of any Borrower or any subsidiary of any Borrower;

(n)     shall cause to be satisfied the milestones set forth on **Schedule I** attached hereto;

(o)     shall, at all times, comply with all terms, conditions and provisions of the DIP Orders; and

(p)     shall ensure that Borrowers' aggregate actual cash disbursements shall equal the cash disbursements projected in the Budget subject to an unfavorable variance of not more than 10% per line item and subject to an unfavorable variance of not more than 5% as to the cash disbursements for all line items aggregated in the Budget.

7.2     **Negative Covenants** Borrowers will not:

(a)     merge or consolidate with another Person, form any new subsidiary or acquire any interest in any Person without prior written consent of Lender, which shall not be unreasonably withheld;

(b)     acquire any assets except in the ordinary course of business and as otherwise permitted by this Agreement and the other DIP Loan Documents;

(c)     enter into any transaction outside the ordinary course of business;

(d)     sell or transfer any Collateral or other assets without the prior written consent of Lender, which shall not be unreasonably withheld, except that Borrowers may sell finished goods Inventory in the ordinary course of its business;

(e)     make any loans to, or investments in, any Affiliate or other Person in the form of money or other assets;

(f)     incur any debt outside the ordinary course of business;

(g)     guarantee or otherwise become liable with respect to the obligations of another party or entity;

(h)     pay or declare any dividends or other distributions on Borrowers' respective equity interests (except for dividends payable solely in equity interests of respective Borrower);

(i)     redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Borrowers' respective equity interests;

026734.0101\576119.05

(j)     make any change in Borrowers' respective capital structure without prior written consent of Lender, which shall not be unreasonably withheld;

(k)     dissolve or elect to dissolve;

(l)     pay any principal or interest on any indebtedness owing to an Affiliate or enter into any transaction with an Affiliate other than on arms-length terms; provided, the foregoing does not apply to the Last-Out Participation; and

(m)     compromise or settle any Account for less than the full amount thereof, grant any extension of time of payment of any Account, release (in whole or in part) any Account Obligor or other Person liable for the payment of any Account or grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any Account other than in the ordinary course of business and provided that the same is promptly reported in writing to Lender; or agree to do any of the foregoing;

(n)     seek to amend, supplement or modify any of the terms of the Interim Order or the Final Order, unless such amendment, supplement or modification (i) is first submitted to counsel for Lender, (ii) is in form and substance acceptable to Lender and its counsel in its sole option and discretion, and (iii) is not entered into without first obtaining the express, written consent of Lender for such amendment, supplement or modification having been obtained or Lender's express consent in open Court;

(o)     apply to the Court for authority to take any action that is prohibited by the terms of any of the DIP Loan Documents or refrain from taking any action that is required to be taken by the terms of any of the DIP Loan Documents or permit any indebtedness or claim to be pari passu with or senior to any of the Obligations, except as provided by this Agreement or the DIP Orders; or

(p)     propose a plan of reorganization in connection with the Chapter 11 Case that does not provide Lender with the payment in full of the Obligations and Pre-Petition Debt.

7.3     **Financial and Other Covenants**.

Borrowers shall at all times comply with the financial and other covenants set forth in the **Schedule E** attached hereto.

## SECTION 8.  EVENTS OF DEFAULT AND REMEDIES.

8.1     **Events of Default**.  The occurrence of any of the following events shall constitute an **"Event of Default"** under this Agreement, and Borrowers shall give Lender immediate written notice thereof:

(a)     Borrowers shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration, or otherwise);

(b)     any representation, warranty, or other statement to Lender by or on behalf of Borrowers, whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made;

(c)     Borrowers shall fail or neglect to perform, keep, or observe any covenant contained in this Agreement or any of the other DIP Loan Documents;

(d)     any Material Adverse Change shall occur;

(e)     any Obligor shall revoke or attempt to revoke or terminate, or fail to confirm Obligor's liability under, any guaranty to which any Obligor is a party;

(f)     the transfer by the present shareholders or members (as listed on **Schedule G** attached hereto) of any Borrower to any other person or entity of any or all of the common stock or other ownership interests of such Borrower outstanding or in treasury as of the date hereof without prior written consent of Lender, or that in the event of any transfer by operation of law, such Borrower fails to immediately notify Lender;

(g)     any merger and/or acquisition by any Borrower without prior approval of Lender, which shall not be unreasonably withheld;

(h)     any instruction or agreement regarding the Remittance Address and procedures related thereto is amended or terminated without the written consent of Lender, or if a Borrower fails, within two (2) Business Days of receipt, to forward Collections it receives with respect to any Accounts to the Remittance Address;

(i)     any default shall occur under any other agreement or arrangement between any Borrower and Lender;

(j)     any guarantor of any of the Collateral shall revoke or attempt to revoke, or shall dispute, such guaranty of any of the Obligations;

(k)     any failure of any Obligor to furnish Lender current financial information upon written request;

(l)     any failure of any Obligor or any pledgor of any security interest in the Collateral (the **"Pledgor"**) to observe or perform any agreement, covenant or promise contained in any agreement, instrument or certificate executed in connection with the granting of a security interest in any Collateral to secure the Obligations;

(m)     any loss, theft, substantial damage, destruction, sale, foreclosure of or encumbrance to any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon or the rendering of any judgment or lien or garnishment or attachment against any Obligor or its property, whether actual or threatened;

(n)     the death, dissolution, termination of existence, appointment of a receiver of any part of the property of, or assignment for the benefit of creditors by Borrower or any Obligor;

026734.0101\576119.05

(o)     any discontinuance or termination of any guaranty of any of the Obligations by a guarantor;

(p)     any amendment or termination of a financing statement naming any Borrower as debtor and the Lender as secured party, or any corrective statement with respect thereto, is filed without the prior written consent of the Lender;

(q)     if the Collateral declines in value or for any reason becomes insufficient in Lender's sole and exclusive judgment to secure the repayment of the Obligations and Borrowers, after demand, fail or refuse to substitute and/or make additions to the Collateral, or pay down the Obligations satisfactory to Lender; or

(r)     Lender deeming itself insecure as to the ability of Borrowers to repay the Obligations, or as to the sufficiency of the Collateral;

(s)     the bringing of a motion by any Borrower in the Chapter 11 Case to obtain additional financing from a Person other than Lender under Section 364(d) of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash all Obligations under this Agreement, or to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the express consent of Lender;

(t)     a trustee shall be appointed in the Chapter 11 Case or a responsible officer or an examiner with expanded powers shall be appointed in the Chapter 11 Case (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; the Borrowers shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, any DIP Order or, without Lender's prior written consent, the Court shall enter an order terminating the Borrowers' right to use "cash collateral" under Section 363 of the Bankruptcy Code; the Court shall grant in the Chapter 11 Case super-priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code to any person or entity other than Lender; or the Borrowers shall challenge the validity, extent, priority or enforceability of any of the Pre-Petition Loan Documents or Pre-Petition Debt;

(u)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(v)     the entry of an Order by the Court granting relief from or modifying the Automatic Stay (i) to allow any creditor (other than Lender) to execute upon or enforce a lien or security interest on any Collateral, or (ii) with respect to any lien or security interest of or to permit the granting of any lien or security interest on any Collateral to any state or local environmental or regulatory agency or authority;

(w)     the commencement of a suit or action against Lender that asserts, by or at the direction of the Borrowers, any claim or legal or equitable remedy which seeks the avoidance or subordination of the Post-Petition claim or Post-Petition lien or security interest of Lender;

(x)     any modification of the Court's DIP Order authorizing Borrowers to execute this Agreement and the other DIP Loan Documents without the consent of Lender;

18

(y)     a Borrower or any other party proposing any sale of Collateral (pursuant to 11 U.S.C. § 363, a plan of reorganization, or otherwise) that seeks to limit or prohibit the Lender from credit bidding the Obligations or the Pre-Petition Debt.

(z)     a Borrower shall make any payment on account of indebtedness, or on account of any interest, principal, premium or otherwise, or the Borrower shall make any other disbursement, except (i) as expressly permitted by this Agreement or by the DIP Orders, or (ii) as set forth in the Budget (subject to such variances as may be permitted under the DIP Orders); or

(aa)     any covenant, agreement or obligation of Borrowers contained in or evidenced by any of the DIP Loan Documents or the Pre-Petition Loan Documents shall cease to be enforceable or shall be determined by a court of competent jurisdiction to be unenforceable in accordance with its terms or any Borrower shall file a pleading with the Court asserting the same; Borrowers shall deny or disaffirm their obligations under any of the DIP Loan Documents or liens granted in connection therewith or ratified or reaffirmed thereby; or any liens in any of the Collateral granted under or ratified or reaffirmed by the DIP Loan Documents shall be determined by a court of competent jurisdiction to be voidable, invalid or unperfected, or subordinated or not given the priority contemplated by this Agreement.

8.2     **Remedies**.

Without in any way limiting the right of Lender to demand payment of any portion of the Obligations payable upon demand in accordance with this Agreement, upon or after the occurrence of an Event of Default (and for so long as such Event of Default shall exist), Lender may in its sole discretion declare the principal of and accrued interest on the Advances and all other Obligations outstanding to be, and whereupon the same shall thereupon become without further notice or demand (all of which notice and demand Borrowers expressly waive), forthwith due and payable and Borrowers shall forthwith pay to Lender the entire principal of and accrued and unpaid interest on the Advances and other Obligations, together with reasonable attorneys' fees and court costs if such principal and interest are collected by or through an attorney at law, and Lender may terminate this Agreement.  In addition, Lender may, in its sole discretion, at any time or times exercise all of the rights and remedies of a secured party under the UCC or any other Applicable Law and all other legal and equitable rights to which Lender may be entitled under any of the Loan Documents, all of which rights and remedies shall be cumulative and shall be in addition to any other rights or remedies contained in any of the Loan Documents or available pursuant to Applicable Law, and none of which shall be exclusive.  Borrowers agree that any requirement of notice to Borrowers of any proposed public or private sale or other disposition of any Collateral by Lender shall be deemed reasonable notice thereof, if given at least seven (7) days prior thereto.  Lender may purchase all or any part of the Collateral at a public sale or, if permitted by Applicable Law, at any private sale, and, in lieu of actual payment of such purchase price, may set off the amount of such price against the outstanding Obligations.  The proceeds realized from any sale or other disposition of Collateral may be applied first to any Extraordinary Expenses incurred by Lender, second to interest accrued with respect to any of the Obligations, and then to the principal balance of the Obligations.  If any deficiency shall arise, Borrowers and each Obligor shall remain liable to Lender therefore.  The failure or delay of Lender to require strict performance by Borrowers of any provision of the Loan Documents or to exercise or enforce any rights, Liens, powers, or remedies under any of the Loan Documents

shall not operate as a waiver of such performance, liens, rights, powers, and remedies, but all such rights, Liens, powers, and remedies shall continue in full force and effect until all of the Obligations have been fully satisfied. If, following the entry of the DIP Order, an Event of Default has occurred, the Borrowers irrevocably waive any right they may have to use cash collateral under Section 363 of the Bankruptcy Code without Lender's express, written consent.

## SECTION 9. [RESERVED]

## SECTION 10. TERM

### 10.1 **Effectiveness of Agreement**.

This Agreement will become effective when executed by Borrowers and accepted by Lender in the State of Georgia and approved by the Interim DIP Order (the **"Effective Date"**), and shall continue in effect until the Termination Date unless terminated by either party as set forth in <u>Section 10.2</u> of this Agreement or as otherwise provided herein. Unless sooner demanded, all Obligations will become immediately due and payable, without further notice or demand, upon any termination of this Agreement.

### 10.2 **Termination**.

Borrowers may terminate this Agreement at any time prior to the Termination Date by giving Lender at least thirty (30) days prior written notice of termination. Lender may terminate this Agreement at any time by giving Borrower at least forty-five days prior written notice of termination provided Lender may terminate this Agreement immediately without prior notice to Borrowers at any time an Event of Default exists.

### 10.3 **[Intentionally Omitted]**.

### 10.4 **Effect of Termination**.

No termination shall affect or impair any right or remedy of Lender or relieve Borrowers of any of the Obligations until all of the Obligations have been indefeasibly paid in full or performed.

## SECTION 11. GENERAL PROVISIONS.

### **11.1 Miscellaneous**.

This Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia; may not be amended, except by written agreement of Borrowers and Lender; expresses the entire understanding of the parties hereto with respect to the subject matter hereof; may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall constitute but one and the same instrument; and shall be binding upon and inure to the benefit of the respective successors and assigns of Borrowers and Lender (provided that Borrowers may not assign or transfer any of its rights under this Agreement or other Loan Documents without the prior written consent of Lender). The paragraph and section headings in this Agreement are for convenience of reference only and

shall not affect the substantive meaning of any provision of this Agreement. Time is of the essence of this Agreement and all of the other Loan Documents. All notices given under this Agreement shall be in writing and shall be given by hand delivery by a reputable private delivery service, by regular first-class mail or certified mail return receipt requested, addressed to Lender or Borrowers at the address set forth hereinabove, or by facsimile transmission to Borrowers at 713-335-4298 or Lender at (770) 493-5532, or such other address or facsimile number as may be designated in writing by one party to the other delivered in accordance with the provisions hereof.

11.2 **Notices.**

All demands, notices and communications under this Agreement shall be in writing and shall be deemed to have been duly given if mailed by registered or certified mail, return receipt requested or by overnight delivery service, addressed to the appropriate party hereto at the address as follows:

      (a)      If to the Lender:      Presidential Financial Corporation
                                      3460 Preston Ridge Road, Suite 550
                                      Alpharetta, GA 30005

                                      With Copy to:

                                      Patton Boggs LLP
                                      2000 McKinney Ave, Suite 1700
                                      Dallas, Texas, 75201
                                      Attention: Jeff LeForce

      (b)      If to the Borrowers:      To each respective Borrower's "Notification Address" found on **Schedule F.**

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

11.3 **Consent to Forum**.

Borrowers hereby consent to the non-exclusive jurisdiction of the Court or at Lender's sole discretion any United States federal court sitting in or with direct or indirect jurisdiction over the Northern District of Georgia or in any Georgia state or superior court sitting in Fulton County, Georgia, in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents and Borrowers irrevocably agree that all claims and demands in respect of any such action, suit or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such action, suit or proceeding brought in any such court or that such court is an inconvenient forum. Nothing herein shall limit the right of Lender to bring proceedings against

Borrowers or with respect to any Collateral in the courts of any other jurisdiction. Any judicial proceeding commenced by Borrowers against Lender involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Loan Document shall be brought only in the Court or a United States federal court sitting in or with direct jurisdiction over the Northern District of Georgia or in any Georgia state or superior court sitting in Fulton County, Georgia. Nothing in this Agreement shall be deemed to preclude the enforcement by Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction.

11.4 **Waivers by Borrower**.

To the fullest extent permitted by Applicable Law, Borrowers waive (i) the right to trial by jury (which Lender hereby also waives) in any action, suit, proceeding or counterclaim of any kind arising out of or related to any of the Loan Documents, the Obligations or the Collateral; (ii) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrowers may in any way be liable and hereby ratifies and confirms whatever Lender may do in this regard; (iii) notice prior to taking possession or control of the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of Lender's remedies; (iv) the benefit of all valuation, appraisement and exemption laws; (v) any claim against any Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in respect of any claim for breach of contract or any other theory of liability arising out of, or the taking of any enforcement action, or related to any of the Loan Documents, any transaction thereunder or the use of the proceeds of any Advances; and (vi) notice of acceptance hereof. Borrowers acknowledge that the foregoing waivers are a material inducement to Lender's entering into this Agreement and that Lender is relying upon the foregoing waivers in its future dealings with Borrowers. Each of the Borrowers warrant and represent that it has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

11.5 **Severability; Time of the Essence; Ratification of Pre-Petition Debt; Miscellaneous**.

If any provision hereof or of any other DIP Loan Document is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible. Time shall be of the essence with respect to the Obligations and all requirements of the DIP Loan Documents. Delivery of this Agreement and the other DIP Loan Documents neither extinguishes, discharges or otherwise satisfies any of the duties, obligations or indebtedness (including, without limitation, the Pre-Petition Debt) of the Borrowers and the other Obligors (as those terms are defined in the Pre-Petition Loan Agreement) arising under the Pre-Petition Loan Agreement and the Pre-Petition Loan

Documents, constitutes an accord and satisfaction or novation of the Pre-Petition Debt nor waives any Events of Default existing under and as defined in the Pre-Petition Loan Agreement. The Borrowers hereby agree that, with respect to matters relating to the period before the Closing Date, all of the terms, conditions and other provisions of the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents are hereby ratified and confirmed and shall remain in full force and effect. All amounts payable under the DIP Loan Documents are payable in the good and immediately available funds in the legal tender of the United States of America.

11.6 **Joint and Several Liability**.

(a) **Joint and Several Liability of Borrowers.** Each Borrower jointly and severally agrees to pay, and shall be jointly and severally liable for the payment and performance of all Obligations. Each Borrower acknowledges and agrees that the joint and several liability of the Borrowers is provided as an inducement to Lender to provide loans and other financial accommodations to the Borrowers, and that each such loan or other financial accommodation shall be deemed to have been done or extended by Lender in consideration of, and in reliance upon, the joint and several liability of the Borrowers. The joint and several liability of each Borrower hereunder is absolute, unconditional and continuing, regardless of the validity or enforceability of any of the Obligations, or the fact that a security interest or lien in any Collateral may not be enforceable or subject to equities or defenses or prior claims in favor of others, or may be invalid or defective in any way and for any reason. Each Borrower hereby waives: (i) all notices to which such Borrower may be entitled as a co-obligor with respect to the Obligations, including, without limitation, notice of (x) acceptance of this Agreement, (y) the making of loans or other financial accommodations under this Agreement, or the creation or existence of the Obligations, and (z) presentment, demand, protest, notice of protest and notice of non-payment; and (ii) all defenses based on (w) any modification (or series of modifications) of this Agreement or the other DIP Loan Documents that may create a substituted contract, or that may fundamentally alter the risks imposed on such Borrower hereunder, (x) the release of any other Borrower from its duties this Agreement or the other DIP Loan Documents, or the extension of the time of performance of any other Borrower's duties hereunder or thereunder, (y) the taking, releasing, impairment or abandonment of any Collateral, or the settlement, release or compromise of the Obligations or any other Borrower's or Guarantors' liabilities with respect to all or any portion of the Obligations, or (z) any other act (or any failure to act) that fundamentally alters the risks imposed on such Borrower by virtue of its joint and several liability hereunder. It is the intent of each Borrower by this paragraph to waive any and all suretyship defenses available to such Borrower with respect to the Obligations, whether or not specifically enumerated above.

(b) **Subrogation and Contribution Rights.** Each Borrower hereby agrees that until payment in full in cash of all Obligations and termination of all Obligations of Lender hereunder, such Borrower will not exercise any subrogation, contribution or other right or remedy against any other Borrower or any security for any of the Obligations arising by reason of such Borrower's performance or satisfaction of its joint and several liability hereunder. In addition, each Borrower agrees that (i) such Borrower's right to receive any payment of amounts due with respect to such subrogation, contribution or other rights, as well as its right to receive payment of any indebtedness of another Borrower for such Borrower is subordinated to the full and final payment and satisfaction of the Obligations, and (ii) such Borrower agrees not to

23

demand, sue for or otherwise attempt to collect any such payment until payment in full in cash of all Obligations and termination of all Obligations of Lender hereunder.

(c) **Limitation of Joint and Several Liability.** Notwithstanding any provisions of this Agreement to the contrary, it is the intent of the parties hereto that the joint and several nature of the liabilities of the Borrowers, and the security interests granted by the Borrowers to secure the Obligations, not constitute a fraudulent conveyance under Section 548 of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance, fraudulent transfer or similar law of any state, nation or other governmental unit, as in effect from time to time. Accordingly, Lender and the Borrowers agree that if the obligations and liabilities of any Borrower hereunder, or any security interests granted by such Borrower securing the Obligations would, but for the application of this sentence, constitute a fraudulent conveyance or fraudulent transfer under applicable law, the obligations and liabilities of such Borrower hereunder, as well as the security interests securing such obligations and liabilities, shall be valid and enforceable only to the maximum extent that would not cause such obligations, liabilities or security interests to constitute a fraudulent conveyance or fraudulent transfer under applicable law.

(d) **Structure of Credit Facility.** Each Borrower hereby agrees that Lender shall have the right, in its sole discretion, to do any or all of the following in connection with the credit facility established by this Agreement: (i) establish a separate "borrowing base" for each Borrower, (ii) advance a Loan specifically to a specific Borrower, based on such Borrower's availability under its own "borrowing base", (iii) establish separate lockbox and dominion accounts for each Borrower, and (iv) establish such other procedures as shall be deemed by Lender to be useful in tracking where Loans are made under this Agreement and the source of payments received by Lender on such Loans. In addition to and not in limitation of the foregoing, Borrowers hereby agree and acknowledge that the present intention of Lender is to advance future Loans directly to such Borrower whose assets provide the Availability for such Loan to be used by such Borrower for its working capital and other purposes relevant to the normal conduct of such Borrower's business.

## 11.7 **DIP Orders Control**.

This Agreement and the other DIP Loan Documents are each subject to the terms and provisions contained in the DIP Orders to the same extent and effect as if the DIP Orders were fully set forth herein and therein; and if any term or provision of this Agreement or any other DIP Loan Document conflicts or is inconsistent with any term or provision of any DIP Order, the term or provision of the applicable DIP Order shall control and be given effect.

## 11.8 **Submission of DIP Orders**.

The Interim Order, if entered, the Final Order and all other orders of the Bankruptcy Court authorizing or affecting any aspect of the DIP Loan and all related motions and pleadings seeking to modify, amend or otherwise affect the Interim Order or the Final Order filed on behalf of the Borrowers, shall (a) first be submitted to Lender and its counsel, (b) be in form and substance acceptable to Lender and its counsel, at its option, and (c) not be modified without the prior, express written consent of Lender or its express consent given in open court.

11.9    **Release and Indemnity.**

The Borrowers represent and warrant that no Borrower has any set-off, recoupment, counterclaim, defense, cross-complaint, claim, demand or other cause of action of any nature whatsoever (together, the "Counterclaims") against Lender which arise out of the transactions evidenced by the Pre-Petition Loan Agreement, this Agreement or the other DIP Loan Documents, any transactions that were renewed or extended by this Agreement or the DIP Loan Documents, any other transaction with Lender, or which could be asserted to reduce or eliminate all or any part of a Borrower's liability to repay the Obligations or to seek affirmative relief or damages of any kind or nature from Lender, irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise, including, without limitation, any contracting for, changing, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable, the exercise of any rights and remedies under the DIP Loan Documents, the negotiation for and execution of this Agreement and any settlement negotiations. To the extent that any counterclaims may exist, whether known or unknown, such are waived and hereby released by the Borrowers.  Furthermore, the Borrowers, on behalf of themselves, their respective successors, agents, attorneys, officers, directors, assigns and personal and legal representatives, do hereby release, remise, acquit and forever discharge Lender and Lender's employees, agents, representatives, consultants, attorneys, fiduciaries, servants, officers, directors, partners, predecessors, successors and assigns, subsidiary corporations, parent corporations, and related corporate divisions (all of the foregoing hereinafter called the "Released Parties"), from any and all actions and causes of action, judgments, executions, suits, debts, claims, demands, liabilities, obligations, damages and expenses of any and every character, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature (each being a "Claim"), whether heretofore or hereafter arising, for or because of any matter or things done, omitted or suffered to be done by any of the Released Parties prior to and including the Closing Date, and in any way directly or indirectly arising out of or in any way connected to the Pre-Petition Loan Agreement, this Agreement or the other DIP Loan Documents, irrespective of whether any such claims arise out of contract, tort, violation of law or regulations or otherwise, including but not limited to, any contracting for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable, the exercise of any rights and remedies under the DIP Loan Documents, the negotiation for and execution of this Agreement, or any settlement negotiations **AND INCLUDING, WITHOUT LIMITATION, ANY CLAIMS ARISING ON ACCOUNT OF LENDER'S NEGLIGENCE OR STRICT LIABILITY** (all of the foregoing hereinafter called the "Released Matters"); and the Borrowers hereby covenant and agree never to institute any action or suit at law or in equity, nor institute, prosecute, or in any way aid in the institution or prosecution of, any claim, action or cause of action, rights to recover debts or demands of any nature against any of the Released Parties arising out of or related to Lender's actions, omissions, statements, requests or demands in administering, enforcing, monitoring, collecting or attempting to collect, the Obligations, indebtedness and other obligations of the Borrowers to Lender.  The Borrowers agree to indemnify and hold Lender harmless from any and all Counterclaims that Borrowers, Guarantors or any other person or entity claiming by, through, or under them may at any time assert against Lender.  The Borrowers acknowledge that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages to the Borrowers (or any of them) and their respective successors, agents, attorneys, officers, directors, assigns and personal and legal representatives arising in connection with the Released Matters.  Each Borrower represents and

warrants to Lender that it has not purported to transfer, assign or otherwise convey any right, title or interest of it in any Released Matter to any other person or entity and that the foregoing constitutes a full and complete release of its claims with respect to all Released Matters. **THE PROVISIONS OF THIS SECTION AND THE REPRESENTATIONS, WARRANTIES, RELEASES, WAIVERS, REMISES, ACQUITTANCES, DISCHARGES, COVENANTS, AGREEMENTS AND INDEMNIFICATIONS CONTAINED HEREIN (A) CONSTITUTE A MATERIAL CONSIDERATION FOR AND INDUCEMENT TO LENDER FOR ENTERING INTO THIS AGREEMENT, (B) DO NOT CONSTITUTE AN ADMISSION OF OR BASIS FOR ESTABLISHING ANY DUTY, OBLIGATION OR LIABILITY OF LENDER TO ANY BORROWER OR ANY OTHER PERSON OR ENTITY, (C) DO NOT CONSTITUTE AN ADMISSION OF OR BASIS FOR ESTABLISHING ANY LIABILITY, WRONGDOING, OR VIOLATION OF ANY OBLIGATION, DUTY OR AGREEMENT OF LENDER TO ANY BORROWER OR ANY OTHER PERSON OR ENTITY, AND (D) SHALL NOT BE USED AS EVIDENCE AGAINST LENDER BY ANY BORROWER OR ANY OTHER PERSON OR ENTITY FOR ANY PURPOSE.**

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE TO FOLLOW]*

026734.0101\576119.05

IN WITNESS WHEREOF, each Borrower and Lender have signed this Agreement as of the date set forth in the heading.

ATTEST

**BORROWERS:**

**CONGRESS MATERIALS, LLC**

By_____
Name:  Jay Krasoff
Title:  President

_____

[CORPORATE SEAL]

ATTEST

**CONGRESS SAND & GRAVEL, LLC**

_____

By:_____
Name: Jay Krasoff
Title: President

[CORPORATE SEAL]

**LENDER:**

**PRESIDENTIAL FINANCIAL CORPORATION**

By:_____
Printed Name: Frank Palmieri
Title: Senior Vice President

**ACKNOWLEDGE AND ACCEPTED AS PARTIES TO THE LAST-OUT PARTICIPATION AGREEMENT**

**JK AIR INVESTMENT GROUP, LLC**

By: _____
Printed Name: _____
Title: _____

**CHIRON EQUITIES, LLC**

By: _____
Name: Jay Krasoff
Title: President

State of _____

County of _____

     The foregoing instrument was acknowledged before me this _____ day of _____, 2010, by Jay Krasoff.  He is personally known to me or has produced _____ _____ as identification.

_____
Notary                                 Seal

My commission expires:_____

## SCHEDULE A

### Definitions

This Schedule is an integral part of the Debtor-In-Possession Loan and Security Agreement dated September ___, 2010, between CONGRESS MATERIALS, LLC, CONGRESS SAND & GRAVEL, LLC and PRESIDENTIAL FINANCIAL CORPORATION (the **"Agreement"**).

In addition to terms defined in the Agreement, as used in the Agreement, the following terms have the following meanings:

**"Accounts"** means all of any Borrower's now owned or existing and future acquired or arising "accounts", as such term is defined in the UCC, and any and all other receivables (whether or not specifically listed on schedules furnished to Lender), including, without limitation, all accounts created by, or arising from, all of such Borrower's sales, leases, rentals or other dispositions of goods or renditions of services to its customers (whether or not they have been earned by performance), including but not limited to, those accounts arising from sales, leases, rentals or other dispositions of goods or software sold or licensed or rendition of services made under any of the trade names, logos or styles of such Borrower, or through any division of such Borrower, all contract rights, notes, drafts, acceptances, general intangibles and other forms of obligations and receivables, and any and all Supporting Obligations in respect thereof.

**"Accounts and Securities"** means all of each Borrower's money, deposit accounts, letters of credit, letter of credit rights and investment property.

**"Account Obligor"** means the Person primarily obligated to pay an Account or Chattel Paper.

**"Account Obligor Claim"** means to any Account Obligor such Account Obligor's dispute, claim, offset, defense, deduction, rejection, recoupment, counterclaim or contra account with respect to any Account Obligor, including any dispute or claim relative to price, terms, quality, quantity, performance, workmanship (regardless of the merits of any such dispute or claim).

**"Accounts Advance Rate"** means a percentage established by Lender, which may be increased or decreased by Lender and may vary from Borrower to Borrower from time to time in the exercise of its sole discretion. As of the Closing Date the percentage for each Borrower is as follows:

(a)     Materials:  Eligible Accounts shall be 85%;

(b)     S&G: Eligible Accounts shall be 85%;

**"Additional Participation"** means a participation purchased by Chiron or JK Air after the Closing Date and as set out in the Last-Out Participation Agreement.

**"Advance"** or **"Advances"** means a loan advance under this Agreement.

"**Affiliate** or **Affiliates**" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, such Persons, managers and members. For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of any equity interest, by contract or otherwise.

"**Allowable Professional Fees**" means all Professional Fees that have been approved by order of the Court, and, with respect to Professional Fees incurred prior to an Event of Default, only those Professional Fees which are incurred pursuant to and not in excess of the amounts provided for in the Budget for such Professional Fees.

"**Anniversary Date**" means the day that is 365 (or 366, as applicable) days after the date of this Agreement.

"**Applicable Law**" means all laws, rules and regulations applicable to the Person, conduct, transaction, covenant or Loan Document in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of governmental bodies; and orders, judgments and decrees of all courts and arbitrators.

"**Automatic Stay**" shall mean the automatic stay imposed under Section 362 of the Bankruptcy Code.

"**Availability**" shall have the meaning assigned to it in Section 1.1.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (as amended).

"**Borrowing Base Certificate**" means the report prepared by Borrowers, in the form set forth on **Schedule D** attached hereto, which provides the numerical value of Collateral as of a specific date signed by Jay Krasoff or such other authorized signer of such Borrower approved by Lender, in its reasonable discretion.

"**Budget**" means each detailed rolling thirteen-week consolidated cash flow budget, along with projected net Availability for such period, satisfactory to Lender in all respects prepared by the Borrowers pursuant to Section 2.1(g) and Section 7.1(h) and updated on a weekly basis (with the categories and amounts contained in each of the first twelve weeks of each such Budget matching the categories and amounts of the corresponding periods contained in the then most recent Budget delivered by the Borrowers to Lender unless otherwise consented to by Lender in writing). The initial Budget is attached hereto as **Exhibit B**.

"**Business Day**" means a day other than a Saturday or Sunday or any other day on which Lender or banks in Georgia are authorized to close.

"**Capital Expenditures**" will mean for any period, the aggregate capital expenditures recorded by Borrowers in conformity with GAAP, including charges in respect of any capitalized

2

lease obligations (exclusive of imputed interest), but excluding those capital expenditures made with insurance/condemnation proceeds, or proceeds from asset sales permitted under this Agreement.

"**Carve-Out**" has the meaning given to such term in the DIP Orders.

"**Carve-Out Reserve**" means on any date of determination thereof a reserve established by Lender in its credit judgment to cover the amount of the Carve-Out.

"**Chapter 11 Case**" has the meaning given to such term in the recitals of this Agreement.

"**Chattel Paper**" means a record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. As used in this paragraph, "monetary obligation" means a monetary obligation secured by the goods or owed under a lease of the goods and includes a monetary obligation with respect to software used in the goods.

"**Chiron**" means Chiron Equities, LLC, a Delaware limited liability company.

"**Collateral**" means all property and interests in property in or upon which a Lien is granted pursuant to this Agreement or the other Loan Documents. However, the Collateral shall not include Proceeds of avoidance actions created under Chapter 5 of the Bankruptcy Code.

"**Collections**" means, with respect to any Account, all collections and other payments on or with respect to such Account.

"**Court**" has the meaning given to such term in the recitals of this Agreement.

"**Default**" means any event, which with notice or passage of time, or both, would constitute an Event of Default.

"**Deposit Accounts**" mean any and all demand, time, savings, passbooks or similar accounts maintained with a bank.

"**Deposit Account Agreement**" means in form and substance reasonably acceptable to Lender, executed and delivered by each Borrower and the applicable deposit bank.

"**DIP Loan**" means the credit facility established by this Agreement.

"**DIP Loan Documents**" means this Agreement, any promissory notes further evidencing the Obligations, the mortgages and/or deeds of trust on the real estate, the leasehold mortgages, the other closing documents executed by a Borrower or a Guarantor, and any other ancillary loan and security agreements executed by the Borrowers or the Guarantors from time to time in connection with this Agreement, all as may be renewed, amended, restated or supplemented from time to time.

3

"**DIP Orders**" means the Interim Order and the Final Order entered by the Court or any other court of competent jurisdiction.

"**Dollars**" mean the legal tender of the United States of America.

"**Eligible Account**" means an Account which arises in the ordinary course of business of Materials or S&G from the rendition or performance of services and/or for the sale of goods, is payable in Dollars, is subject to Lender's duly perfected Lien and is deemed by Lender, in its sole discretion, to be an Eligible Account. Without limiting the generality of the foregoing, the following Accounts shall not be eligible:

1.　　　No Account of Materials or S&G shall be an Eligible Account if:

(i)　　　the Account is more than 90 days from invoice date relative to invoices with payment terms of 30 days or less);

(ii)　　　25% or more of the Accounts from the Account Debtor are not deemed Eligible Accounts;

(iii)　　　the Account is subject to any Account Obligor Claim;

(iv)　　　the Account is not payable in Dollars;

(v)　　　the Account is due and owing by an Account Obligor who is an Affiliate of such Borrower or a Person controlled by an Affiliate of such Borrower;

(vi)　　　the Account is due and owing by an Account Obligor who is not creditworthy in the reasonable determination of Lender;

(vii)　　　the Account is due and owing by an Account Obligor who does not have its principal assets and place of business in the United States;

(viii)　　　the Account is unbilled;

(ix)　　　any covenant, representation or warranty contained in the Agreement with respect to such Account has been breached;

(x)　　　an Insolvency Proceeding has been commenced by or against the Account Obligor or the Account Obligor has failed, suspended business or ceased to be solvent;

(xi)　　　the Account is subject to a Lien other than a Permitted Lien;

(xii)　　　the Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment;

(xiii)　　　the Account represents, in whole or in part, a billing for interest, fees or late charges;

026734.0101\576119.05

(xiv)   the Account is not evidenced by an invoice, statement or other electronic or documentary evidence satisfactory to Lender;

(xv)   the Account has been turned over or submitted to a third party for collection;

(xvi)   such Account is in the form of a cost report receivable owing from any Governmental Authority, unless Lender has expressly agreed to include it in the Borrowing Base as an Eligible Account; or

(xvii)   the Account arises from a sale to the Account Debtor on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment or any other repurchase or return basis; or

(xviii) the Account is owing from the United States of America or which amount is owing from the United States of America or any agency, department or subdivision thereof, unless a properly executed assignment of claims has been received by Lender; or

(xix)   the Account does not comply with such other criteria and requirements as may be specified from time to time by Lender in its sole discretion.

"**Eligible Inventory**" means Inventory of Materials and S&G which Lender, in its sole judgment, deems eligible for borrowing, based on such considerations as Lender may from time to time deem appropriate. Without limiting the fact that the determination of which Inventory is eligible for borrowing is a matter of Lender discretion, Inventory of Materials and S&G which does not meet the following requirements will not be deemed to be Eligible Inventory: Inventory which

(i)   consists of boxed finished goods, in good, new and salable condition (including raw materials as has been specifically permitted by Lender), which is not perishable, not for demonstration purposes, not obsolete or unmerchantable, and is not comprised of work in process, packaging materials or supplies;

(ii)   meets all applicable governmental standards;

(iii)   has been manufactured in compliance with the Fair Labor Standards Act;

(iv)   conforms in all respects to the warranties and representations set forth in this Agreement;

(v)   is at all times subject to Lender's duly perfected, first priority security interest;

(vi)   is situated at one of the locations set forth on the **Schedule F**; and

(vii)   Lender has received a Landlord Waiver and Agreement, in form and substance acceptable to Lender, from the landlord where the Inventory is situated.

"**Estate**" means the bankruptcy estate created in the Chapter 11 Case pursuant to 11 U.S.C. § 541(a).

"**Extraordinary Expenses**" means all costs and expenses (including legal fees) incurred by Lender in connection with the enforcement of any of its rights or remedies under this Agreement, including any costs and expenses incurred in connection with its repossession of any of the Collateral, collection of any of the Collateral, storing or removing any of the Collateral, or advertising for sale or selling any of the Collateral.

"**Final Order**" means the order entered by the Court in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001 (c)(2), pursuant to Sections 364(c) and (d) of the Bankruptcy Code, as to which no stay has been entered and no appeal has been timely filed, and which has not been vacated, modified or reversed, (i) authorizing the Borrowers to incur Post-Petition secured indebtedness and to grant liens and security interests securing the Obligations in accordance with the terms of this Agreement and the other DIP Loan Documents, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Lender in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Agreement and the other DIP Loan Documents, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose liens and security interests have been primed, and (iv) authorizing the payment by the Borrowers of all fees and expenses contemplated by this Agreement and the other DIP Loan Documents, each as set forth in such order. Additionally, such order shall provide for usual and customary protections for Lender, including, but not limited to, (a) a waiver of any and all claims and causes of action of the Borrowers against Lender on account of the Pre-Petition Debt and Pre-Petition Loan Documents, including, but not limited to, any claims for preference, fraudulent conveyance or other claims arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection or avoidability of the secured claims of Lender, subject to the right of any creditors' committee (or if no creditors' committee is appointed, any party in interest other than Guarantors or a Borrower) to investigate and challenge (and to the extent successful, avoid) any such liens, security interests and claims for a period of 45 days from the date the creditors committee is appointed, (b) an acknowledgment by the Borrowers and a finding by the Bankruptcy Court as to the amount of the Pre-Petition Debt and the validity of Lender's liens and security interests on the Pre-Petition Collateral, (c) a waiver by the Borrowers of any right to assert a surcharge or other claim under Section 506(c) of the Bankruptcy Code against any of the Collateral, (d) a waiver by the Borrowers of any right to assert or require marshalling of any Collateral, and (e) preclusion of any Post-Petition financing, on a priming basis or otherwise, other than pursuant to this Agreement, unless such Post-Petition financing first indefeasibly satisfies the Obligations (including any Pre-Petition Debt) outstanding to Lender and this Agreement has been terminated, or Lender expressly consents to such financing and the priming liens thereof in writing.

"**Fixed Charges**" means required payments, whether actually made or not, for (i) federal, state, local and foreign income and similar tax expense, (ii) principal payable pursuant to this Agreement, (iii) amounts payable pursuant to operating leases, (iv) interest expense paid in cash or cash equivalents, and/or (v) unfinanced Capital Expenditures.

"**Furniture, Fixtures and Equipment**" means all of a Borrower's presently owned and hereafter acquired machinery, furniture, fixtures and equipment wherever located (all of the foregoing being hereinafter collectively referred to as the "FF&E");

6

"**GAAP**" means generally accepted accounting principles as in effect from time to time, consistently applied.

"**General Intangibles**" means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

"**Governmental Unit**" means a subdivision, agency, department, county, parish, municipality, or other unit of the government of the United States, a state, or a foreign country. The term includes an organization having a separate corporate existence if the organization is eligible to issue debt on which interest is exempt from income taxation under the laws of the United States.

"**Guarantor**" means Chiron, Jay Krasoff and any other Person now or hereafter guaranteeing payment of all or any portion of the Obligations.

"**Instruments**" mean any and all negotiable instruments or any other writings that evidence a right to the payment of a monetary obligation, are not themselves a security agreement or lease, and are of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment.

"**Insolvency Proceeding**" means any case or proceeding commenced by or against a Person under the Bankruptcy Code or any other applicable insolvency law; as an assignment by a Person for the benefit of such Person's creditors; or for the appointment of a receiver, trustee, or other custodian for a Person or any of such Person's property.

"**Interim Order**" means the order entered by the Court in the Chapter 11 Case pursuant to Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), as to which no stay has been entered and no appeal has been timely filed, and which has not been vacated, modified or reversed, (i) authorizing the Borrowers to incur Post-Petition secured indebtedness and to grant liens and security interests in accordance with this Agreement and the other DIP Loan Documents, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Lender in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Agreement and the other DIP Loan Documents, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose liens and security interests have been primed, and (iv) authorizing the payment by the Borrowers of all fees and expenses contemplated by this Agreement and the other DIP Loan Documents, each on an interim basis and as set forth in such order. Additionally, such order shall provide for usual and customary protections for Lender, including, but not limited to, (a) a waiver of any and all claims and causes of action of the Borrowers against Lender on account of the Pre-Petition Debt and Pre-Petition Loan Documents, including, but not limited to, any claims for preference, fraudulent conveyance or other claims arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection or avoidability of the secured claims of Lender, subject to the right of any creditors' committee (or if no creditors' committee is appointed, any party in interest other than Personal Guarantor or a Borrower) to investigate and challenge (and to the extent successful, avoid) any such liens,

security interests and claims for a period of 45 days from the date the creditors committee is appointed, (b) an acknowledgment by the Borrowers and a finding by the Court as to the amount of the Pre-Petition Debt and the validity of Lender's liens on the Pre-Petition Collateral, (c) notice of the Borrowers' intention to waive in the Final Order any right to assert a surcharge or other claim under Section 506(c) of the Bankruptcy Code against any of the Collateral, (d) a waiver by the Borrowers of any right to assert or require marshalling of any Collateral, and (e) preclusion of any Post-Petition financing, on a priming basis or otherwise, other than pursuant to this Agreement, unless such Post-Petition financing first indefeasibly satisfies the Obligations (including any Pre-Petition Debt) outstanding to Lender and this Agreement has been terminated, or Lender expressly consents to such financing and the priming liens thereof in writing.

"**Inventory**" means all of each Borrower's finished goods and inventory, packing and shipping supplies, all goods intended to be sold or used by such Borrower or to be furnished by such Borrower under contracts of service, including all raw materials, goods in process, finished goods, materials and supplies of every kind and nature, used or usable in connection with the manufacture, shipping, advertising, selling, leasing or furnishing of such goods, all documents evidencing or representing the same and all documents of title, all negotiable and non-negotiable warehouse receipts representing the same and all products, accounts and proceeds resulting from the sale or other disposition of the foregoing, that may be rejected, returned repossessed or stopped in transit and all other items, customarily classified as inventory (all of the foregoing being hereinafter collectively referred to as the "Inventory");

"**Inventory Advance Rate**" means a percentage established by Lender, which may be increased or decreased by Lender and may vary from Borrower to Borrower from time to time in the exercise of its sole discretion. As of the Closing Date, the percentage for each Borrower is as follows:

        (a)     Materials: the percentage shall be 50%;

        (b)     S&G: the percentage shall be 50%; and

"**Investment Property**" means a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract, or commodity account.

"**JK Air**" means JK Air Investment Group, LLC, a Texas limited liability company.

"**Last-Out Participation**" means the last-out junior participation purchased by and/or committed to be purchased by JK Air and Chiron in the Loans pursuant to the Last-Out Participation Agreement, such last-out junior participation to be an amount equal to the outstanding Obligations minus (Eligible Account multiplied by the Accounts Advance Rate) minus (Eligible Inventory multiplied by the Inventory Advance Rate) all as of the Closing Date of this Agreement.

"**Last-Out Participation Agreement**" means a participation agreement in form and substance satisfactory to Lender, in its sole discretion, pursuant to which JK Air and Chiron purchase the Last-Out Participation, the terms and conditions of Last-Out Participation to be satisfactory to Lender, Chiron, and JK Air.

"**Lien**" means any security interest in, or common law, statutory or contractual lien with respect to, any property of a Person. For the purpose of this Agreement, a Borrower shall be deemed to be the owner of any property which it has acquired or holds subject to a conditional sale agreement or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes.

"**Loans**" means all monies advanced by the Lender to the Borrower pursuant to the terms of this Agreement.

"**Loan Documents**" means the Agreement and all notes, guaranties, security agreements, certificates, landlord's agreements, Bank Agreements, Deposit Account Agreements and all other agreements, documents and instruments now or hereafter executed or delivered by Borrower or any Obligor in connection with, or to evidence the transactions contemplated by, this Agreement, and shall include, without limitation, all "DIP Loan Documents".

"**Material Adverse Change**" means any material change in ownership of any Borrower, material losses to any Borrower, any material decline of revenues, any change that has been or reasonably could be expected to be material and adverse to the value of any of the Collateral or to the business, operations, prospects, properties, assets, liabilities, or financial condition of any Borrower.

"**Material Adverse Effect**" means a material adverse effect on either (a) the business, condition (financial or otherwise), operations, performance, properties or prospects of any Borrower, (b) the ability of any Borrower to perform its obligations under this Agreement or any other Loan Document, or to enforce its rights against account debtors of such Borrower, (c) the value of the Collateral or (d) the ability of Lender to enforce the Obligations or its rights and remedies under this Agreement or any of the other DIP Loan Documents. Notwithstanding the foregoing, the commencement of the Chapter 11 Case shall not be a Material Adverse Effect.

"**Maximum Inventory Loan**" means an amount not to exceed Five Hundred Thousand and No/100 Dollars ($500,000.00), with the following terms and conditions, including reductions in the Maximum Inventory Loan:

(a)        Borrower agrees to make principal payments on the first day of each calendar month beginning November 1, 2010 of Three Thousand Dollars ($3,000.00), and thereafter such monthly principal payments shall increase to Five Thousand and No/100 Dollars ($5,000.00) beginning on November 1, 2011, and until the principal balance of the inventory loan is reduced to Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00). The parties agree that the required monthly reductions in the Maximum Inventory Loan will be paid through advances against the Eligible Accounts of Materials.

(b)        Materials and S&G agree to provide to Lender at the end of each week an estimated inventory tonnage by type, value, and location. In addition, Materials and S&G agree to maintain property damage insurance coverage on all inventory with Lender named as Loss Payee and Additional Insured.

(c)        It is agreed that inventory advances will be limited to no more than fifty percent (50%) of the value of all Eligible Inventory of Materials and S&G as provided by Borrowers.

026734.0101\576119.05

"**Maximum Loan Amount**" means One Million Seven Hundred Fifty Thousand and No/100 Dollars ($1,750,000.00).

"**Obligations**" means the Pre-Petition Debt and all other present and future Advances, Loans, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by any Borrower or any Obligor to Lender, whether evidenced by or arising under the Agreement or any other Loan Document, whether arising from an extension of credit, guaranty, indemnification or otherwise whether direct or indirect (including those acquired by assignment and any participation by Lender in any Borrower's indebtedness owing to others), whether absolute or contingent, whether due or to become due, and whether arising before or after the commencement of a proceeding under the Bankruptcy Code or any similar statute, including all interest, charges, expenses, fees, attorney's fees, expert witness fees, audit fees, letter of credit fees, loan fees, Early Termination Fees and any other sums chargeable to, or reimbursable by, any Borrower under the Agreement or under any other Loan Document.

"**Obligor**" means any Guarantor, endorser, acceptor, surety or other person liable on, or with respect to, the Obligations or who is the owner of any property that is security for the Obligations, other than Borrower.

"**Other Property**" means any and all other property of any nature whatsoever of any Borrower now or hereafter in the possession of, assigned to or hypothecated to Lender for any purpose, including, but not limited to balances, credits, deposits, accounts, items and monies of such Borrower now or hereafter with Lender and all dividends and distributions on or rights in connection with any such property and all rights of such Borrower earned or to be earned under contracts to sell goods or render services.

"**Overadvance**" shall have the meaning assigned to it in Section 1.3.

"**Payment Account**" means an account maintained by Lender to which all Collections or other monies from time to time remitted as directed and deposited by Lender shall be transferred and all other payments by Borrower to Lender shall be sent in immediately available federal funds.

"**Payment Notice**" means the notice placed on each invoice, directing the Account to remit only to the Lockbox. Payment made to any other party or location will not constitute valid payment of the invoice. Notice: Congress Materials, LLC OR Congress Sand & Gravel, LLC, P.O. Box 105328, Atlanta GA 30348-5348.

"**Permitted Liens**" means Liens in favor of Lender and any other Liens agreed or consented to by Lender in writing.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, government or any agency or political division thereof, or any other entity.

"**Petition**" has the meaning given to such term in the recitals of this Agreement.

"**Petition Date**" has the meaning given to such term in the recitals of this Agreement.

"**Post-Petition**" means any event, matter or item that arose on or after the Petition Date.

"**Pre-Petition**" means any event, matter or item that arose prior to the Petition Date.

"**Pre-Petition Debt**" means all indebtedness, liabilities, and obligations, including, without limitation, the Pre-Petition Liabilities and all other indebtedness, liabilities and obligations in connection with the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents owed by Borrowers to Lender as of the Petition Date, whether direct or indirect, absolute or contingent, primary or secondary, due or to be come due, including all interest thereon accruing after the Petition Date and all legal fees and collection expenses heretofore or hereafter incurred in collecting any of such indebtedness, liabilities or obligations.

"**Pre-Petition Liabilities**" has the meaning given to such term in the recitals of this Agreement.

"**Pre-Petition Loan Agreement**" has the meaning given to such term in the recitals of this Agreement.

"**Pre-Petition Loan Documents**" means the Pre-Petition Loan Agreement and all other "Loan Documents" as such term is defined in the Pre-Petition Loan Agreement.

"**Prime Rate**" means the per annum rate of prime rate of interest quoted in *The Wall Street Journal* from time to time. If the Wall Street Journal Prime becomes unavailable during the term of this Agreement, Lender may designate a substitute index after notice to Borrower.

"**Procedures Letter**" means the letter issued herewith by Lender and accepted by Borrowers by execution of this Agreement which sets forth the procedures with respect to Advances and reporting to the extent such procedures are not covered in this Agreement.

"**Proceeds**" means all substitutions, improvements, accessions, additions, renewals and replacements of or to any of the Collateral (including, but not limited to, returned or unearned premiums from any insurance written in connection with this Agreement) and all proceeds of any of the foregoing, including, but not limited to, any and all proceeds in the form of Accounts and Inventory.

"**Professional Fees**" means all fees and expenses of professionals retained pursuant to Section 327, Section 328, Section 363 or Section 1103 of the Bankruptcy Code in connection with the Chapter 11 Case.

"**Records**" means all of each Borrower's books and records relating to its business or assets, including records pertaining to any Collateral. Without limiting the generality of the foregoing, each Borrower's accounting and financial records will include all records (whether paper, computer or electronic) data, tapes, discs, or other media and all programs, files, records and procedure manuals relating thereto wherever located.

"**Supporting Obligations**" mean a letter of credit right or secondary obligation that supports the payment or performance of an account, chattel paper, a document, a general intangible, an instrument, or investment property.

11

"**Term**" means the period commencing on the date of this Agreement and ending on the Termination Date or, if earlier, the date on which this Agreement is terminated pursuant to Section 10.2.

"**Termination Date**" means the earliest to occur of: (i) the twelve (12) month anniversary of the Effective Date, (ii) 30 days after the commencement of the Chapter 11 Case, if at such time there is no Final Order, (iii) the confirmation and substantial consummation of a plan of reorganization that is confirmed by an order of the Court (or any other court that may have jurisdiction in the Chapter 11 Case) as to which no stay has been entered and no appeal has been timely filed, and which has not been vacated, modified or reversed, or (iv) [ _____. 201_]

"**UCC**" means, at any given time, the Uniform Commercial Code as adopted and in effect at such time in the State of Georgia.

All accounting terms used in the Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with GAAP. All other terms contained in the Agreement, unless otherwise indicated, shall have the meanings provided by the UCC, to the extent such terms are defined therein. The term "including," whenever used in the Agreement, shall mean "including, but not limited to." The singular form of any term shall include the plural form, and vice versa, when the context so requires. References to Sections, subsections and Schedules are to Sections and subsections of, and Schedules to, the Agreement; to agreements and statutes shall include all amendments thereto and successor statutes in the case of statutes; to the time of day shall mean the time of day on the day in question in Alpharetta, Georgia; to Lender's discretion means Lender's sole and absolute discretion.

026734.0101\576119.05

Fees And Expense Reimbursement

> **The fees and expense reimbursements listed on this schedule are in addition to any fees listed in the Agreement, any of the DIP Loan Documents or subsequently agreed to by Lender and any Borrower, and are not intended to exclude any expenses for which any Borrower is required to reimburse Lender under the Agreement or any of the DIP Loan Documents.**

       (a)     <u>Service Charge</u>.  A service charge of (a) one percent (1%) based on the average daily A/R loan balance and (b) zero point seven percent (.7%) on the average daily inventory loan balance when the average inventory loan balance is equal to or greater than $250,000.00, or zero point six percent (.6%) when the average inventory loan balance is less than $250,000.00, payable on the fifteenth (15th) and last day of each month so long as any of the Obligations are outstanding.

       (c)     <u>Wire Fee</u>.  A charge of $30.00 for each outgoing wire sent to, or on behalf, of any Borrower, and a charge of $15.00 for each incoming domestic wire received, or $30.00 for each foreign wire received for the benefit of any Borrower.  The Wire Fee is subject to change without notice.

       (d)     <u>Automated Clearing House ("ACH") Fee</u>.  A charge of $10.00 for each outgoing ACH transaction and a charge of $10.00 for each incoming ACH transaction. The ACH fee is subject to change without notice.

       (e)     <u>Field Examination</u>.  A fee of $750.00 per person per day plus out of pocket expenses for each field examination conducted by or on behalf of Lender; provided however, field examinations shall be limited to four (4) per year assuming no Event of Default has occurred and is  continuing.

       (f)     <u>Remittance Notification to Debtor Fee</u>:  A fee of $1.00 per letter, plus the cost of mailing.

       (g)     <u>Late Reporting Fee</u>: A fee of $10.00 per day for each report not received by Lender as required under this Agreement, the Procedures Letter or any other loan document.

       (h)     <u>Change of Bank Routing Instruction Fee</u>: A fee of $25.00 for each change of any Borrower's bank of record for wires and ACHs.

       (i)     <u>Misdirected Payment Fee</u>.  For each such occurrence, Borrowers agree to pay to Lender an amount equal to fifteen percent (15%) of any payment on account of any invoice where said payment has been received by a Borrower and not delivered in kind or the proceeds paid by such Borrower to Lender within 2 Business Days of receipt of such payment by such Borrower.

(j)     <u>DIP Loan Fee</u>.  Borrowers agree to pay to Lender $25,000 in connection with the execution of this Agreement.  The fee shall be payable in four equal monthly installments beginning on the date of entry of the Interim Order.

**SCHEDULE C**

**Permitted Liens**

To Be Determined

**SCHEDULE D**

**Borrowing Base Certificate**

**As Currently Used by Borrower**

**SCHEDULE E**

**Financial And Other Covenants**

Borrowers shall, at all times during the term of the loan, maintain Minimum EBITDA plus investor cash infusions to Fixed Charges of 1:1. The first compliance test will be September 30, 2010, and quarterly thereafter.

Borrowers shall, at all times during the term of the loan, maintain a maximum A/R turnover, expressed as Days of Sales, of 60 days, with immediate compliance testing.

For purposes of the covenants set forth in this **Schedule E**, the terms listed below shall have the following meanings:

Earnings before Interest, Taxes, Depreciation and Amortization (**"EBITDA"**) means, for the trailing twelve-month period, net income (exclusive of any extraordinary or non-recurring non-cash gains and extraordinary or non-recurring non-cash losses and other income which is not from the continuing operations of Borrower), plus, to the extent deducted from such net income, Interest expense, income taxes paid and depreciation/amortization expense, all determined in accordance with GAAP.

**SCHEDULE F**

**Locations And Jurisdictions In Which Each Borrower Is Authorized To Do Business**

<u>**MATERIALS**</u>

Locations
Materials currently has the following business and inventory locations, and no other:

<u>Chief Executive Offices</u>:
    1001 Fannin Street, Suite 4775
    Houston, TX 77002

<u>Other Locations</u>:
    PO Box 1457
    Bridgeport, TX 76426

    1401 Cates Street, Suite 200
    Bridgeport, TX 76426

<u>Notification Address</u>:
    1001 Fannin Street, Suite 4775
    Houston, Texas 77002
    Attn:  Jay Krasoff

<u>Inventory Locations</u>:

    11650 Mosier Valley Road
    Euless, TX 76040

    3637 Castle Drive
    Garland, TX 75040

<u>**Jurisdictions (Include Legal Name and all Tradename)**</u>

| Name | Type of Entity (domestic corporation, foreign corporation, partnership, limited liability company, D/B/A, tradename, etc.) | State |
|---|---|---|
| Congress Materials, LLC, as successor by merger to Green Aggregates, Inc. | Limited liability company | Delaware |
| Green Aggregates | Tradestyle and D/B/A | Delaware and Texas |

**S&G**

Locations
S&G currently has the following business and inventory locations, and no other:

Chief Executive Offices:

    1001 Fannin Street, Suite 4775
    Houston, TX 77002

Notification Address:
    1001 Fannin Street, Suite 4775
    Houston, Texas 77002
    Attn: Jay Krasoff

Inventory Locations:

    14099 NE County Road 3180
    Kerens, TX 75144

**Jurisdictions (Include Legal Name and all Tradename)**

| Name | Type of Entity (domestic corporation, foreign corporation, partnership, limited liability company, D/B/A, tradename, etc.) | State |
| --- | --- | --- |
| Congress Sand & Gravel, LLC | Limited liability company | Texas |
| Union Materials | Tradestyle and D/B/A | Texas |

**GREEN**

Locations
Borrowers currently have the following business and inventory locations, and no other:


Chief Executive Offices:

      1001 Fannin Street, Suite 4775
      Houston, TX 77002

Other Locations:
      PO Box 1457
      Bridgeport, TX 76246

      1401 Cates Street, Suite 200
      Bridgeport, Texas 76426

Notification Address:

      1001 Fannin Street, Suite 4775
      Houston, TX 77002
      Attn: Jay Krasoff

Inventory Locations:
      (If different from above)

      11650 Mosier Valley Road
      Euless, TX 76040

      3637 Castle Dr.
      Garland, TX 75040

**Jurisdictions (Include Legal Name and all Tradename)**

| Name | Type of Entity (domestic corporation, foreign corporation, partnership, limited liability company, D/B/A, tradename, etc.) | State |
| --- | --- | --- |
| Green Aggregates, Inc. | Corporation | Texas |
| Cooke County Stone | Tradestyle and D/B/A | Texas |
| Recycled Aggregates | Tradestyle and D/B/A | Texas |
| Congress Materials | Tradestyle and D/B/A | Texas |

**SCHEDULE G**

**Capital Structure**

| Class of Stock/Membership Interest | Record Owner | Percent of Membership Interest |
|---|---|---|
| Congress Materials LLC – common | Chiron Equities, LLC | 100 |
| Congress Sand & Gravel, LLC - common | Chiron Equities, LLC | 100 |

**SCHEDULE H**

**Claims and Causes of Action**

Thomas Petroleum (fuel from early 2009)
Case : CIV7-14475
Filed in Victoria County, Texas – District Court
Outstanding Balance: $60,000

TKO Equipment Company (equipment rentals from early 2009)
Case: 09-05381
Filed in Dallas County, Texas – District Court
Outstanding Balance: $80,000

**SCHEDULE I**

**Milestones**

1)      Interim Order              by:  October 29, 2010

2)      Final Order               by:  November 19, 2010

3)      Disclosure Statement and Plan filed that is
acceptable to Lender              by:  November 30, 2010

4)      Order acceptable to Lender approving Disclosure Statement by:  January 8, 2011

5)      Order acceptable to Lender approving a Plan of Reorganization acceptable to Lender
by:  February 28, 2011

6)      Effective Date of Plan of Reorganization        by: March 31, 2011

7)      Substantial Consummation of a Plan of Reorganization Paying all Pre-Petition and Post-
Petition Obligations in full and/or Closing of an Exit Facility Replacing this Agreement    by:
March 31, 2011

**EXHIBIT A**

**Form of Certificate of Compliance**

**(Use Congress Materials, LLC Letterhead with this Form)**

Date:

To: Credit manager

This is to certify that, in accordance with Section 7.1(d) of the Amended and Restated Loan and Security Agreement between Congress Materials, LLC, Congress Sand & Gravel, LLC and Presidential Financial Corporation dated September __, 2010 (the **"Loan Agreement"**) the attached financial statements are complete and true and have been prepared in conformance with GAAP. In addition, there are no Defaults or Events of Default continuing as of such date (if there are acceptable exceptions, list them).

Also attached are the covenant calculations used in determining compliance with the financial covenants contained in Schedule E of the Loan Agreement.

Capitalized terms used herein are as defined in the Loan Agreement.

Very truly yours,

_____

Jay Krasoff

# EXHIBIT B

## Borrowers' Budget

**EXHIBIT C**

**Lender Approval of Borrowers' Budget**