HELLER, DRAPER, HAYDEN, PATRICK & HORN, LLC
Attorneys for the Debtors
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
(504) 299-3300

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, LA Bar No. 14891
lcollins@hellerdraper.com
Kendra M. Goodman, LA Bar No. 32790
kgoodman@hellerdraper.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **CONGRESS SAND & GRAVEL, LLC,** *et al*.[1] | § | **Case No. 10-37522(SGJ)** |
| | § | |
| **DEBTORS.** | § | **Chapter 11** |
| | § | **(Jointly Administered)** |

---

**DISCLOSURE STATEMENT AS OF MARCH 1, 2011**

**Submitted by:**

/s/ Douglas S. Draper
DOUGLAS S. DRAPER, (Bar #5073)
**Heller, Draper, Hayden, Patrick & Horn, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone:  504-299-3300
Facsimile:  504-299-3399
*Attorneys for Debtors*

---

[1] The Debtors include Congress Sand & Gravel, LLC and Congress Materials, LLC (Case No. 10-37526).

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………...3

I.      DEFINITIONS AND RULES OF CONSTRUCTION………………………….4

II.     PURPOSE AND SUMMARY OF THE PLAN.......................................................15

III.    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS
        AND INTERESTS UNDER THE PLAN …………………………………………..20

IV.     GENERAL OVERVIEW AND BACKGROUND INFORMATION……………….27

V.      PLAN…………………………………………………………………………....45

VI.     CORPORATE GOVERNANCE ISSUES AND RESITRICTIONS ON
        THE DEBTOR'S POST CONFIRMATION OPERATIONS………………………..52

VII.    EXECUTORY CONTRACTS………………………………………………………52

VIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES……………………55

IX.     LIQUIDATION ANALYSIS UNDER CHAPTER 7………………………………...57

X.      CONFIRMATION PROCEDURE…………………………………………..……..58

XI.     CONCLUSION AND RECOMMENDATION…………………………………......69

**Formatted:** Font: Not Bold

**Formatted:** JW Body Text First Indent Double, Tabs: Not at 2.5"

**Formatted:** Font: 12 pt

**Formatted:** Justified

# INTRODUCTION

Congress Sand and Gravel, LLC and Congress Materials, LLC as debtors and debtors-in-possession ("<u>Debtors</u>") have filed Plan of Reorganization as of January 6, 2011, as subsequently amended (the "<u>Plan</u>"). The Debtors submit this Disclosure Statement (the "<u>Disclosure Statement</u>"), pursuant to Section 1125 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), to holders of Claims against and Equity Interests in the Debtors, in connection with (i) the solicitation of acceptances or rejections of the Plan (together with any modification, amendment or supplement, of the Plan), and (ii) the hearings to consider approval of the Plan to be scheduled before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>") on the date(s) set forth in the accompanying notice.

Unless otherwise defined in this Disclosure Statement, all capitalized terms contained herein have the meanings ascribed to them in the Plan. In the event of a conflict or difference between the definitions used, and provisions contained, in this Disclosure Statement and the Plan, the definitions and provisions contained in the Plan shall control.

THE DESCRIPTIONS OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT ARE SUMMARIES, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO DEBTORS' PLAN. EACH CREDITOR IS ENCOURAGED TO ANALYZE THE TERMS OF THE PLAN CAREFULLY.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BELIEVED TO BE ACCURATE AS OF THE DATE OF ITS FILING UNLESS ANOTHER TIME IS SPECIFIED IN THIS DISCLOSURE STATEMENT. THEY SHOULD NOT BE CONSTRUED AS IMPLYING THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH SINCE THE DATE ON WHICH THIS DISCLOSURE STATEMENT WAS

PREPARED AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

# I. DEFINITIONS AND RULES OF CONSTRUCTION

1.      **"Administrative Claim"** means a claim for costs and expenses of administration of the Reorganization Cases and any allowed interest under section 503(b) of the Bankruptcy Code entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code.

2.      **"Allowed Administrative Claim"** means all or that portion of an Administrative Claim which has been allowed pursuant to a Final Order of the Bankruptcy Court.

3.      **"Allowed"** means, with respect to a Claim or Interest, except as otherwise allowed or provided for in the Plan or a Final Order of the Bankruptcy Court, a Claim or Interest, proof of which was timely and properly Filed or, if no proof of claim or proof of interest was Filed, which has been or hereafter is listed by the Debtors on their Schedules as liquidated in amount and not disputed or contingent, and, in either case, as to which:

> (a)      no objection to the allowance thereof has been interposed on or before the later of: (i) the one hundred twentieth (120th) day after the Effective Date, or (ii) such other applicable period for objection as may be fixed or extended by the Court, or

> (b)      any objection thereto has been determined by a Final Order to the extent such objection is determined in favor of the respective holder.

Unless otherwise specified herein or by order of the Court, an "Allowed Claim," "Allowed Unsecured Claim" or "Allowed Secured Claim" of a particular Class shall not include any interest, fees, costs or other charges on such Claim accruing after the Petition Date.

{00313909-7}

4.      **"Allowed Priority Tax Claim"** means all or that portion of a Priority Tax Claim which has been allowed pursuant to a Final Order of the Bankruptcy Court.

5.      **"Allowed Secured Claim"** means all or that portion of a Secured Claim which has been allowed pursuant to a Final Order of the Bankruptcy Court and which shall include any amounts allowed under 11 U.S.C. § 506.

6.      **"Allowed Unsecured Claim"** means all or that portion of an Unsecured Claim allowed by Final Order of the Bankruptcy Court.

7.      **"Avoidance Actions"** means all of the Debtors' and the Estates' rights and claims under sections 502, 522(f), 541 through 553, inclusive, and 724(a) of the Bankruptcy Code, or under any similar or related state or federal statute or common law, whether or not an action is initiated on or before the Effective Date.

8.      **"Ballot"** means the form to be distributed with this Disclosure Statement to each holder of an Impaired Claim on which the holder is to indicate acceptance or rejection of the Plan.

9.      **"Bankruptcy Code"** means Title 11 of the United States Code, or the Bankruptcy Reform Act of 1978, as amended.

10.     **"Bankruptcy Court"** means the United States Bankruptcy Court for the Northern District of Texas, or, in the event such court ceases to exercise jurisdiction over the Reorganization Cases, such court or adjunct thereof that exercises jurisdiction over the Reorganization Cases in lieu of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

11.     **"Bankruptcy Rules"** means collectively, the (a) Federal Rules of Bankruptcy Procedure, (b) Federal Rules of Civil Procedure, and (c) Local Rules of the Bankruptcy Court, as

applicable from time to time in the Reorganization Cases, or proceedings therein, as the case may be.

**12.** **"Business Day"** means any day other than a Saturday, Sunday or Federal holiday in the United States.

**13.** **"Cash"** means cash or cash equivalents.

**14.** **"Causes of Action"** shall mean, without limitation, any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, debts, sums of money, damages, judgments, claims and demands, actions, defenses, offsets, powers (including all police, regulatory, and enforcement powers and actions that may be taken), privileges, licenses, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whatsoever, whether known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or tort, in law, equity or otherwise, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable.

Causes of Action shall include, but are not limited to (a) damages, (b) the recovery of monies, (c) lien avoidance, subordination, surcharge, re-characterization, rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (d) tax refunds, (e) injunctive, equitable, or other relief, (f) claims pursuant to Section 362 of the Bankruptcy Code, (g) such claims and defenses as fraud, mistake, duress, and usury, (h) Avoidance Actions, (i) objections to the allowance of claims for disgorgement and/or otherwise, including any related to the extent, priority, subordination, or validity of liens, (j) claims for preferences, fraudulent transfers and conveyances under the Bankruptcy Code, (k) claims for

simulation, fraud, revocatory action, oblique action, and fraudulent transfers and conveyances under Texas state law or any other applicable law, (l) claims pursuant to title 18 U.S.C. and any claims or causes of action related to any of the foregoing, (m) all equitable subordination claims under 11 U.S.C. § 510, (n) all claims arising under all theories of recovery relating to participatory, vicarious, secondary, and related theories of liability including aiding and abetting, conspiracy, principal-agent, partnership, common enterprise, joint and several liability, proportionate responsibility, and contribution, (o) equitable claims including claims for lien subordination and contempt and any claims or causes of action related to any of the foregoing, (p) any claims or proceedings for recovery under any policies of insurance issued to or on behalf of the Debtors or any judgment obtained on behalf of any of the Debtors, (q) all claims arising from tort theories of recovery, including tortious interference with existing contract, tortious interference with contractual/business relations, conversion, breach of fiduciary duty, breach of duty as an officer and director of the Debtors entities, fraud, bankruptcy fraud, negligence, gross negligence, trade-secret misappropriation, failure to disclose, misrepresentation, malpractice, libel, slander, malicious prosecution, bad faith denial of coverage or other insurance claim, and any claims or causes of action related to any of the foregoing, (r) all claims arising from all contract theories of recovery, including contract and usury, quasi-contract claims, including quantum merit, promissory estoppel, suit on a sworn account, money had and received and any claims or causes of action related to any of the foregoing, (s) Retained Causes of Action, and (t) all causes of action that may be directly or derivatively asserted on behalf of the Debtors, their Estates, or the Reorganized Debtors. Causes of Action shall also include the XTO Matter and the JTM Claim.

15. **"Chiron Equipment Claim"** shall mean the claim of Chiron Equities, LLC arising out of the note secured by the Volvo L330C Wheel Loader & 2005 Terex Pegson 1412 Trakpactor Crusher.

16.  **"Chrysler"** shall mean Chrysler Financial Corporation.

17. **"Claim"** shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

18. **"Class"** means a category of holders of Claims classified together pursuant to section 1123(a)(1) of the Bankruptcy Code.

19. **"Committee"** means Official Unsecured Creditors' Committee appointed in this case to the extent a committee exists and the members thereto.

20. **"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

21. **"Confirmation Hearing"** means the hearing held pursuant to section 1128(a) of the Bankruptcy Code at which the Bankruptcy Court considers confirmation of the Plan, including any continuances thereof.

22. **"Confirmation Order"** means the final order of the Bankruptcy Court entered following the Confirmation Hearing that confirms the Plan.

23. **"Continental"** shall mean Continental Bank.

24. **"Creditor"** means the holder of an Allowed Claim.

25. **"Cure Payment"** means actual pecuniary loss due or required to be paid under Section 365(b)(1)(A)-(C) of the Bankruptcy Code on an assumed contract or unexpired lease.

26. **"Debtors"** mean Congress Materials, LLC (successor to Green Aggregates) and Congress Sand & Gravel, LLC, collectively.

27. **"Debtors in Possession"** mean the Debtors between the Petition Date and the Effective Date.

28. **"Deere"** shall mean John Deere Credit Corporation.

29. **"Deere Congress"** shall mean the claim of Deere arising out of its loan to Congress Materials.

30. **"Deficiency Claim"** shall mean the difference between a creditor's claim and such creditors allowed secured claim.

31. **"DIP Facility"** shall mean the Debtor-in-Possession loan facility among the Debtors and Presidential, which provides Presidential a first priority lien in the Debtors' accounts, inventory, and other assets, as set forth in the DIP Orders and Debtor-in-Possession Loan and Security Agreement.

32. **"DIP Orders"** shall mean the relief granted at the final hearing on November 23, 2010 and final order entered on December 16, 2010 (Docket No. 143) entitled "Final Order (1) Authorizing the Debtors to Obtain Post-Petition Financing, Granting Senior Security Interests and According Priority and Administrative Expense Pursuant to Section 364(c) and 364(d) of the Bankruptcy Code, (2) Authorizing the Use of Cash Collateral (3) Granting Adequate Protection, and (4) Modifying the Automatic Stay" and as applicable the relief granted at the interim hearing on November 1, 2010 and the interim order entered on November 5, 2010 (Dkt. 64) entitled "Interim Order (1) Authorizing the Debtors to Obtain Post-Petition Financing, Granting Senior Security Interests and According Priority and Administrative Expense Pursuant to Section 364(c) and 364(d) of the Bankruptcy Code, (2) Authorizing the Use of Cash Collateral (3) Granting Adequate Protection, (4) Modifying the Automatic Stay, and (5) Approving Form and Manner of Notice and Scheduling a Final Hearing Under Bankruptcy Rule 4001(c).

33.     **"Disallowed Claim"** means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

34.     **"Disclosure Statement"** means this Disclosure Statement for the Debtors to accompany the Plan, as modified or amended, filed with and approved by the Bankruptcy Court on _____ 2011.

35.     **"Disputed Claim"** or **"Disputed Interest",** mean any Claim, which is neither an Allowed Claim nor a Disallowed Claim, or an Allowed Interest nor a Disallowed Interest, as the case may be. In the event that any part of a Claim or Interest is disputed, such Claim or Interest in its entirety shall be deemed to constitute a Disputed Claim or Disputed Interest for purposes of distribution under the Plan unless a Final Order has been entered providing otherwise. Without limiting any of the foregoing, a Claim or Interest that is the subject of a pending objection, motion, complaint, counterclaim, setoff, Avoidance Actions, litigation claim or other defense, or any other proceeding seeking to disallow, subordinate or estimate such Claim, shall be deemed to constitute a Disputed Claim or Disputed Interest, as the case may be.

36. **"Distribution"** means any payment with respect to Allowed Claims under the Plan.

37. **"Effective Date"** shall be the day selected by the Debtors that is after the Confirmation Date, but in no event shall be more than ten (10) days after all conditions to the effectiveness of the Plan have been satisfied or waived or more than 60 days after the confirmation of the Plan.

38. **"Equity"** shall mean Equity Bank and its successor to Triumph Savings Bank S.A.

39. **"Equity Interest"** means the Interests in the Debtors.

40. **"Estates"** means the estates created in the Reorganization Cases under section 541 of the Bankruptcy Code.

41. **"Exit Facility"** shall mean a loan facility to potentially be provided by Presidential upon the Effective Date of the Plan.

42. "**File**" or "**Filed**" means filed with the Bankruptcy Court in the Reorganization Cases, as reflected on the official docket of the Bankruptcy Court for the Reorganization Cases.

43. **"Final Order"** means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, rearguement, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment

was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired, with no further appeal, petition for certiorari or motion for reargument or rehearing pending; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule of the Bankruptcy Rules, may be filed with respect to such order or judgment shall not render such order or judgment not to be a Final Order.

44. **"Ford"** shall mean Ford Motor Credit Corporation.

45. **"Governmental Unit"** shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

46. **"Impaired"** means a Claim or Interest or a Class of Claims or a Class of Interests that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

47. **"Insider Claims"** shall mean all those claims, both secured or unsecured, held by Chiron Equities, LLC, Congress Recycled Aggregates, LLC, JK Air Investment Group, LLC, First KT Lending, LLC or KT Foods, LLC, except for the Chiron Equipment Claim and any lease of personal property between the Debtors and Chiron Equities, LLC. The term Insider Claims includes the current participation by Chiron Equities, LLC in the Presidential DIP Facility.

48. **"Interest"** means the holder of any current or former holder of an "equity security" (as defined in Section 101(16) of the Bankruptcy Code).

49. **"JTM Claim"** means any Cause of Action of Congress Materials against JTM Materials, Inc., arising from events prior to or after the Petition Date, including but not limited to a cause of action for post-petition setoff or unpaid post-petition purchases.

50.     **"Owners"** mean the owners of an Interest in Debtors.

51.     **"Patriot"** shall mean Patriot Bank

52.     **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

53.     **"Petition Date"** means October 28, 2010.

54.     **"Presidential"** shall mean Presidential Financial Corporation.

55.     **"Presidential Claim"** shall mean the pre and post petition claim of Presidential.

56.     **"Plan"** means the plan of reorganization, either in its present form or as it may be altered, amended, or modified from time to time by the Debtors or the Reorganized Debtors in accordance with the Bankruptcy Code and Bankruptcy Rules.

57.     **"Priority Tax Claim"** shall mean any Claim entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, but only to the extent it is entitled to priority under such subsection.

58.     **"Pro Rata"** shall mean a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim or Allowed Interest in a Class to the amount of such Allowed Claim or Allowed Interest is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims or Allowed Interests in such Class.

59.     **"Professional"** means an Entity (a) employed in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) to whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4), 506, or 1129(a)(4) of the Bankruptcy Code.

60. **"Professional Fee Claim"** means those fees and expenses claimed by Professionals pursuant to sections 330, 331, 503, 506, and/or 1129(a)(4) of the Bankruptcy Code, and unpaid as of the Confirmation Date.

61. **"Property" or "Properties"** means any and all assets of the Debtors' respective Estates, including any assets of the Estates that are vested in the Reorganized Debtors on the Effective Date.

62. **"Reorganization Cases"** means these jointly administered bankruptcy cases under Chapter 11 of the Bankruptcy Code.

63. **"Reorganized Debtors"** means the Debtors, as re-vested with property of the Estates to the extent provided in the Plan, on or after the Effective Date.

64. **"Retained Causes of Action"** means the Causes of Action retained by the Reorganized Debtor, including but not limited to the XTO Matter and the JTM Claim.

65. **"Rice"** shall mean Danny Rice.

66. **"Scheduled"** means set forth, stated or listed on the Schedules.

67. **"Schedules"** means the Schedules of Assets and Liabilities and List of Equity Security Holders Filed by the Debtors under the Bankruptcy Rules, as the same have been or may be amended from time to time before the Effective Date.

68. **"Secured Claim"** means any Claim that is secured by a valid, perfected and unavoidable lien on property in which the Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the claimholder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, and determined under section 506 of the Bankruptcy Code.

69. **"Small Claim"** means any Claim totaling $5,000 or less.

70.	**"Small Claim Creditor"** means a holder of a Small Claim, or a holder of a Claim electing to be treated as a holder of a Small Claim.

71.	**"Unclassified Claim"** means an administrative claim and a priority claim.

72.	**"Unimpaired"** means a Claim or Interest or a Class of Claims or a Class of Interests that is not Impaired.

73.	**"Unsecured Claim"** means any claim that is not an Administrative Claim, Priority Claim, Secured Claim, or a Claim otherwise specifically classified in another class in the Plan.

74.	**"Unsecured Creditor Amount"** means the sum of $500,000.00.

75.	**"Voting Deadline"** means the date and time, as set by an Order of the Bankruptcy Court and set forth in this Disclosure Statement, by which all Ballots must be received at the address set forth used for voting on the Plan, as such date may be extended by an order.

76.	**"XTO Matter"** means cause of action no. 348-235990-09, styled XTO Energy, Inc, Plaintiff v. Green Aggregates, Inc. and Congress Materials, LLC, Defendants.

**Formatted:** Font: Bold

## II. PURPOSE AND SUMMARY OF THE PLAN

**THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW AND ANALYZE THE PLAN IN ITS ENTIRETY**.

The primary purpose of the Plan is to restructure the Debtors' obligations to creditors so that expected revenue will allow the Reorganized Debtors to pay all operating costs as well as Distributions required under the Plan

A.	**Purpose of Disclosure Statement**

This Disclosure Statement has been prepared by Debtors to disclose information that the Bankruptcy Court has determined to be material and necessary to enable the Creditors of the Debtors and other parties in interest to make informed decisions in voting for acceptance or rejection of the plan of reorganization filed by Debtors. Confirmation of a plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code depends in part upon the receipt of a sufficient number of votes in favor of reorganization under the terms and conditions set forth in the Plan.

**B.      Brief Explanation of Chapter 11**

Pursuant to Chapter 11 of the United States Bankruptcy Code, a Debtor may reorganize its business for its own benefit and that of its creditors and equity interest holders. To facilitate this process, all efforts to collect pre-petition claims from a Debtor and any secured creditor's attempts to foreclose on or seize property of a Debtor are stayed during the pendency of the reorganization proceeding. In this case, Debtors filed a petition for Chapter 11 relief on October 28, 2010.

The formulation of a plan of reorganization is the principal purpose of a Chapter 11 reorganization case. The plan of reorganization attached as Exhibit A is Debtors' proposal for satisfying claims against the Debtors, and discharging the Debtors' estate from all pre-petition liabilities except as provided in the Plan.

**C.      Voting**

Each Creditor entitled to vote will be furnished a ballot for voting, on which it must indicate the classification of its Claim and its vote. Debtors believe that the holders of Unclassified Administrative Claims, and Class 1, 8, and 13 Claims are Unimpaired and therefore are conclusively presumed to have accepted the Plan. Accordingly, pursuant to Bankruptcy Code Section 1126(f), the votes of holders of such classes shall not be solicited. Holders of

**Deleted:** .

Claims in Classes 2, 3, 4, 5, 6, 9, 11, 12, 14, 15, 16, 17, 19, 20, 21, 22, and 23 are Impaired under

Deleted: 7,

Deleted: 10,

Deleted: 18,

the Plan, and therefore shall be entitled to vote to accept or reject the Plan. A Creditor's failure

to indicate a class on a ballot will result in the ballot's being classified by the Debtors for voting

purposes in accordance with the Plan. However, Debtors may object to any votes that Debtors

believe to have been voted in an incorrect class. The Bankruptcy Court will decide any disputes

regarding the classification of Claims for voting purposes.

In order to confirm a plan without the approval of unsecured creditors, the Bankruptcy

Code requires that the class of unsecured creditors must be paid in full before any Equity Interest

holders receive anything on account of their interests. The Debtors here seek the approval of the

unsecured creditors, although the Debtors shall seek to confirm the Plan over the objection of

any creditors.

**D.    Confirmation Hearing**

A hearing on Confirmation of the Plan will be set by the Bankruptcy Court after the

approval of this Disclosure Statement. Each Creditor will be mailed at the address shown on the

Bankruptcy Court's mailing matrix a notice indicating the time and date of the hearing. The

Confirmation hearing will be held at the United States Bankruptcy Court for the Northern

District of Texas, 1100 Commerce Street, Dallas, Texas 75242. At the hearing, the Bankruptcy

Court will consider whether the Plan satisfies the requirements of the United States Bankruptcy

Code, including whether it is feasible and whether it is in the best interest of the holders of

Claims against the Debtors. At that time the Bankruptcy Court also will receive and consider a

"ballot report" tabulating the votes for acceptance or rejection of the Plan by the parties entitled

to vote.

**E.    Confirmation of the Plan**

{00313909-7}

There are two methods by which the Bankruptcy Court may confirm a Plan. These include the "acceptance" method, in which all the impaired classes of Claims have voted in the requisite amounts to accept the Plan, and the Plan complies with 11 U.S.C. §1129(a). The second, known as the "cram-down" method, requires that at least one class of impaired Claims have voted to accept the Plan and that certain other requirements (discussed below) are met with respect to all other impaired classes of Claims.

To be confirmed under the non-acceptance or cram-down method, a plan must be accepted by at least one class of claims that is "impaired." A claim that will not be repaid in full or for which the legal, equitable or contractual rights are altered is considered "impaired," unless its treatment under a plan complies with 11 U.S.C. §1124(1), (2) or (3). A holder of a claim that is impaired under a plan of reorganization is entitled to vote to accept or reject that plan if the claim has been allowed or is deemed allowed under §502 of the Bankruptcy Code, or is temporarily allowed for voting purposes under Bankruptcy Rule 3018. For a class of claims to vote to accept a plan, at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims actually voting in that class must be cast for acceptance of the Plan. BALLOTS OF HOLDERS OF IMPAIRED CLAIMS THAT ARE SIGNED AND RETURNED, BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN, WILL BE COUNTED AS BALLOTS FOR ACCEPTANCE OF THE PLAN. A BALLOT ACCEPTING THE PLAN MAY NOT BE REVOKED WITHOUT THE CONSENT OF THE DEBTORS OR APPROVAL OF THE BANKRUPTCY COURT.

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan notwithstanding its rejection by one or more impaired classes, if, as to such impaired class or

classes, the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the impaired classes. Those requirements are summarized as follows:

1. With respect to each impaired class of claims or interests that does not accept the plan, the Bankruptcy Court must determine that each holder of a claim in such class will receive or retain property of a value not less than the amount such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

2. The Bankruptcy Court must find that the plan does not unfairly discriminate and is fair and equitable with respect to each impaired class that does not accept the plan. With respect to classes of secured creditors, the fair and equitable test requires that a secured creditor (a) retains its lien and receive cash payments equal to the allowed amount of its claim, (b) receive the proceeds from the sale of its collateral, or (c) realize the indubitable equivalent of its claim. With respect to classes of unsecured claims, the fair and equitable test requires that if each holder of a claim in that class does not receive property with a value equal to the allowed amount of its claim, no class junior to that class can receive anything under the plan.

If the Bankruptcy Court orders confirmation of Debtors' Plan, then pursuant to 11 U.S.C. §1141 of the Bankruptcy Code, generally, the Debtors are discharged from all pre-Confirmation debts except as provided in Debtors' Plan or Bankruptcy Code § 1141. Confirmation of the Plan makes the Plan and its provisions binding on the Debtors, all Creditors, all holders of Equity Interests, and other parties in interest, regardless of whether they have accepted or rejected the Plan.

F.    **Approval of this Disclosure Statement**

A decision by the Bankruptcy Court to approve this Disclosure Statement under 11

U.S.C. § 1125 as containing information of a kind and in sufficient detail to enable a reasonable,

hypothetical investor typical of holders of impaired Claims to make an informed judgment about

the Plan is not a recommendation by the Bankruptcy Court either for or against the Plan.

## III.   SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The Plan contemplates payments to all Allowed Claims against the Debtors out of cash

on hand and out of revenue generated from operations by the Reorganized Debtors.

The following is a summary of the classification and treatment of Claims under each of

the Plan:

| CLASS | TREATMENT |
|---|---|
| **Unclassified - Allowed Administrative Expense Claims.**<br><br>The Debtors estimate that the amount of administrative expense claims will be $400,000 or less. | Unimpaired.  Not entitled to vote.<br><br>Subject to the bar date provisions of the Plan, the Debtors shall pay each holder of an Allowed Administrative Claim against the Debtors on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount of the Allowed Administrative Claim the later of thirty days after the Effective Date or the date such claim is allowed (if applicable).<br><br>On or before the Effective Date, the Debtors shall pay all fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, in Cash in full.<br><br>Except as provided below for professionals and non-tax liabilities incurred in the ordinary course of business by the Debtors in Possession, requests for payment of Administrative Claims must be Filed no later than **sixty (60)** days after the Effective Date.<br><br>Holders of Administrative Claims based on liabilities incurred in the ordinary course of business of the Debtors in Possession prior to the Effective Date (other than professionals or other holders of Professional Fee Claims, and governmental units that hold claims for taxes or claims and/or penalties related to such taxes) shall not be required to File any request for payment of such claims.   Such Administrative Claims shall be assumed and paid by the Reorganized Debtors in the ordinary course of business under the terms and conditions of the particular transaction giving rise to such Administrative Claim, without any further action by the holders of such claims.<br><br>Holders of Allowed Administrative Claims shall be entitled to interest on their |

| | |
|---|---|
| | Administrative Claims to the extent allowable, except holders of Professional Fee Claims.<br><br><br>Estimated percentage recovery: 100%. |
| **Unclassified: Allowed Priority Tax Claims.**<br><br>The total estimate of Allowed Priority Tax Claims is unknown, but considered to be $1,158,000.<br><br>**Congress Materials**<br>The Allowed Priority Tax Claim relating to the IRS is estimated to be $865,000.  The Claims in this class are estimated to be:<br>1) IRS Congress Materials: $800,000.<br>2) Texas Comptroller: $222,000.<br>3) Texas Workforce: $523.<br>4) Texas Sales Tax: $38,000.<br>5) City & County Taxes: $10,000.<br>6) IRS Congress Sand: $65,766.<br>7) Navarro County: $8,500.<br>8) Wise County: $515.<br>9) Cooke County: $13,000.<br>. | Unimpaired. Not entitled to vote.<br><br>Each holder of an Allowed Priority Tax Claim, shall be paid the Allowed Amount of its Allowed Priority Tax Claim, at the option of the Reorganized Debtors: (a) Cash on the Effective Date, or on such other date on which such Priority Tax Claim becomes an Allowed Claim, in an amount equal to the amount of the Allowed Priority Tax Claim or (b) in 36 payments with the monthly payment calculated with  same amortization schedule of the  payments to the Class 16 creditors with interest calculated in accordance with 11 U.S.C. §511 or otherwise as required by Section 1129(a)(9)(C) or (D) of the Bankruptcy Code.  The initial payments to the IRS and the State of Texas Sales Tax shall be applied to amounts that were incurred by Congress The Allowed Priority Tax Claims shall only include interest incurred through the Petition Date but not penalties.<br><br>Estimated percentage recovery:  100%. |

| | |
|---|---|
| **Unclassified: Allowed Secured Tax Claims**<br><br>The total estimate of Allowed Secured Tax Claims is unknown, but considered to be approximately $78,000.00.<br><br>**Congress Materials**<br>The Allowed Secured Tax Claims with respect to the Cooke County Appraisal District is $12,988.24, with respect to Navarro County is $8,424.33, with respect to Wise CAD is $17,345.40, with respect to Wise County is $515.58, and with respect to the Texas Workforce Commission is $37,459.86.<br><br>**Congress Sand**<br>The Allowed Secured Tax Claim relating to the Texas Workforce Commission is $1,561.23. | Unimpaired. Not entitled to vote.<br><br>Each holder of an Allowed Secured Tax Claim, shall be paid the Allowed Amount of its Allowed Secured Tax Claim, at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; or (b) in monthly Cash payments commencing sixty (180) days after the Effective Date, within five (5) years from the Petition Date, and in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section 1129(a)(9)(C) or (D) of the Bankruptcy Code. The initial payments to holders of Secured Tax Claims shall be applied to amounts that were incurred by Congress Materials until paid in full and thereafter shall be applied to any amounts assumed by Congress Materials when it merged with Green Aggregates, Inc. The Allowed Secured Tax Claims shall only include interest incurred thru the Petition Date.<br><br>Estimated percentage recovery: 100%. |
| **Class 1: Presidential Claim**<br><br>The total estimate of the Allowed Class 1 Administrative Claim will have a principal balance of $1,850,000 on the Effective Date. Affiliates of the Debtors have a participation in this Class, more particularly described in Article IV, Section C of this Disclosure Statement. | N/A Administrative Claim<br><br>The Presidential Claim (whether pre-petition or post-petition) shall be paid in full through the Exit Facility. However, the Exit Facility shall not pay any of the Chiron Participation, which shall be converted to equity in the Reorganized Debtors. The Exit Facility shall have (1) a senior priority lien on all accounts, accounts receivable, payment intangibles, instruments, chattel paper, investment property, deposit accounts, chattel paper, inventory, Congress Materials' leasehold interests, the Terex Haul Truck TA 27, Serial No. a8681103 (the "Terex Truck") and any other assets not subject to a pre-petition lien and (2) a junior lien on any other assets subject to a pre-petition senior lien.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery: 100%. |
| **Class 2: Equity Bank**<br><br>The total estimate of the Allowed Claim in this class has a principal balance of $104,000. | Impaired: Entitled to vote<br><br>The Debtors do not believe any value exists in the Equity Bank claim inasmuch as the lien of Equity Bank is primed by priority tax claims and as such the Debtors intend to abandon the property that serves as collateral for the Equity Bank claim.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>The holder of the Class 2 Allowed Claim shall posses solely a Class 16 Claim. |

| | |
|---|---|
| | Estimated percentage recovery : 8%. |
| **Class 3: Continental Bank**<br><br>The total estimate of the Allowed Secured Claim in this class has a principal balance of $625,000. | Impaired. Entitled to vote.<br><br>The holder of this Claim shall retain its security interest until its Class 3 Claim is paid in full. The claimant in this class shall be paid based upon monthly payments of principal and interest based upon the following:<br>    a) an interest rate of 6.5% simple interest<br>    b) an amortization and term of six (6) years<br>    c) a principal balance based upon the allowed secured claim of Continental.<br><br>The final payment shall be made 60 days after the Effective Date. The Deficiency Claim of Continental Bank shall be treated as a Class 16 Claim.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery of the Class 3 Claim: 100% |
| **Class 4: Bank of the Ozarks**<br><br>The total estimate of the Allowed Secured Claim in this class has a principal balance of $125,000. | Impaired. Entitled to Vote<br><br>The holder of this Claim shall retain its security interest in the property that secures its debt until its Class 4 Claim is paid in full. The claimant in this class shall be paid based upon monthly payments of principal and interest based upon the following:<br>    a) An interest rate of 6.5% simple interest<br>    b) An amortization and term of six (6) years<br>    c) A principal balance based upon the allowed secured claim of Ozarks<br><br>The first payment shall be made 60 days after the Effective Date. The Deficiency Claim of Bank of the Ozarks shall be treated as a Class 16 Claim.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery of the Class 4 Claim: 100%. |
| **Class 5: Chiron Equipment Claim**<br><br>The total estimate of the Allowed Secured Claim in this class has a principal balance of $385,000. | Impaired. Entitled to Vote<br><br>The holder of this Claim shall retain its security interest until its Class 5 Claim is paid in full. The claimant in this class shall be paid based upon monthly payments of principal and interest based upon the following:<br>    a) an interest rate of 6.5% simple interest<br>    b) an amortization and term of six (6) years<br>    c) a principal balance based upon the allowed secured claim of Chiron Equities, LLC.<br><br>The first payment shall be made 60 days after the Effective Date. The Deficiency Claim of Chiron Equipment Claim shall be waived. |

| | |
|---|---|
| | This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery of the Class 5 Claim: 100%. |
| **Class 6: Deere Congress**<br><br>The total estimate of the Allowed Secured Claim of Deere Congress in this class has a principal balance of $140,000. | Impaired. Entitled to Vote<br><br>The holder of this Claim shall retain its security interest until its Class 6 Claim is paid in full. Beginning thirty (30) days after the Effective Date, the claimant in this class shall be paid monthly payments of principal and interest based upon the following:<br>   a) an annual interest rate of 4.5% simple interest;<br>   b) an amortization and term of five (5) years; and<br>   c) a principal balance based upon the Allowed Secured Claim of Deere Congress which shall be equal to $140,000.00.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery of the Class 6 Claim: 100%. |
| **Class 7: Intentionally Left Blank** | |
| **Class 8: U.S. Bank**<br><br>The total estimate of the Allowed Secured Claim has a principal balance of $23,275.. | Unimpaired. Not Entitled to Vote<br><br>The holder of this Claim will be paid in accordance with the current Loan Agreement. Any existing monetary default will be cured and paid on the Effective Date of the Plan of Reorganization.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery of the Class 8 Claim: 100%. |
| **Class 9: Patriot Bank**<br><br>The total estimate of the Allowed Secured Claim in this class has a principal balance of $85,000. | Impaired. Entitled to Vote<br><br>The holder of this Claim shall retain its security interest until its Class 9 Claim is paid in full. The claimant in this class shall be paid based upon monthly payments of principal and interest based upon the following:<br>   a) an interest rate of 6.0% simple interest;<br>   b) an amortization and term of seventy-two (72) months; and<br>   c) a principal balance based upon the Allowed Secured Claim of Patriot Bank, to be determined by the Court.<br><br>The first payment shall be made 60 days after the Effective Date. The Deficiency Claim of Patriot shall be a Class 16 Claim.<br><br>Estimated percentage recovery of the Class 9 Claim: 100%. |
| **Class 10: Intentionally Left Blank** | |
| **Class 11: City of Garland**<br><br>The total estimate of the Allowed | Impaired. Entitled to Vote<br><br>The holder of this Claim shall retain its security interest until its Class 11 Claim |

| | |
|---|---|
| Claim in this class has a principal balance of $210,000. | is paid in full. Beginning sixty (60) days after the Effective Date, the claimant in this class shall be paid monthly payments of principal and interest based upon the following:<br><br>    a)   an interest rate of 5.0% simple interest;<br>    b)   an amortization and term of six (6) years; and<br>    c)   a principal balance based upon the Allowed Secured Claim of the City of Garland.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery of the Class 11 Claim : 100%: |
| **Class 12: Ford Motor Credit**<br><br>The total estimate of the Allowed Secured Claim in this class has a principal balance of $18,000. | Impaired. Entitled to Vote<br><br>The holder of this Claim shall retain its security interest until its Class 12 Claim is paid in full. The claimant in this class shall be paid based upon monthly payments of principal and interest based upon the following:<br><br>    a)   an interest rate of 6.5% simple interest<br>    b)   an amortization and term of six (6) years<br>    c)   a principal balance based upon the allowed secured claim of Ford Motor Credit.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>The first payment shall be made 60 days after the Effective Date. The Deficiency Claim of Ford Motor Credit shall be a Class 16 Claim. The Debtors will retain possession of the following vehicles which serve as collateral for the Ford Motor Claim:<br><br>    a)   2006 Ford F250; VIN: 1FTSW21P56EC82758<br>    b)   2008 Ford F250; VIN: 1FTSX215X8EA83056<br>    c)   2008 Ford F250; VIN: 1FTSW21R48EB61532.<br><br>The Debtors will not retain possession of any other vehicle which serves as collateral for the Ford Motor Credit Claim, and will abandon these trucks.<br>Estimated percentage recovery of the Class 12 Claim: 100%: |
| **Class 13: Chrysler Finance**<br><br>The total estimate of the Allowed Secured Claim in this Class has a principal balance of $1,500. | Unimpaired. Not Entitled to Vote<br><br>The holder of this Claim shall be paid in full on the Effective Date.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery 100%: |
| **Class 14: Oppenheimer, Blend, Harrison & Tate and Green Aggregates US Trustee fees**<br><br>The total estimate of the Allowed Class 14 Claim has a principal balance of $30,000.00 | Impaired. Entitled to Vote.<br><br>The holder of this Claim will be paid in twelve equal installments with no interest. The first installment will be paid 30 days after the Effective Date.<br><br>Estimated percentage recovery: 100%. |
| **Class 15: General Unsecured** | Impaired. Entitled to Vote. |

| | |
|---|---|
| **Creditors - Small Claims under $5,000 or creditors who reduce their claims to $5,000**<br><br>The total estimate of the Class 15 Claims is approximately $50,000, comprised of approximately 30 Creditors. | The holders of the Small Claims (those with claims of $5,000 or less) in Class 15 will be paid in two equal installments. The first installment will be paid 180 days after the Effective Date with the second installment paid 180 days thereafter.<br><br>Estimated percentage recovery: 100%. |
| **Class 16: General Unsecured Creditors**<br><br>The total estimate of the Class 16 Claims is approximately $5,827,000 comprised of approximately 42 Creditors, and includes any of those creditors in Classes 1-15 and 20, to the extent a portion of their claim is unsecured. | Impaired. Entitled to Vote.<br><br>The holders of the Class 16 Allowed Unsecured Claims shall share pro-rata in the Unsecured Creditor Amount. Each Class 16 creditor shall receive its pro-rata share of the following quarterly payments based upon the following :<br>      a) a principal amount equal to the Unsecured Creditor Amount<br>      b) an interest rate of 0 %<br>      c) an amortization of ten (10) years, and<br>      d) a term of five years.<br><br>The first payment shall be made 90 days after the Effective Date.<br><br>Estimated percentage recovery: 8%. |
| **Class 17: IRS Tax Claims concerning Green Aggregates, Inc.**<br><br>The total estimate of the Allowed Class 17 Claims is approximately $329,000.00. | Impaired. Entitled to Vote.<br><br>The holder of the Class 17 Allowed IRS Tax Claims concerning Green Aggregates, Inc. shall share pro-rata in the Unsecured Creditor Amount. The Class 17 creditor shall receive its pro-rata share of the following quarterly payments based upon the following:<br>      a) a principal amount equal to the Unsecured Creditor Amount<br>      b) an interest rate of 0 %<br>      c) an amortization of ten (10) years, and<br>      d) a term of five years.<br><br>The first payment shall be made 90 days after the Effective Date.<br><br>Estimated percentage recovery: 8%. |
| **Class 18: Intentionally Left Blank** | |
| **Class 19: SureTec Insurance Co. Claim**<br><br>The Debtors dispute the information contained in the proof of claim filed by SureTec Insurance Co., and will accordingly file a objection to such proof of claim. The total estimate of the Allowed Class 19 Claim is approximately $246,000.00 | Impaired. Entitled to Vote.<br><br>The holder of this Claim shall retain any security interest until its Class 19 Claim is paid in full. The claimant in this class shall be paid based upon monthly payments of principal and interest based upon the following:<br>    a)  an interest rate of 6.0% simple interest<br>    b)  an amortization of ten (10) years<br>    c)  a payments term of five (5) years<br>    d)  a ballon payment at the end of the five (5) year term<br>    e)  a principal balance based upon the Allowed Secured Claim of SureTec Insurance Co.<br><br>The first payment shall be made 60 days after the Effective Date. |

| | |
|---|---|
| | This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recovery of the Class 19 Claim: 100%: |
| **Class 20: GE Capital Corporation**<br><br>The total estimate of the Allowed Class 20 Claim is approximately $392,368.40. | Impaired. Entitled to Vote.<br><br>The holder of this Claim shall retain any security interest until its Class 20 Claim is paid in full. The claimant shall be paid based upon monthly payments of principal and interest based upon the following:<br><br>a) an interest rate of 6.0 % simple interest<br>b) an amortization and term of five (5) years, and<br>c) a principal balance based upon the Allowed Secured Claim of GE Capital Corporation.<br><br>This Claim is secured by collateral as described on the attached amended Exhibit "D".<br><br>Estimated percentage recover of the Class 20 Claim: 100% |
| **Class 21: Unsecured Tax Claims**<br><br>The total estimate of the Allowed Unsecured Tax Claims is unknown, but is considered to be $204,000.00 | Impaired. Entitled to Vote.<br><br>The holders of the Class 21 Allowed Unsecured Tax Claims shall share pro-rata in the Unsecured Creditor Amount. Each Class 21 creditor shall receive its pro-rata share of the following quarterly payments based upon the following :<br>a) a principal amount equal to the Unsecured Creditor Amount<br>b) an interest rate of 0 %<br>c) an amortization of ten (10) years, and<br>d) a term of five years.<br><br>The first payment shall be made 90 days after the Effective Date.<br><br>Estimated percentage recovery: 8%. |
| **Class 22: Unsecured Insider Claims**<br><br>The total estimate of the Allowed Class 17 Claims is approximately $1,608,386.16, with the potential to increase to $2,040,386.16. | Impaired. Entitled to Vote.<br><br>The holders of Claims in Class 22 shall receive 100% of the Interests in the Reorganized Debtors.<br><br>Estimated recovery: 0%. |
| **Class 23: Membership Interests**<br><br>**N/A** | Impaired. Entitled to Vote.<br><br>All equity interests of Congress Sand & Gravel, LLC and Congress Materials, LLC shall be canceled, and the current owner of such interests shall receive nothing. On the Effective Date of the Plan, Chiron Equities, LLC and affiliates shall convert all of its Class 22 Claims into the equity interests in the Debtors into New Equity. Inasmuch as Class 23 shall receive no distributions under the Plan, the holders of Class 23 Interests are deemed to have rejected the Plan.<br><br>Estimated Recovery: 0%. |

# IV.  GENERAL OVERVIEW AND BACKGROUND INFORMATION

## A.    BACKGROUND AND GENERAL INFORMATION

Congress Sand & Gravel, LLC ("Congress Sand") is a Texas limited liability company formed on June 5, 2009. Congress Sand, whose principal place of business is located at 22 Waugh Drive, Suite 320, Houston, Texas, has filed an assumed name certificate with the Texas Secretary of State for the name "Union Materials, LP". Chiron Equities, LLC is the sole member and manager of Congress Sand.

Congress Materials, LLC ("Congress Materials") is a Delaware limited liability company that was formed on December 19, 2007. It is qualified to do business in Texas and Arizona. Congress Materials, whose principal place of business is located at 22 Waugh Drive, Suite 320, Houston, Texas, has filed assumed name certificates with the Texas Secretary of State for the names "Green Aggregates" and "Union Materials, LP". Congress Materials is a member managed limited liability company, with Chiron Equities, LLC being its sole member.

On August 17, 2010 Green Aggregates, Inc. ("Green Aggregates") merged into Congress Materials (the "Merger")

Green Aggregates, Inc. ("Green Aggregates") was a Texas corporation that was formed on March 28, 2006. The original principals of Green Aggregates were unrelated to Congress Materials, Congress Sand or Congress Equities until Congress Materials acquired the stock of Green Aggregates in January, 2009. Green Aggregates, whose principal place of business has been located at 22 Waugh Drive, Suite 320, Houston, Texas, has filed an assumed name certificate with the Texas Secretary of State for the name "Congress Materials". In addition, Green Aggregates had also used the names "Cooke County Stone" and "Recycled Aggregates" prior to Congress Materials acquisition of the stock of Green Aggregates.

Green Aggregates filed a petition for relief under the Bankruptcy Code on December 31, 2007.  This case was assigned Case No. 07-53439-RBK ("2007 Case") in the

United States Bankruptcy Court for the Western District of Texas, San Antonio Division ("WD Court"). In March, 2008, Congress Materials was hired by a Chapter 11 Trustee to operate the assets of Green Aggregates. In addition to Congress Materials operating the assets of Green Aggregates, certain affiliates of Congress Materials (First KT Lending, LLC and Chiron Equities, LLC) advanced $450,000 to Green Aggregates under a DIP Loan Participation Agreement (subordinate to the existing working capital lender, Presidential). Upon Green Aggregates exit from bankruptcy, Chiron Equities, LLC converted this subordinated DIP loan to the equity in Green Aggregates.

On December 29, 2008, Chiron Equities, LLC filed a Chapter 11 Plan of Reorganization ("Original Plan") in the 2007 Case, and on December 8, 2008, Chiron Equities, LLC filed a Modification to Proposed Plan of Reorganization ("Modified Plan", together with the Original Plan hereinafter collectively referred to as the "Plan"). The *Order Confirming Amended Plan of Reorganization for Green Aggregates, Inc. as Modified Under Chapter 11, Title 11, United States Code* ("Confirmation Order") was entered by the WD Court on December 31, 2008. The Plan as modified and confirmed by the Confirmation Order is hereinafter referred to herein as the "Confirmed Plan". The Confirmed Plan became effective on January 12, 2009 ("Effective Date"). Pursuant to the Confirmed Plan, all of the equity interest in Green Aggregates vested in Congress Materials on the Effective Date. The 2007 Case is no longer pending, it was dismissed on December 1, 2010.

The Debtors are primarily engaged in the processing of construction aggregates used over a wide range of applications, including road construction, commercial construction, and ready mix concrete. The Debtors' principal customers are road paving companies, oil and gas companies (for drilling pad sites), utility contractors (for pipe bedding) and concrete

product companies (for ready mix and other precast products). For the twelve months ending October 31, 2010 the consolidated Debtors had revenue of $5.1 million. The Debtors employ 39 people, of which 27 are employed by Congress Materials and 12 by Congress Sand. Exhibit C.

Congress Materials had been operating a limestone quarry in Cooke County, Texas ("Quarry") where the Company processed a blend of sandstone and limestone for road construction applications. Congress Materials did not have access to qualified studies when it originally made its investment in Green Aggregates, and subsequently realized that the original resource studies relative to the Quarry were flawed. In the spring of 2009, Congress Materials hired independent engineers to drill core samples and produce geological studies and maps of remaining resources. These studies showed a significant variation from the original studies, and indicated an economically unfeasible operation. Congress Materials had been operating the Quarry for eighteen (18) months as a blending operation, something that proved cost prohibitive.

Limestone is the target resource for the finished product that was sold to the customers; however, the limestone at the Quarry was substantially depleted, and Congress Materials had been meeting customer needs by blending sandstone and limestone – thereby the term "blending operation". The increased cost of having to blend the material exceeded the sales price, and therefore the operation was economically unfeasible.

Congress Materials had been operating the Quarry at a significant negative margin for the first eighteen months of ownership of the business. This resulting cash flow had been a significant drain on the other operations of Congress Materials and was not sustainable. The failure at the Cooke County Quarry can be attributed to several factors: (1) poor resource

quality and quantity; (2) depressed market conditions and downward price pressure; and (3) an inferior location with transportation cost disadvantages compared to other competitors. This operation was economically and financially unfeasible and prior to this filing, in July 2010, Congress Materials discontinued the Quarry operation. In conjunction with this operation closing, Congress Materials redistributed the remaining equipment that was in usable condition to its other operations, sold the inefficient and obsolete quarrying equipment at auction, and negotiated a full release of its obligations to the landlord, Edison Cattle Company, LLC.

The Debtors more profitable operations have been in the business of concrete recycling and mining sand and gravel.

At its concrete recycling businesses, Congress Materials purchases concrete rubble and discarded asphalt from demolition contractors. This rubbish material is subsequently re-processed into road base, utility stone, and foundation material. The asphalt waste is recycled and used by various road contractors and oil and gas companies for dust control. Margins are strong in this business and additional revenue is generated during the re-processing phase through the sale of steel re-bar, a by-product of waste concrete rubble.

Congress Materials operates one recycling facility in Garland, Texas and refers to it as the "Garland Yard". Garland is conveniently located twenty miles northeast of the Dallas Central Business District. The operations at the Garland Yard include crushing and screening of demolished concrete and asphalt. This facility is leased from the City of Garland. The lease extends through 2017. The Garland Yard has a proprietary location as it relates to ongoing infrastructure work in Northeast Dallas and is located in the heart of the growth corridor.

Historically, the operations at the Garland Yard have supplied a substantial

amount of material for public utility work to the surrounding area. Strong relationships have been formed with local municipalities, which provide a stable baseline of sales despite the current macro-economic conditions.

Congress Materials operates its second recycling facility in Arlington, Texas. This facility is referred to as "Mosier Valley". This facility is conveniently located twenty miles east of the Fort Worth Central Business District in Tarrant County. Operations include crushing and screening of demolished concrete and asphalt. Mosier Valley is leased from J&W Sand & Gravel and it situated on approximately 53 acres of land. The lease extends through 2016 with an additional five year renewal option at Lessee's discretion.

The Mosier Valley facility is located in the heart of the Barnett Shale, a major oil & gas reservoir in the Fort Worth Basin. Congress is well positioned to benefit from the return of drilling activity in the area. Additionally, Mosier Valley is roughly five miles from the Dallas Cowboys' new football stadium. The Mosier Valley facility also provides construction material to the numerous road construction projects in the vicinity and expects an increase in commercial construction to follow.

Congress Sand's operations are in Kerens, Texas, which is approximately sixty (60) miles southeast of Dallas. These operations primarily include the mining and processing of sand and gravel deposits. This facility, located on 500 acres of land, is leased from the VCH Ranch. The lease expires on August 1, 2011, with a renewal option. It is estimated that there are several million tons of economically feasible reserves, and based on current production an estimated useful remaining life of fifteen (15) years. Congress Sand has leveraged strong customer relationships with major ready-mix companies to sell the majority of its materials into the South Dallas area. Congress Sand also focuses on supplying concrete sand to areas

southwest of Dallas such as Midlothian and Waxahacie and east of Dallas to Tyler and Longview.

The Debtors maintain their principal places of business, including their accounting office and corporate headquarters, at 22 Waugh Drive, Suite 320  Houston, Texas 77007. It is at this location that the major decisions for each of the Debtors are made. Jay Krasoff acts as the CEO and manager of the Debtors.  All of the major accounting records, bank accounts and corporate documents are maintained at this Houston address. An additional office for bookkeeping, invoicing and other daily functions of the business is maintained in Bridgeport, Texas. The space for this office is leased on a month to month obligation at $1,800 per month. This office is occupied by three employees of Congress Materials and supplements the work at the Houston office.

**B.       EVENTS LEADING TO THE FILING**

Congress Materials acquired all of the equity interest of Green Aggregates as part of the Confirmed Plan. Unfortunately for Congress Materials, this acquisition was ill-timed and directly in the middle of a macroeconomic downturn, with the construction and building industry especially hard hit.  While private sector work was materially affected by the downturn in the economic cycle, the Debtors grew sales to the public sector and had higher month over month sales from previous years.  The Debtors secured sales from many local municipalities in the Dallas-Fort Worth market and also secured sales from two large, federally funded toll-way projects in the Dallas area.

The increased sales to the public sector were offset by increased debt. Following the Effective Date, Congress Materials incurred new debts exceeding $5 million. This new debt was a matter of necessity, as the existing equipment was neither reliable nor

efficient.  After spending close to $1 million on repairs and deferred maintenance on this equipment, it was determined that this was not sustainable and that Green Aggregates could not be profitable operating in that fashion.  The key mechanism for operating profitably in business of the Debtors is the efficiency of operations and lowering production costs.  Continuing to use the existing dilapidated equipment would have been a futile exercise as repair bills were never ending, down time was very high and efficiencies were very low.  As a result, the Debtors was not dependable to its customers.  All of this prevented the growth of Debtors' business, hurt the ability of the Debtors (a) to develop a reputation in the marketplace of being reliable, (b) having finished inventory that would be conducive to sales, and (c) to lower its costs so that it would not price itself out of the market.

Congress Materials assumed that major equipment repairs made while in bankruptcy (prior to January 12, 2009) would have been sufficient; however, this was not the case and instead Congress Materials was again immediately confronted with expensive issues concerning inefficient and continually underperforming equipment at all of Green Aggregates' locations. Within 60 days of the purchase of Green Aggregates, Congress Materials finally realized that it was no longer cost effective to continue the repair of the older equipment. In March of 2009, Congress Materials spent approximately $1.65 million to purchase four (4) new large wheel loaders.  The loaders were used to load customer trucks and "feed" the processing plants. These pieces of equipment were all financed by John Deere Credit.

In March of 2009, there were other failures in equipment obtained in the Green Aggregates bankruptcy.  The Garland plant was constantly broken down, and the crusher and several conveyors needed to be replaced. Congress replaced the Garland equipment at a large cost by installing newly purchased equipment from the City of Garland. In December 2009,

again out of necessity, Congress Materials purchased another John Deere wheel loader for approximately $425,000.00. This wheel loader was financed by GE Capital Corporation.

At the Quarry, Congress Materials was confronted with failures in the mining trucks that hauled material from the blast pits to the processing plant, and new haul trucks were purchased, as well as larger and more efficient conveyors. The methodology by which material was processed at all three plants was re-evaluated and changes were made to attempt to streamline the processes, resulting in yet additional equipment needs. The failing older equipment was the collateral for Equity Bank's notes. Bank of the Ozarks, John Deere and Continental Bank made additional loans and financial leases to Congress Materials for the purchase of these new necessary pieces of equipment.

Congress Materials continued to sell the old equipment that was subject to Equity Bank's security interests. These sales were made in accordance with the terms of the Plan Confirmation from the 2007 Case. Congress Materials was only able to sell such equipment at market prices, which were severely below the values asserted by Equity Bank in the 2007 case. The equipment sales yielded less than 10% of the stated value as scheduled in the restructured Equity Bank notes assumed by Congress Materials as part of the 2007 Case Plan Confirmation. For example, Congress Materials sold five (5) old Caterpillar loaders on March 3, 2009 at a Richie Brothers auction. The scheduled value for this Equity Bank collateral was approximately $750,000.00; however, the March 3, 2009 Richie Brothers auction yielded only $91,000 for these pieces of equipment. This was an orderly sale of equipment through a reputable equipment dealer, Ritchie Brothers Auctioneers.

It was clear at this point that the value of collateral underpinning the $4.5 million Equity Bank notes was significantly overstated, and Congress Materials was over-

levering its balance sheet with new purchases and not obtaining any benefit of debt reduction from equipment sales of older equipment. In May, July, September and December 2010, a large number of other equipment that was subject to the security interests in favor of Equity Bank was (or is being) sent to Ritchie Brothers to be auctioned. This equipment, which had been on a collateral list for a total value of approximately $2,400,000.00, has generated less than $350,000.00 to the Equity Bank claim.

Congress Materials does not need any of the remaining equipment that is subject to the security interests in favor of Equity Bank. At the time of the petition filing Congress had reached an agreement with Equity Bank as part of this Chapter 11 to pay-off a few remaining necessary pieces of equipment for $104,000 and deliver any remaining equipment to Richie Brothers for auction.

In the early Spring of 2010 there were severe breakdowns in the processing plant at the Mosier Valley location of Congress Materials and a new crusher and conveyor belts had to be purchased for the Plant. These items are currently in the process of being installed. These new pieces of machinery were purchased by Congress Recycled Aggregates, LLC ("Congress Recycled"). Congress Recycled is an affiliate of the Debtors with the same parent company, Chiron Equities, LLC. Congress Recycled has leased this necessary equipment to the Debtors at a below market rate. The rental payments are the same payments that Congress Recycled is obligated to pay its lender who financed this purchase. These purchases were made by Congress Recycled because the credit necessary for these purchases could not be obtained by the Debtors. However, this transaction was absolutely necessary because the Mosier Valley plant has an excellent order backlog, but due to the equipment failure was unable to deliver material timely and just as importantly, produce it at an

economically feasible cost. A table of substantial equipment, leases, and secured lenders indicating the locations of the applicable collateral is attached as Exhibit D.

The primary reasons for this Chapter 11 filing are to complete the settlement negotiations between Equity Bank and Congress on their approximate $4.25 million deficiency (unsecured claim), reduce the leverage of Congress such that the Company can conform to standard debt covenant ratios, make timely equipment and Plan payments, and to complete the settlement of the discontinued Quarry operation equipment.

The combined Debtors generate a significant operating profit and have growing sales and expanding margins, but simply put cannot service the existing debt payments required as currently structured. It is projected that through this restructure, the Debtors can be expected to reduce their monthly debt service to a more manageable level and work toward paying pre-petition creditors from free cash flow.

C.      THE DEBTORS' DEBT STRUCTURE

The Company's debt structure consists of an accounts receivable and inventory based credit facility with Presidential whereby the company borrows 85% of existing invoices and 50% of inventory, with the amount outstanding against inventory capped at $500,000. Upon receipt of payment of the invoices, Presidential deducts their fees, then remits the balance to the Debtors. The company also has term debt held by various banks, which use the companies' assets as collateral.

The Debtors recently expanded its line of credit with Presidential on August 24, 2010. The line was increased from $1.3 million to $1.6 million. This was again expanded with the Post-Petition Financing Motion to $1.75 million. At the time of closing on August 24, 2010, Chiron Equities, LLC and JK Air Investment Group, LLC had a subordinated "last out

participation" within this facility in the approximate amount of $250,000 (the "Chiron Participation"). As of the Petition Date, the Chiron Participation was at a balance of $290,000, which is included in the secured claim of Presidential. Since the Petition Date, Chiron Equities, LLC has advanced an additional $192,000 under this facility such that the total Chiron Participation is currently at $482,000, which is being converted to equity.

The operations of the Debtors are currently being financed, in part, through a Debtors-in-Possession financing facility (the "DIP Financing Facility") between the Debtors and Presidential. Pursuant to the Motion to Incur Post-Petition Financing, as approved by the Court dated November 23, 2010, Presidential is advancing funds based upon eligible accounts receivables and inventory (generated by the Debtors operations) and an over-advance which is secured by collateral of a Debtors affiliate, RockBottom, LLC. This additional collateral pledged to Presidential is comprised of 225 acres of fee simple property (to be used in mining operations) located in Congress, Arizona. The overadvance is funded through the DIP Financing Facility, with the Chiron Participation being repaid after Presidential in a "last-out" agreement between the parties. A summary of the Presidential line of credit is shown below.

PRESIDENTIAL FINANCIAL CORPORATION

| | 9/30/2010 | Petition Date (10/28/10) | 11/30/2010 |
|---|---|---|---|
| Total Loan Balance | 1,559,781 | 1,552,745 | 1,431,359 |
| Overadvance | 324,651 | 246,069 | 337,612 |
| Chiron Pariticpation (in Overadvance) | 245,177 | 290,008 | 320,981 |

The Debtors have accrued certain priority unsecured claims as a result of their financial struggles. In addition, the Debtors assumed certain priority unsecured claims in the 2007 Case that have not been paid in full. Those claims incurred prior to January, 2009 are categorized as "Green Aggregates" claims and those claims incurred thereafter are in the names of the respective Debtors.

In addition to Presidential as the Debtors working capital lender, the Debtors have various other term debt obligations secured by the assets of the Company. These lenders include Continental Bank with five outstanding loan obligations; Bank of the Ozarks with three outstanding loan obligations (consolidated to one for payment purposes); Ford Motor Credit with one outstanding loan obligation; John Deere Credit with one outstanding loan obligation; US Bank with one outstanding loan obligation; City of Garland with one outstanding loan obligation; Chiron Equities, LLC with two outstanding loan obligations; Chrysler Finance with one outstanding loan obligation; Patriot Bank with an unknown number of loan obligations; Danny Rice with one loan obligation; U.S. Bank with one outstanding loan obligation and Equity Bank with two outstanding loan obligations. The Debtors believe most of the secured lenders to be substantially secured with the exception of Equity Bank (which the Debtors believe to be substantially unsecured by nearly 95% of its claim, or $4,250,000), Patriot Bank, Ford Motor Credit and Danny Rice.

The Debtors are also obligated on three operating leases. These leases are with John Deere Credit and Congress Recycled. The lease with GE Capital Corporation described on the Schedules of Congress Materials has been determined to create a security interest, and is therefore not a true lease. The lease with John Deere Credit is secured by four John Deere 844K Wheel Loaders and has a monthly obligation of $33,000.00. The remaining two leases are with Congress Recycled, and are secured by a Telsmith Jaw Crusher, John Deere 744 Wheel Loader and John Deere 770BH Motor Grader. The Debtors needs the underlying equipment to these leases and thereby would propose to assume all of these leases and cure any defiencies existing under the leases in six equal monthly installments beginning 90 days after the Effective Date of the Plan. However, any deficiencies concerning the lease with John Deere will be re-amortized

{00313909-7}

over the existing term of the lease. The secured obligations of the Debtors are described on the amended Exhibit "D" attached hereto.

D.    **DEBTORS RELATED TRANSACTIONS AND DEBT**

The Debtors have certain related party transactions with Chiron Equities, LLC and affiliates of Chiron Equities, LLC that have benefited the financial structure of the Debtors and will continue to support the financial health of the Company. These include the Chiron Participation with Presidential in the DIP Financing Facility, operating leases for necessary equipment with Congress Recycled and the loan obligations for certain equipment to Chiron Equities, LLC (notes that were purchased by Chiron Equities, LLC from Bank of the Ozarks). All of these relationships are more particularly described in Article IV, Section C of this Disclosure Statement.

In addition to the relationships listed above, affiliates of the Debtors hold a variety of unsecured claims. Some of these claims are a direct result of monies infused into the Debtors operations under a specific loan agreement, as is the case with the Unsecured Claims of First KT Lending, LLC and KT Foods, LLC. Other of these claims are the result of Chiron Equities, LLC's purchase of unsecured claims in the 2007 Case that have not been paid by the Debtors and remain outstanding. In total, these claims compromise nearly 50% of the outstanding unsecured non-priority unsecured claims pool. The Debtor was a proponent of a plan in Union Materials. The case has been dismissed. The Debtor did not own an interest in Union Materials.

E.    **FINANCIAL EVENTS**

The Debtors' financial problems have been caused by primarily four factors: (1) a downturn in the industry which has only now begun to show signs of improvement; (2) an unprofitable quarrying operation (which had negative cash flow in excess of $30,000 per month) that has recently been discontinued (3) an approximate $4.25 million deficiency to Equity Bank

and resulting State Court lawsuit as a result of major losses on secured equipment sales and the Quarry deed of trust; and (4) over-leverage as a result of the Equity Bank loan to value coupled with depleted working capital, quick amortization of secured debts and thereby not having a conducive balance sheet to foster additional equity investments. This also resulted in an inability to meet plan obligations from the 2007 Case or timely meet other obligations of the Debtors.

### F.    SIGNIFICANT POST-PETITION EVENTS

#### 1.    The Filing

On October 28, 2010, the Debtors commenced their reorganization cases by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code §§ 101-1330 (the "Bankruptcy Code," "USBC," or "Code"). The Debtors filed a motion with the Bankruptcy Court requesting joint administration of the Bankruptcy Cases for administrative purposes only. The Bankruptcy Court subsequently granted the Debtors' motion to jointly administer.

#### 2.    Continuation of Business; Stay of Litigation

The Debtors continued to manage their properties and operate their business as Debtors-in-Possession pursuant to 11 U.S.C. §§ 1107 and 1108. No trustee or examiner has been appointed in this case.

The Bankruptcy Court has certain supervisory powers over the Debtors' operations during the pendency of the Chapter 11 Case, including the power to approve any transactions that are outside the ordinary course of the Debtors' business.

An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtors. This injunction will remain in effect until the Effective Date unless modified or lifted by order of the Bankruptcy Court.

{00313909-7}

**3.      Other First Day Pleadings**

Following the filing of the petition, the Debtors filed, among other pleadings, the following pleadings with the Bankruptcy Court:

(a)      Emergency Motion for Authority to Incur Secured Debt in the Form of a Revolving Line of Credit with Presidential Financial Corporation, to Use Cash Collateral and to Provide Adequate Protection Pursuant to 11 USC Sections 363 and 364, which was granted on an interim basis and a final basis;

(b)      Application by Debtors for Entry of an Order Authorizing the Employment and Retention of Douglas Draper and the Law Firm of Heller, Draper, Hayden, Patrick & Horn, L.L.C. on an Interim Basis and Setting Final Hearing;

(c)      Motion for Authority to Pay Employees' Pre-Petition Wages, Related Expenses, and Taxes, which was granted on an interim basis;

(d)      Critical Vendor Motion in which the Court granted the Debtor authority to pay pre-petition debt of a small group of its pre-petition creditors provided that such creditors provided the Debtor post petition terms.  The creditors covered by the motion related to parts suppliers and repair facilities for the Debtors equipment.

**4.      Applications to Employ Professionals**

(a)      Debtors' Counsel

The Bankruptcy Court approved the employment of Heller, Draper, Hayden, Patrick & Horn, L.L.C. as bankruptcy counsel for the Debtors.  James Gordon was approved as local counsel and special counsel for the XTO Matter.

**5.      Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules and U. S. Trustee Deadlines**

On November 12, 2010, the Debtors filed their Statement of Financial Affairs, Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Lists of Equity Security Holders.

Pursuant to section 341 of the Bankruptcy Code, meetings of creditors for the Debtors were held on November 30, 2010. There were a number of representatives of creditors present at this meeting including VCH Ranch, LP; GE Capital Corporation; Internal Revenue Service; SureTec Insurance Co.; JTM Materials, Inc. and Presidential.

**6.    Cash Collateral Order**

As part of its first day motions, Debtors filed an Emergency Motion for Authority to Incur Secured Debt in the Form of a Revolving Line of Credit with Presidential Financial Corporation, to Use Cash Collateral and to Provide Adequate Protection Pursuant to 11 USC Sections 363 and 364, which was granted on an interim basis. This motion was granted on a permanent basis on November 23, 2010.

**7.    Adequate Protection Orders**

A number of creditors have sought adequate protection orders at the time this Disclosure Statement was filed. Most of these motions were resolved by agreed orders.

(a)    Colonial Pacific Leasing Corporation Motion for Relief from the Automatic Stay was granted by the court [P-150], terminating the automatic stay as to:

(i)    One (1) John Deere Hydraulic Excavator Model 450DLC, S/N FF450DX913353, and

(ii)    any interest of the Debtors in a Terex Articulated Truck – Off Hwy Model TA27G, S/N A86895.

(b)    General Electric Capital Corporation Motion for Relief from the Automatic Stay was resolved by agreed order [P-142], terminating the stay as to:

i.    One (1) Deere 850 Crawler Dozer, S/N T0850CXB98478, and

ii.    One (1) John Deere 250D Articulated Dump, S/N DW250DT607245.

(c)    Deere Credit, Inc. Motion to Compel Assumption or rejection of Equipment Lease and to Condition Use of Equipment upon Adequate Protection, which was resolved by an agreed order [P-169], under which Congress Materials was ordered, *inter alia*, to file a motion to assume or reject the lease agreement on or before entry of an order approving the disclosure statement, or the lease agreement would be deemed rejected and the automatic stay would terminate.

(d)    Continental Bank Motion for Relief from the Automatic Stay was resolved by an agreed order [P-196], whereby the parties agreed to adequate protection for Continental Bank's security interest in certain collateral.

(e)    The Motion of John Deere Construction & Forestry Company for Relief from the Automatic Stay, the Motion of Patriot Bank for Relief from the Automatic Stay as to Equipment, and the Motion to Require Assumption or Rejection of Executory Contract by a Date Certain, and to Condition Use of Equipment on Adequate Protection, have all been resolved between the parties, and agreed orders will be submitted to the Court concerning each.

**8.    Motion to Assume Nonresidential Real Property Leases**

The Debtors filed a Motion for an Order Pursuant to Section 365(a) of the Bankruptcy Code Authorizing the Debtor to Assume Certain Leases of Nonresidential Real Property, which is set for hearing on April 6, 2011.

**9.    Other Orders**

The Court has approved the sale of some equipment through a Ritchie Brothers auction and to TBK.  The proceeds of the auction and the sale in the amount of $85,686.29 and $12,000.00 respectively have been placed in escrow pending court determination.

Deleted: 9

### 10.     Business Conditions Since Commencement of the Bankruptcy Case

The Debtors also have consolidated some operations in the months leading up to the filing in an attempt to reduce overhead, discontinued unprofitable operations and increase gross margins.  Revenues in October, 2010 were some of the strongest the Debtors have ever had. Although the November 2010 sales have trended down from October and from last year, the Debtors have a significant backlog of orders that will begin shipping over the coming months and result in the Debtors meeting or exceeding their revenue projections.  The Debtors expect this trend to continue (subject to cyclicality in winter months) as a result of a better sales plan, lowered costs and improving market conditions.

## V.     THE PLAN

The Debtors have proposed the Plan and believes that the classification and treatment of Claims provided for in the Plan are consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, holders of Allowed Claims against in the Debtors that are Impaired and that receive distributions under the Plan are entitled to vote on the Plan.  A copy of the Plan accompanies this Disclosure Statement as Exhibit A.  A summary of the classification and treatment of Claims and Interests under the Plan is set forth above in this Disclosure Statement.

### A.     PLAN FUNDS

The Reorganized Debtors intend to fund Distributions from cash on hand, additional equity from JK Air/Chiron Equities, LLC as needed, and ongoing operations.

### B.    MANAGEMENT

Congress' President and CEO will be Jay H. Krasoff. The Board of Directors will be Jay Krasoff and Kyle Tauch.

### C.    GENERAL DESCRIPTION OF PLAN

The Reorganized Debtors will continue the businesses of each of the Debtors, which, when coupled with cash on hand, is expected to generate sufficient revenue to meet operating costs and fund the Distributions contemplated by the Plan.

### D.    TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

The Plan provides for the payment of Claims against the Debtors, including the treatment of Unclassified Claims.

Subject to the bar date provisions in the Plan, the Reorganized Debtors shall pay each holder of an Allowed Administrative Claim against the Debtors on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount of the Allowed Administrative Claim, on the later of: (a) the Effective Date, or (b) the date such Administrative Claim becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable, except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment.

On or before the Effective Date, the Reorganized Debtors shall pay all fees payable under 28 U.S.C. §1930, as determined by the Bankruptcy Court at the Confirmation Hearing, in Cash in full.

Except as provided below for professionals and non-tax liabilities incurred in the ordinary course of business by the Debtors in Possession, requests for payment of Administrative Claims must be filed no later than thirty (30) days after the Effective Date.  Holders of Administrative Claims (including, without limitation, any governmental units asserting claims for federal, state,

or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by such bar date shall be forever barred from asserting such claims against the Debtors, Reorganized Debtors, any other person or entity, or any of their respective Property.

Holders of Allowed Administrative Claims except holders of Professional Fee Claims, shall be entitled to interest on their Administrative Claims to the extent such interest is allowable.

All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Reorganization Case) shall File and serve on the Reorganized Debtors an application for final allowance of compensation and reimbursement of expenses no later than thirty days after the Effective Date.

Subject to the bar date provisions of the Plan, the Reorganized Debtors shall pay each holder of an Priority Tax Claim against the Debtors on account of and in full satisfaction of such Allowed Priority Tax Claim, Cash equal to the amount of the Allowed Priority Tax Claim, on the later of: (a) the Effective Date, or (b) the date such Priority Tax Claim becomes and Allowed Priority Tax Claim, or, as soon thereafter as is practicable, except to the extent that the holder of an Allowed Priority Tax Claim agrees to different treatment.

E.      MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

1.      Generally.

The Debtors since June, 2009 have collected receivables and made payments out of a Congress Materials or Congress Sand & Gravel account in which all funds are received. All employees work for Congress Materials or Congress Sand. Upon confirmation of the Plan, the Debtors shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan including, without limitation, the execution and

filing of all documents required or contemplated by the Plan.

**2.      Continuation of Business.**

The Reorganized Debtors intend to continue the business operations of the Debtors with the modifications suggested and implemented by management.  The Debtors project due to their increased sales efforts, reduced cost structure and improved operational efficiencies, that they will see increases in sales and margin over the coming months, quarters,, and years which will enable Debtors to fund the payments under the Plan out of sales.

**3.      Status of Existing Liens of Allowed Secured Tax Claims.**

Unless otherwise provided in the Plan, on the Effective Date, all existing liens by the Holders of Allowed Secured Tax Claims on the Debtors' Property shall retain the same validity, priority and extent that existed on the Petition Date.  All other liens and encumbrances shall be deemed automatically canceled, terminated and of no further force or effect without further act or action under any applicable agreement, law, regulation, order, or rule. However, any asserted lien by or secured claims of the United States of America and/or the Internal Revenue Service based upon any pre-petition filings during the preference period shall be deemed void and shall not continue post-confirmation and shall not have any priority over the Exit Facility.

**4.      Vesting of Assets.**

As of the Effective Date, all Property of the Estates (including debtor-in-possession bank accounts, Cash held by any receiver, custodian or similar person or entity, Plan Funds, the Retained Claims and Causes of Action) shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances and other interests of Creditors and holders of Interests except those recognized by the Plan or court order.  From and after the Effective Date, the Reorganized Debtors may use, acquire, and dispose of Property and settle and compromise claims or interests without supervision by the Bankruptcy Court,  free of any restrictions of the

{00313909-7}

Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**5.     Binding Effect.**

Subject to the occurrence of the Effective Date, on and after the occurrence of the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or an Interest in any of the Debtors and such holder's successors and assigns, whether or not such holder's Claim or Interest is Impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

**6.     Discharge of Debtors.**

Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the treatment of the Claims and Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims against and Interests in the Debtors and the Debtors in Possession, their Property, or interests in Property of any nature whatsoever, including any interest accrued on any Claim from and after the Petition Date. Except as expressly otherwise provided herein or in the Confirmation Order, on the Effective Date, all Claims arising before the Effective Date (including those arising under Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code) against the Debtors and the Debtors in Possession (including any based on acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of any of the Debtors, or any conduct for which any of the Debtors may be deemed to have strict liability under any applicable law), shall be irrevocably satisfied, discharged, cancelled and released in full.

For the avoidance of doubt, the Reorganized Debtors shall be responsible only for (a) those payments and Distributions expressly provided for or due under the Plan and (b) Claims

and Interests that are not canceled and discharged pursuant to specific and express provisions of the Plan, and then only to the extent and in the manner specifically and expressly provided in the Plan. All Entities shall be precluded and forever barred from asserting against the Debtors, the Reorganized Debtors, or the Property, any Claims based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date, except for (a) the payments and distributions expressly provided for or due under the Plan and (b) Claims and Interests that are not canceled and discharged under the Plan pursuant to specific and express provisions of the Plan.

       **7.**       **Injunctions**

       Except as otherwise provided in the Plan or the Confirmation Order, and in addition to the injunction provided under sections 524(a) and 1141 of the Bankruptcy Code on and after the Effective Date, all persons who have held, currently hold or may hold a debt, Claim or Interest are permanently enjoined from taking any of the following actions on account of any such discharge of debt or Claim: (1) commencing or continuing in any manner any action or other proceeding against the Debtors, or the Reorganized Debtors; (2) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtors, or the Reorganized Debtors; (3) creating, perfecting, or enforcing any lien or encumbrance against the Debtors, or the Reorganized Debtors; (4) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtors, or the Reorganized Debtors; and (5) commencing or continuing any action in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Any person injured by any willful violation of such injunction may recover actual

{00313909-7}

damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.

In order to effectuate the Plan, no action may be taken by a holder of a Claim against a non-debtor co-borrower, co-maker, co-obligor, or guarantor of such Claim if the co-borrower, co-maker, co-obligor, or guarantor is also a manager, member, or officer of the Debtors or Reorganized Debtors, up to and through thirty (30) days after the fifth anniversary of the Effective Date of the Plan, provided however, that the Bankruptcy Court shall retain jurisdiction upon reopening of these Chapter 11 Cases to modify or terminate the stay in the event of a material default by the Reorganized Debtors in the performance of obligations under the Plan. The managers, members, and officers of the Debtors are essential to the operation of the Debtors and will be essential to the operation of the Reorganized Debtors, therefore a third-party action against such non-debtor co-borrowers, co-makers, co-obligors, or guarantors would have an adverse impact on the Debtors' ability to accomplish reorganization. However, this provision shall in no way apply to Presidential or the Exit Facility.

8.      **Exit Facility**

The Debtors shall enter into the Exit Facility with Presidential or other lender on the Effective Date and such Exit Facility (notwithstanding any other purported pre-petition liens on any assets of the Debtors) shall have (1) a senior priority lien on all accounts, accounts receivable, payment intangibles, instruments, chattel paper, investment property, deposit accounts, chattel paper, inventory, Congress Materials' leasehold interests, the Terex Truck, and any other assets not subject to a pre-petition lien and (2) a junior lien on any other assets subject to a pre-petition senior lien.  Presidential may require various conditions precedent to the Exit Facility, including various guaranties and other matters.  Presidential has not yet provided a

{00313909-7}

commitment to enter into an Exit Facility and the parties are negotiating specific terms. Presidential shall assign its pre-existing liens and lien filings to the provider of the Exit Facility and such liens shall be deemed and ordered to be effective, valid, and continuing.

## VI.  CORPORATE GOVERNANCE ISSUES AND RESTRICTIONS ON THE DEBTORS'S POST CONFIRMATION OPERATIONS

### A.  Restrictions on Distributions and Loans

None of the Debtors will be able to make a loan to any Insider nor shall any dividends be paid until the completion of all payments due under the Plan except that a distribution may be made to shareholders to the purpose of paying personal income tax attributable to profits made by the Debtors.

## VII.  EXECUTORY CONTRACTS

### A.  REJECTION

Each executory contract or unexpired lease of the Debtors that has not expired by its own terms before the Effective Date or previously been assumed by the applicable Debtor in Posses-sion pursuant to an order of the Bankruptcy Court, shall be assumed by the applicable Debtor as of the Effective Date pursuant to Sections 365 and 1123 of the Bankruptcy Code, except for any executory contract or unexpired lease (i) that is listed on a "Schedule of Executory Contracts and Unexpired Leases to be Rejected" (to be Filed on or before the day that is ten (10) days prior to the Confirmation Hearing), (ii) that has been previously rejected by the Debtor in Possession pursuant to an order of the Bankruptcy Court, (iii) as to which a motion for rejection of such executory contract or unexpired lease is filed prior to the Effective Date, (iv) that is deleted from the Schedule of Executory Contracts and Unexpired Leases to be Assumed, or (v) added to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" prior to the Effective

Date. The Debtors are additionally filing a "Schedule of Executory Contracts and Unexpired Leases to be Assumed."

**B.    ASSUMPTION**

Each executory contract or unexpired lease of the Debtors that is listed on the "Schedule of Executory Contracts and Unexpired Leases to be Assumed" is assumed in accordance with sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

There are six executory contracts that the Debtors have chosen to assume that are essential to their ongoing operations (the "Assumed Leases"). These include three leases on equipment and three leases of real property.

As for the personal property leases (equipment), the Debtors shall assume the lease of John Deere Credit for four John Deere 844K Loaders, and they shall separately assume the two leases of Congress Recycled for a 2006 Telsmith 3055 Jaw Crusher, a 2004 John Deere 744J and a 1995 John Deere 770BH Motor Grader. Any past due amounts owed under the Assumed Leases shall be payable in six equal monthly installments beginning 90 days after the Effective Date of the Plan. Any deficiencies owed to John Deere will be re-amortized over the term of the lease.

As to real property leases, the Debtors shall assume the three leases where their operating facilities are located. More specifically, the Debtors shall assume the lease of J&W Sand & Gravel for the Mosier Valley recycling facility and they shall assume the lease with City of Garland for the Garland recycling facility. The Debtors will also assume the lease with VCH Ranch, LP for the sand and gravel facility located in Kerens, Texas. On February 16th, 2011, the Debtors filed their *Motion for an Order Pursuant to Section 365(a) of the Bankruptcy Code Authorizing the Debtor to Assume Certain Leases of Nonresidential Real Property* [P-203] indicating their intent to assume these three leases.

The Debtors reserve the right at any time before the Effective Date to amend the Schedule of Executory Contracts and Unexpired Leases to be Assumed to: (a) delete any executory contract or unexpired lease listed on the Schedule, thus providing for its rejection or (b) add any executory contract or unexpired lease to the Schedule. The Debtors shall provide notice of any amendment of the Schedule to the party to the affected executory contract and unexpired lease and the Office of the U.S. Trustee.

The Debtors reserve the right at any time before the Effective Date to amend the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to: (a) delete any executory contract or unexpired lease listed on the "Schedule of Executory Contracts and Unexpired Leases to be Rejected", thus providing for its assumption under the Plan, or (b) add any executory contract or unexpired lease to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected", thus providing for its rejection under the Plan. The Debtors shall provide notice of any such amendment of the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to the party to the affected executory contract and unexpired lease and the Office of the U.S. Trustee.

### C. BAR DATE FOR FILING PROOFS OF CLAIM RELATING TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES REJECTED PURSUANT TO THE PLAN

Any Claims for damages arising from the rejection of an executory contract or unexpired lease must be filed within thirty (30) days after the Effective Date if the executory contract is rejected by the Plan or thirty (30) days after the date the Court enters an order rejecting an executory contract if the executory contract is not rejected pursuant to the Plan. If such Claims are not filed, such Claims will be forever barred and unenforceable against the Debtors,

Reorganized Debtors, and their Property, and the holders of any such Claims are barred from receiving any distributions under the Plan.

### D. EFFECT OF CONFIRMATION ORDER ON EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtors believe that certain cure amounts totaling approximately $250,000 remain due and owing. The Confirmation Order shall constitute a finding of fact and conclusion of law that there are no defaults of the Debtors, no Cure Payments owing (including that there is no compensation due for any actual pecuniary loss) other than as set out on the Schedule of Executory Contracts and Unexpired Leases or as provided for in Article VII, Section B of this Disclosure Statement.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections of all executory contracts and unexpired leases which are not assumed and assigned under the Plan as of the Effective Date, with the rejection effective as of the day before the Petition Date, as being burdensome and not in the best interest of the Estates. Any Claims for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed within thirty (30) days after the Effective Date or be forever barred and unenforceable against the Debtors, Reorganized Debtors, and their Properties, and barred from receiving any distribution under the Plan. The Debtors do not believe there are significant rejection claims.

## VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain U.S. holders of Claims and Interests.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published

administrative rules and pronouncements of the Internal Revenue Service (the "<u>IRS</u>"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section. Certain tax aspects of the Plan are uncertain due to the lack of applicable regulations and other tax precedent. The Debtors has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt.

TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND ANY INTERESTS ARE HEREBY NOTIFIED THAT (a) ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE, AND (b) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE PLAN.

HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT THEIR TAX ADVISOR TO DETERMINE THE AMOUNT AND TIMING OF ANY INCOME OR LOSS SUFFERED AS A RESULT OF THE CANCELLATION OF THE CLAIMS OR STOCK OPTIONS HELD BY SUCH PERSON, WHETHER SUCH INCOME OR LOSS IS ORDINARY OR CAPITAL AND THE TAX EFFECT OF ANY RIGHT TO, AND RECEIPT OF DEFERRED PAYMENT.

THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## IX.     LIQUIDATION ANALYSIS UNDER CHAPTER 7

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, if each Class of impaired Claims does not vote unanimously to accept the Plan, then the "best interests of creditors test" requires the Bankruptcy Court to find that the Plan provides to each holder of a Claim in each impaired Class a recovery on account of such holder's Claim that has a value at least equal to the value of the distribution that each such holder would receive if the respective Debtors was liquidated under Chapter 7 of the Bankruptcy Code. The Debtors firmly believes that creditors will receive as much or more under the Plan than in a Chapter 7 proceeding. In order to assist creditors in evaluating this, the Debtors have prepared the Liquidation Analysis attached hereto as Exhibit E.

Based upon Chiron Equities, LLC's analysis and experience in the industry, they believe that the forced liquidation values of the assets are below that of the total amount of secured creditors. The basis for this belief is knowledge of the industry, internal analysis of auction values at Ritchie Brothers Auctioneers and inevitably the real depreciation of the assets. The majority of the assets would have very little value to anyone outside of the concrete and asphalt recycling and quarrying business. Additionally, the current depressed state of the construction industry further diminishes the potential recoverable value upon liquidation of the assets. The major assets include heavy mining equipment, on and off road trucks, concrete

crushing equipment, and leases and permits. However, the leases are only valuable as a "going concern". The environmental and TCEQ permits associated with each facility also are only valuable as a going concern along with the leases and existing equipment. Therefore, liquidating the permits in their current state will not allow the Debtors to recover the most optimal value. Additionally, the secured indebtedness is approximately $8,594,500. Thus, Debtors believes liquidation would yield insufficient proceeds to fully repay the secured indebtedness and priority unsecured creditors. In a forced liquidation, unsecured creditors would receive no consideration for their claims.

No appraisal has been obtained valuing all of the assets, nor have the assets been marketed to test the fair market value of the assets.

## X.     CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.     VOTING AND OTHER PROCEDURES

A Ballot for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan. Each holder of a Claim in Classes 2, 3, 4, 5, 6, 9, 11, 12, 14, 15, 16, 17, 19, 20, 21, 22, and 23 shall be entitled to vote to accept or reject the Plan.

Deleted: 7,

Deleted: 10,

Deleted: 18,

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes of claims that are impaired under the terms and provisions of a Chapter 11 plan and are to receive distributions thereunder are entitled to vote to accept or reject the plan.  Classes of claims in which the holders of claims and interests will not receive or retain any property under a Chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.  Classes of claims in which the holders of claims or interests are Unimpaired under a

Chapter 11 plan are deemed to have accepted the plan and also are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) claims, as acceptance by creditors actually voting in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims; and (ii) Interests, as acceptance by interest holders in that class actually voting that hold at least two-thirds in number of the shares of the common stock of a Debtors.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or otherwise in accordance with the provisions of the Bankruptcy Code.

With respect to the Plan, any holder of a Claim in an Impaired Class (i) whose Claim has been listed by the Debtors in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), or (ii) who filed a proof of claim on or before the applicable bar date (or, if not filed by such date, any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim has not been disallowed and is not the subject of an objection, is entitled to vote. Holders of Claims that are disputed, contingent and/or unliquidated are entitled to vote their Claims only to the extent that such Claims are allowed for the purpose of voting pursuant to an order of the Bankruptcy Court. The Debtors may seek a determination that any Class of Claims that is entitled to vote to accept or reject the Debtors' Plan that does not vote to accept or reject the Debtors' Plan be deemed to accept the Plan, as applicable.

After carefully reviewing this Disclosure Statement, including any exhibits, each holder of an Allowed Claim entitled to vote may vote whether to accept or reject the Debtors' Plan. A

Ballot for voting on the Plan accompanies this Disclosure Statement. If you hold a Claim or in more than one Class and you are entitled to vote Claims in more than one Class, you may receive a Ballot or Ballots, which will permit you to vote in all appropriate Classes of Claims. Please vote and return your Ballot to Heller, Draper, Hayden, Patrick & Horn, LLC ("Voting Agent") as follows, whether by U.S. mail, or by hand delivery or courier service:

**Heller, Draper, Hayden, Patrick & Horn, LLC**
**Attention: Douglas S. Draper**
**650 Poydras Street, Suite 2500**
**New Orleans, LA 70130**
**Date to be inserted**

BALLOTS OF HOLDERS OF IMPAIRED OR INTERESTS THAT ARE SIGNED AND RETURNED, BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN, WILL BE COUNTED AS BALLOTS FOR ACCEPTANCE OF THE PLAN. BALLOTS RETURNED TO THE HELLER, DRAPER, HAYDEN, PATRICK, & HORN, LLC BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS WILL NOT BE COUNTED.

**THE VOTING DEADLINE IS**
**5:00 P.M., CENTRAL**
**TIME ZONE, ON**
**_____, 2011.**

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. ALL CREDITORS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

{00313909-7}

**Ballots must be** *received* **by Heller, Draper, Hayden, Patrick, & Horn, LLC by the Voting Deadline.** If a Ballot is received after the Voting Deadline, it will not be counted. Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail, overnight courier or personal delivery to Heller, Draper, Hayden, Patrick, & Horn, LLC at the address set forth above.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

ANY OBJECTIONS TO THE CONFIRMATION OF THE PLAN MUST BE FILED IN ACCORDANCE WITH AND NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

If you are entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please telephone the Voting Agent at the following telephone number: **1-504-299-3300**.

B.       **DISCLAIMERS AND ENDORSEMENTS**

This Disclosure Statement contains information about the Debtors' Plan. Holders of Claims are urged to study the text of the Plan carefully to determine the impact of the Plan on their Claims and to consult with their financial, tax and legal advisors.

Nothing contained in this Disclosure Statement or the Plan will be deemed an admission or statement against interest that can be used against the Debtors in any pending or future litigation. Any reference to creditors or Claims in this Disclosure Statement is not an admission with respect to the existence, ownership, validity, priority, or extent of any alleged Lien, Claim, or encumbrance.

{00313909-7}

61

Certain statements and assertions in this Disclosure Statement may be subject to dispute by parties in interest.

## C.     THE CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing with respect to the Plan.  The Confirmation Hearing in respect of the Plan has been scheduled for the date and time set forth in the accompanying notice before the Honorable Judge Stacy Jernigan, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Texas.   The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing or posted at the courthouse at the Confirmation Hearing or at an adjournment thereof.  Any objection to confirmation (i) must be made in writing, (ii) must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest in the Debtors held by the objector, and (iii) must be timely made.  Any such objections must be filed with the Bankruptcy Court and served so that they are received by the Bankruptcy Court, and the following counsel, on or before the date and time set forth in the accompanying notice:

**Counsel to the Debtors**:

Heller, Draper, Hayden, Patrick, & Horn, LLC
Douglas S. Draper, La. Bar Roll No 5073
650 Poydras Street, Suite 2500
New Orleans, LA  70130-6103
Telephone: (504) 299-3300
Fax: (504) 299-3399

## D.     CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are met.  Among the requirements for

{00313909-7}

confirmation of a plan are that the plan is (i) accepted by all Impaired Classes of Claims or, if rejected by an Impaired Class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of creditors that are Impaired under the Plan.

### E.  UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS

Under the Bankruptcy Code, a plan does not have to be accepted by every class of creditors or interest holders to be confirmed.  If a class of claims rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to Section 1129(b) of the Bankruptcy Code -- the so-called "cram down" provision of the Bankruptcy Code.  Section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims and interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class, and meets the other legal criteria for confirmation.

In the event that any Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtors reserves the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, and/or (b) modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

Accordingly, to obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cram down" tests for Classes of Secured Claims, unsecured Claims and Interests that do not accept the plan, as follows:

1. **Secured Creditors**

Either (a) each Impaired Secured creditor retains the Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments (x) totaling at least the Allowed Amount of the Secured Claim and (y) having a present value at least equal to the value of the Secured creditor's collateral, (b) each Impaired Secured creditor realizes the "indubitable equivalent" of its Allowed Secured Claim, or (c) the property securing the Claim is sold free and clear of Liens with the Secured creditor's Lien to attach to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (a) or (b) of this subparagraph.

2. **Unsecured Creditors**

Either (a) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the plan, and the "best interest" test is met so that each Impaired unsecured creditor recovers at least what that creditor would receive if the case was converted to a Chapter 7 case.

3. **No Unfair Discrimination**

In addition, the "cram down" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the claims of any impaired, non-accepting class. While the "unfair discrimination" determination depends upon the particular facts of a case and the nature of the claims at issue, in general, courts have interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the Debtors of equal or junior status.

The Debtors believes that the treatment of all Classes of Claims and Interests under the Plan satisfies the "no unfair discrimination" requirement for nonconsensual confirmation of the

Plan under section 1129(b) of the Bankruptcy Code. With respect to each such Impaired, non-accepting Class, there is no Class of equal priority receiving more favorable treatment under the Plan, and no Class that is junior to such Impaired, non-accepting Class will receive or retain any property under the Plan on account of the Claims or Interests in such Class.

### F.    FEASIBILITY

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the Debtors is provided for in the plan. The Debtors' pro-forma is attached as <u>Exhibit F</u>.

The Debtors believes that its respective Plan is feasible. The Historical Financial Information (<u>Exhibit "G"</u>) reflects that the Debtors have had significant revenues before interest, taxes, depreciation, and amortization. In addition, the Pro forma Financial Projections are consistent with adjusted historical results. Congress or an affiliate will pay the funds needed for Plan payments, including any amounts due at the Effective Date, from funds from operations and/or from equity contributions or financing.

### G.    BEST INTEREST TEST

In order to confirm a plan of reorganization, the Bankruptcy Court must determine that the plan is in the best interests of all classes of creditors and equity security holders impaired under that plan. The "best interest" test requires that the Bankruptcy Court find that the plan provides to each member of each impaired class of claims and interests (unless each such member has accepted the plan) a recovery which has a value at least equal to the value of the distribution that each creditor or interest holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

Classes 2, 3, 4, 5, 6, 9, 11, 12, 14, 15, 16, 17, 19, 20, 21, 22, and 23 will receive distributions or retain collateral under the Plan, and are entitled to vote to accept or reject the

**Deleted:** 7,

**Deleted:** 10,

**Deleted:** 18,

{00313909-7}

Plan. The Debtors request confirmation of the Plan over the rejection of any Classes. In so doing, the Debtors seeks to establish that the Plan complies with the best interest of creditors test with respect to any such Class or Classes, and satisfy all other legal criteria for confirmation.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis attached to this Disclosure Statement as <u>Exhibit E,</u> the Debtors believes that the Plan provides to each holder of a Claim and Interest holder a value at least equal to the value of the distribution that each holder would receive if the Debtors was liquidated under Chapter 7 of the Bankruptcy Code.

In the event of Chapter 7 liquidation, the Bankruptcy Code would provide for priorities of payment. The first priority of payment would be Administrative Claims. Those would consist of the attorneys' fees and accountants' fees for the Debtors, professional fees and compensation for the Trustee, the post-petition amounts accrued and due to Presidential, as well as the post-petition ad valorem taxes, the total of which are estimated in aggregate to be $750,000. Payment of these fees in the context of Chapter 7 liquidation could be problematical and potentially unavailable.

Thereafter, under Chapter 7 liquidation, a secured creditor would receive its collateral. Based on the Liquidation Analysis in Section IX, there are not currently enough assets to repay all that is owed to all of the secured creditors and administrative claimants. Further, the Debtors' projections show that the Plan could repay the unsecured creditors in substantial sums in the future and in liquidation, the unsecured creditors could receive nothing. Based upon the foregoing, the Debtors believe that its Plan is a far superior alternative than a Chapter 7 liquidation for all creditors of its respective Estate.

Other alternatives to liquidation under Chapter 7 are (i) the dismissal of the bankruptcy case, or (ii) the proposal and acceptance of an alternative plan of reorganization. If the bankruptcy case were dismissed, the Debtors would no longer have the protection of the Court and the applicable provisions under the Bankruptcy Code. Dismissal would force a race among creditors to foreclose and liquidate the Debtors' assets. In the event of dismissal, the Unsecured Creditors would likely fail to realize any recovery. At this time, there has been no alternative plan suggested by any party.

In addition, it should be noted that the greatest asset of the Debtors besides the equipment is the real property leases. The value of the assets is substantially higher with the Debtors operating as going concerns, and it is believed that their value on a purely liquidation basis is not worth the amount of the Debtors' indebtedness. In the event of a liquidation, it is believed that the unsecured creditors would likely recover nothing for their claims (see Exhibit E).

## H. CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND THE IMPLEMENTATION OF THE PLAN.

The Debtors' Plan is dependant upon the Debtors' receipt of an exit loan from Presidential. The Debtors believe that it will receive the exit loan and has been in discussions relative to the terms of the exit loan.

{00313909-7}

Triumph Savings Bank contends the Plan as filed violates the absolute priority rule embodied in Section 1129(b)(2)(B) of the Bankruptcy Code. To the extent that section is applicable to the confirmation hearing and the Court holds that the absolute priority rule applies, the Plan will not be confirmed as written.

## I.    CERTAIN BANKRUPTCY CONSIDERATIONS

### 1.    Risk of Liquidation of the Debtors' Estates

If the Plan is not confirmed and consummated, there can be no assurance that the Debtors' Chapter 11 Case will continue as Chapter 11 reorganization case rather than be converted to liquidation, or that any alternative plan of reorganization would be on terms as favorable or more favorable to holders of Claims as the terms of the Plan. If a liquidation or different reorganization were to occur, the distributions to certain holders of Allowed Claims may be reduced, or possibly completely eliminated. As previously noted, the Debtors believes that in a liquidation under Chapter 7, additional administrative expenses of a Chapter 7 trustee and such trustee's attorneys, accountants, and other professionals, would cause a diminution in the value of the Debtors' Estates. In addition, certain additional Claims may arise in a Chapter 7 liquidation and from the rejection of unexpired leases and other executory contracts in connection with any cessation of the Debtors' operations. As described above, this might negatively impact the amount of distributions under the Plan, if any, to holders of Allowed Claims. As a result of these circumstances, the Debtors believe that the Plan provides a significantly higher return to holders of Claims against the Debtors, as compared to Chapter 7 liquidation.

Even if the Plan is confirmed, if the Debtors are unable to consummate or perform, the Debtors may be liquidated.

{00313909-7}

2.      **Uncertainty Regarding Objections to Claims**

The Plan provides that certain objections to Claims can be filed with the Bankruptcy Court after the Effective Date.  A creditor may not know that its Claim will be objected to until after the Effective Date.

3.      **Performance of Obligations by the Reorganized Debtors under the Plan**

Although the Debtors and the Reorganized Debtors believe that the Reorganized Debtors can successfully perform all of its obligations under the Plan, there can be no assurance that the Reorganized Debtors will do so.  This could result in a subsequent bankruptcy, and possible liquidation, of the Reorganized Debtors.  Performance by the Reorganized Debtors is largely dependent upon the management of the Debtors and the state of the infrastructure and commercial construction markets in Dallas-Fort Worth.

## XI.      CONCLUSION AND RECOMMENDATION

The Debtors believes that confirmation and implementation of the Plan is preferable to any alternative.  In addition, any other alternative would involve significant delay, litigation, uncertainty, substantial additional administrative costs, and may result in the Debtors' liquidation under Chapter 7. The Debtors urge holders of Impaired Claims against the Debtors to vote in favor of the Plan.

**Dated: March 1, 2011**

Deleted: February 28

**DISCLOSURE STATEMENT FILED BY:**

/s/ Douglas S. Draper
DOUGLAS S. DRAPER, (Bar #5073)
**Heller, Draper, Hayden, Patrick & Horn, L.L.C.**
650 Poydras Street, Suite 2500

{00313909-7}

New Orleans, Louisiana 70130
Telephone:  504-299-3300
Facsimile:  504-299-3399
*Attorneys for Debtors*
Congress Materials, LLC

**EXHIBITS B AND C**

**[TO BE SUBMITTED]**